EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973c
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
FAX: (619) 233-3221
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF MICHAEL
WILSON by and through its
successor-in-interest PHYLLIS
JACKSON, and PHYLLIS
JACKSON,

   Plaintiffs,

v.

COUNTY OF SAN DIEGO,
WILLIAM GORE in his individual
capacity, ALFRED JOSHUA, in his
individual capacity, BARBARA
LEE, in her individual capacity, and
DOES 1-100

   Defendants.

CASE NO. **'20CV0457 JLS  LL**

## COMPLAINT

**(1) Deliberate Indifference to Serious
  Medical Needs (42 U.S.C. §1983)**
**(2) Right of Association (42 U.S.C.
  §1983)**
**(3) Failure to Properly Train (42
  U.S.C. §1983)**
**(4) Failure to Properly Supervise and
  Discipline (42 U.S.C.§1983)**
**(5) *Monell* (42 U.S.C. §1983)**
**(6) Wrongful Death**
**(7) Negligence**
**(8) Violation of 42 U.S.C. §12101 et
  seq. (ADA)**
**(9) Violation of 29 U.S.C. §794(a)
  (Rehabilitation Act)**

## JURY TRIAL DEMANDED

COME NOW, the ESTATE OF MICHAEL WILSON by and through its successor-in-interest PHYLLIS JACKSON, and PHYLLIS JACKSON, by their attorneys of record, and allege and complain as follows:

## I.
## INTRODUCTION

At the time of his death, Michael Wilson was 32 years old. He had suffered from hypertrophic cardiomyopathy since he was three months old. Due to his heart problem, he regularly took medication that allowed him to live unhindered by his diagnosis.  Without medication, Michael's lungs would fill with fluids, causing a medical emergency.  Medical and correctional staff at San Diego Central Jail failed to provide proper medication to Michael.  Michael's family members notified the Jail staff that Michael needed medical attention and that Michael was experiencing breathing problems.  Instead of providing Michael his medication to manage his potentially fatal heart condition, the Medical staff gave him cough syrup.

On February 14, 2019, Michael collapsed in his cell. He was transported to UCSD Medical Center where further resuscitation efforts were also unsuccessful. The autopsy report reflects that Michael's lungs were twice the normal size and that he died from heart failure.

## II.
## GENERAL ALLEGATIONS

1.      Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343(3) and (4), *et. seq*.

2.      Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District.

3.      At all times relevant to this complaint, decedent Michael Wilson was an individual residing in San Diego County, California.

4.    Phyllis Jackson, Decedent's mother, is the successors-in-interest of the Estate of Michael Wilson. This action on behalf of the Estate of Michael Wilson is brought through Plaintiff, the mother Michael Wilson, as the successor-in-interest.

5.    No proceeding for the administration of the estate is pending and Ms. Jackson is the successor in interest under California law and succeeds to the decedent's interest. There is no other person with a superior right to commence the action.

6.    Phyllis Jackson brings this action in her own right, as well, for the loss of her son, Michael.

7.    Plaintiffs Estate of Michael Wilson and Phyllis Jackson have properly complied with the Government Claim Act.  Their claims were submitted to the County of San Diego on August 12, 2019.

8.    The County of San Diego rejected Plaintiffs' claims on September 19, 2019.

9.    Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Diego operates and manages the San Diego Central Jail, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Central Jail, and its respective employees and/or agents.

10.    Defendant William Gore was, at all relevant times, the Sheriff of the County of San Diego, the highest position in the San Diego County Sheriff's Department. As Sheriff, Defendant Gore was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff and Doe Defendants.

11.    At all times relevant to this complaint, Defendant William Gore was a policy-maker for the San Diego Sheriff's Department (hereinafter "Sheriff's") and responsible for promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sheriff's Department alleged herein were committed, as well as the supervision and control of officers who are or were employed by the Sheriff's, who are under his command and/or who report to him, including the Defendants to be named.

12.    At all times relevant to this complaint, Defendant Barbara Lee was the Medical Administrator for the Sheriff's Department.  She supervised the medical and nursing staff.  She directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures.

13.    Defendants Joshua, Lee and Gore are sued in their individual capacity for their own personal actions or inaction for supervisory liability.

14.    At all times relevant to this complaint, all individual defendants and Does were San Diego sheriff deputies or medical personnel and agents of Defendant County of San Diego; and/or agents or contractors authorized to work at the San Diego Central Jail.

15.    San Diego Central Jail is owned and operated by County of San Diego and staffed by County of San Diego Sheriff's deputies.

16.    Plaintiffs are truly ignorant of the true names and capacities of Does 1 through 100, inclusive, and/or is truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

17.    These defendants were agents, servants and employees of each other of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants and each of the defendants had approved or ratified the actions

- 3

of the other defendants thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

### III.
### FACTS

18.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

19.    At the time of his death, Michael Wilson was 32 years old.

20.    Michael has had hypertrophic cardiomyopathy since he was three months old.

21.    Hypertrophic cardiomyopathy can cause shortness of breath, chest pain, fainting, heart palpitations, heart murmurs, an irregular and rapid heart rate known as atrial fibrillation, mitral valve problems that caused blood to flow backward into his heart, heart failure, and sudden cardiac death.

22.    Hypertrophic cardiomyopathy is a treatable condition. When treated with medication and/or a pacemaker, an individual diagnosed with hypertrophic cardiomyopathy will have a normal lifespan.

23.    Michael treated his hypertrophic cardiomyopathy by getting a pacemaker and taking medications, such as Digoxin, Lisinopril, and potassium chloride. Digoxin strengthens the heart by making it beat stronger and with a more regular rhythm. Lisinopril treats high blood pressure, and potassium chloride increases blood levels of potassium.

24.    Jail staff did not give Michael his heart medication.

25.    Michael started to have difficulty breathing.

26.    The intake staff at the Central Jail knew that Michael suffered from hypertrophic cardiomyopathy.

27.    Michael was supposed to be monitored in the Medical Unit.

28.    Per the Court's order, Michael was to be monitored in the Medical Unit specifically because of his potentially serious medical condition.

29.    Phyllis Jackson noticed  during a telephone call that Michael had trouble breathing. Ms. Jackson notified Defendant Doe, an official at the Central Jail, of Michael's difficulty breathing. She told Defendant Doe that Michael would die if he was not taken to a hospital because his lungs were filling up with liquid.

30.    Does were on notice that Michael needed medical attention, but they failed to call for medical staff or anyone from the Medical Unit.

31.    Other members of Michael's family called the Medical Unit of the Jail to alert them and warn them of Michael's worsening condition.

32.    Ms. Jackson and other members of Michael's family notified that Jail staff that Michael needs to go to the hospital to avoid sudden cardiac death.

33.    These calls were ignored.

34.    On February 14, 2019, Michael collapsed. The jail staff began resuscitation efforts and transported him to UCSD Hospital where resuscitation efforts continued. These resuscitation efforts failed, and Michael died.

35.    The Medical Examiner determined that Michael died from sudden cardiac death due to acute congestive heart failure that was caused by his hypertrophic cardiomyopathy.

36.    According to the autopsy report, Michael's lungs were twice the average size, indicating that they filled with liquid as Phyllis Jackson predicted.

37.    Michael's hospital lab results were negative for any alcohol, amphetamines, opiates, methadone, barbiturates or cocaine.

38.    Despite the fact that Michael was not provided with his medication and had difficulty breathing, no medical staff tended to Michael.

39.    He received no medication for his hypertrophic cardiomyopathy.

40.    Michael was instead given cough syrup.

41.    All corrections staff worked under the direction and supervision of Defendant Gore, who set the policies and procedures with respect to housing and security.

- 5

42. All medical staff worked under the direction and supervision of Doe and Lee, who set the policies and procedures with respect to medical services.

43. There had been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails.

44. There had been a systemic failure in San Diego County to investigate incidents of medical neglect, staff misconduct, and deaths in the Jail.

45. San Diego County officials, including Defendant Doe, were aware of the systemic problems with preventable deaths in the jails, but took no action to prevent further Constitutional violations.

46. At the time of Michael Wilson's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

47. Defendants were well aware of these problems before Michael's death.

**Notice of Previous Deaths and Injuries as a Result of Neglect and Misconduct**

48. Deaths of sixty (60) inmates in the San Diego County jails in a span of five (5) years prompted a series of articles by Citybeat, a local newspaper. Citybeat reported that San Diego County had the highest mortality rate among California's largest jail systems based on data from 2007 to 2012.

49. Other than to dispute the methodology Citybeat used (one used by the Department of Justice) to determine that San Diego had the highest mortality rate, the County of San Diego took no action to review its practices.

50. In 2019, after the Union-Tribune published a series of articles titled "Dying Behind Bars" showing that San Diego's jail death rate significantly exceeds the rate in California's five other largest counties, Sheriff Gore wrote an explanation that the statistics were wrong because it did not account for counties that have city lockups.

51.     The Union Tribune then reviewed the death rates of inmates in California using the Department of Justice statistics from 2009 to 2018, taking into account deaths in city lockups.  The UT published the following statistics:

**Mortality rate with city deaths**

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|---|---|---|---|
| **San Diego** | **5,211.9** | **12.8** | 245.6 |
| Los Angeles | 17,060.6 | 30 | 175.8 |
| San Bernardino | 5,643.5 | 8.9 | 157.7 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 8.1 | 136.6 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

**Mortality rate without city deaths**

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|---|---|---|---|
| **San Diego** | **5,211.9** | **12.7** | 243.7 |
| Los Angeles | 17,060.6 | 25.5 | 149.5 |
| San Bernardino | 5,643.5 | 8.8 | 155.9 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 7 | 118.1 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

Source: California Department of Justice                                    U-T

52.     No matter which data was used, San Diego County had the highest death rate.

53.     According to the state Department of Justice data, The San Diego County death rate over the past 10 years was 50 percent higher than Los Angeles County's and two-and-a-half times the Orange County rate.

54.    There had been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct.

55.    At the time of Michael Wilson's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

56.    County Defendants were aware of the following examples of failure to coordinate and share critical medical information among personnel, such as the following:

a.    Between 2007 and 2012, there were eight deaths in San Diego's jails that were drug related.  They were either overdoses or physical complications due to withdrawal.  Richard Diaz, a 40-year-old addict, died from a stomach obstruction after three days of seizures and vomiting due to heroin withdrawal. Had jail staff not failed to communicate Diaz's serious medical state, he would still be alive.

b.    In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who had threatened to kill himself multiple times, CLERB expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing."   The County rejected this recommendation.

c.    On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a fellow inmate found him.  The jail staff had failed to monitor him despite his exhibiting signs of withdrawal and his vomiting in his cell due to the lack of communication between staff.

d.    In September 2012, Bernard Victorianne suffered for five days from drug overdose because the staff ignored his medical information that

he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose. Bernard Victorianne was placed in segregation instead of Medical, where he was found dead face-down, naked in his cell. Staff had failed to input critical medical information in the JIMS system. Staff had failed to communicate with each other Mr. Victorianne's medical alerts which required that the staff report symptoms of overdose and take him immediately to the hospital.

e. In 2014, former U.S. Marine Kristopher NeSmith committed suicide after the jail staff failed to treat Mr. NeSmith for his significant and known mental illness and a history of suicide attempts. When Mr. NeSmith was last seen alive about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety throughout the detention center. The deputy, without breaking stride, said something to the effect of, "NeSmith, what are you trying to do? Kill yourself? Take that thing down." This deputy failed to communicate this information to other jail staff. No other jail staff took any further action. Mr. NeSmith was later found dead, having hung himself.

f. In 2014, Ronnie Sandoval died in the Jail from drug overdose. Mr. Sandoval showed obvious symptoms of overdose, sweating profusely and disoriented. The corrections staff told the nursing staff that Mr. Sandoval needed medical treatment, two of them stating that Mr. Sandoval was withdrawing from drugs. The nursing staff did not summon help or treat him for overdose. The nurses failed to pass down information regarding Mr. Sandoval's condition during the shift change. Mr. Sandoval died from drug intoxication.

g. In 2014, Jerry Cochran, a known diabetic, was arrested after mumbling gibberish on the street. At the time of his arrest, Mr. Cochran was wearing his medical ID bracelet with an alert for diabetes, but his condition was not communicated. At the Jail, he fell face-forward off a bench. Mr. Cochran died from diabetic ketoacidosis, a condition caused by an insulin shortage that is rarely fatal if treated properly.

h. In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to

- 9

treat a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS. One of the psychiatrists testified that she did not know how to use JIMS to add "alerts", meaning the most critical information regarding a patient's care. She testified that she was never trained.

i. Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse noted in Mr. Nunez's chart:

"Informed I/P that he will seen [sic] by psych for f/u
   Exercise as tolerated and ***drink plenty of water***
 I/P verbalizes understanding and agrees to plan."
                    (Emphasis added).

This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank. According to one of the nursing staff, the intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once. The intake nurses only have sufficient time to look to whether the Jail will book he person into jail.

j. In 2016, Heron Moriarty was arrested after having a psychotic break. Despite multiple warnings by family members, including 28 telephone calls by his wife, the Jail staff failed to communicate his condition and failed to provide him psychiatric care. On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself.

k. In 2016, Jason Nishimoto killed himself with a bedsheet on his fourth night in Jail, the evening before he was scheduled to see a psychiatrist. His psychiatric condition was well known to the Jail staff, who ignored it.

l. In January 2018, Frankie Greer, a United States veteran with a seizure disorder was placed on a top bunk as a result of the failure of staff to communicate his bottom bunk requirement. Mr. Greer suffered a seizure that same night and fell to the cement floor onto his head. The corrections staff ignored the desperate calls of his cell mates through

the emergency panic button and did not respond for another 15 minutes. As a result, Mr. Greer went into a coma and suffered catastrophic injuries, including a life altering brain injury.

57.    These are just a few examples of the customs and/or policies of the Sheriff's Department which sent the message to staff that negligence, dishonesty, and improprieties will be tolerated by the Department, even when a death results.

58.    The County and its officials were well aware of the problems of the jail staff failing to use JIMS. The Grand Jury took issue with the Jail Information Management System (JIMS), a database used for maintaining inmate records. According to jail staff who commented to jurors for the report, the staff have trouble sorting and retrieving information and the eleven-year old software was in need of an update. See https://www.nbcsandiego.com/investigations/Grand-Jury-Report-Criticizes-San-Diego-County-Jail-Facilities-381590761.html

59.    The Jail staff did not know how to use JIMS, the only system used in the Jails to communicate the medical needs of inmates. The medical staff did not know how to use JIMS to input critical information and they had not been trained on how to use JIMS to obtain patient information.

60.    Jail nurses had complained to the supervisors, including Lee, that they did not have sufficient time to read, to understand or to document patient information during booking.

61.    On November 8, 2016, the San Diego Sheriff's Department contracted for assistance regarding compliance with the NCCHC Standards for Health Services in Jails.

62.    In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails. Of the 38 "essential standards" all of which must be met in order to attain accreditation, the Central Jail failed to meet 26 standards.

63.    NCCHC found that the Jails were failing to review inmates' deaths in a timely manner.

64.   Health care providers were not being informed of any results of death reviews.

65.   NCCHC found that there was no formal peer review process for contract medical providers or for nurses.

66.   NCCHC found that the inmate grievances were hard to track and that it was difficult to count the number of medical grievances.  When an inmate filed a grievance related to medical issues, the health care staff would not maintain it in Medical's database.  Because all grievances are kept in the same central database with no ability to sort, health related grievances filed per month or year were not available.

67.   NCCHC found that there was no central log of training of correctional officers in health-related topics.  Verification of participation were kept only in the individual officer's files.

68.   NCCHC found that there was no policy addressing the time frame between ordering medication and receiving from the pharmacist.  NCCHC found that some essential medications are delayed due to the length of the booking process.

69.   NCCHC found that it can take up to 30 hours to complete booking an inmate into the Jail without the inmate being evaluated by health staff.

70.   NCCHC found that nurses were routinely taking a stock bottle to administer to patients without taking the patients' medication administration record with them to keep track.

71.   NCCHC found "There is no safety check for names or allergies or which medications are to be administered at that time. This is actually dispensing and only pharmacists and providers may dispense. This violation of nursing practice is serious and a violation of the Nurse Practice Act. A change to individual patient-specific or individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no

inventory control practice for medications (order and delivery) that are ordered, which medications are delivered, and when a medication container is empty."

72.     NCCHC found that missing in the screening form was the "disposition" of the inmate, which would communicate to the next health care provider where the patient would be housed.

73.     NCCHC advised, "we confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient."

74.     The County's investigative body, CLERB, which has the responsibility to investigate all in-custody deaths, had just three paid employees: an executive officer, an investigator, and an administrative assistant.

75.     CLERB consists of eleven volunteers, who are not required to have previous special training or experience in investigations, or any other relevant topics related to jail operations, Constitutional requirements or law.

76.     CLERB members are appointed by the County Board of Supervisors.

77.     CLERB does not control its budget.  It cannot hire investigative staff itself, even when required to complete its work.

78.     While CLERB has the authority to annually inspect county adult detention facilities and annually file a report of such visitations together with pertinent recommendations on issues including detention, care, custody, training and treatment of inmates, CLERB has never inspected a single jail facility in the 25 years of its existence.

79.     By October of 2017, CLERB had 59 open in-custody death investigations, including a death going back six years.

80.     On November 11, 2017, CLERB announced that it was summarily dismissing 22 death cases without review.  CLERB dismissed these cases based on a one-year time limitation for imposing officer discipline for misconduct.  This is

despite the fact that CLERB has publicly stated that "death cases and other complex investigations often take more than one year to complete."

81.    The County does not authorize or allow CLERB to investigate the misconduct of the Jail's medical staff.

82.    There is no mechanism for an independent investigation of the misconduct of the medical staff.  The County does not empower CLERB to investigate or propose discipline for the misconduct of any medical staff no matter how egregious.

83.    CLERB is not authorized to investigate medical staff even in cases of Catastrophic injuries or death.  There is no independent review of the medical staff by any outside agency even when the misconduct or negligence leads to serious injury or death.

84.    Michael Wilson was a disabled individual suffering from hypertrophic cardiomyopathy that substantially limited one or more major life activities. Michael Wilson was a "qualified individual with a disability" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

85.    The County of San Diego are "public entities" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

86.    It was well documented that Michael Wilson was diagnosed with hypertrophic cardiomyopathy.

87.    Defendants denied Michael Wilson benefits of the services, programs or activities of the County of San Diego and the San Diego County Jail because of his disability and subjected him to discrimination.

## FIRST CAUSE OF ACTION
### (Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983))
### [By the Estate of Michael Wilson Against Does 1-50]

88.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

- 14

89.     Defendants violated Michael Wilson's Fourteenth Amendment right to medical care.

90.     Defendants knew that Michael Wilson faced a serious medical and mental health need.

91.     Defendants were made aware that Michael suffered from hypertrophic cardiomyopathy and that he needed medication to treat it.

92.     Defendants were also made aware that Michael was in a serious medical condition because Phyllis Jackson, Michael's mother, and other family members notified them that Michael was having difficulty breathing.

93.     Defendants were deliberately indifferent to a known and serious medical need.

94.     Defendants failed to properly communicate to other medical and security staff the necessary medical information so that Michael would receive medical attention.

95.     Defendants ignored the obvious signs of medical distress.  Defendants failed to provide proper medication as Michael's lungs were filling up with fluids.

96.     Defendants failed to transport him to the hospital despite repeated warnings by family members that Michael may die without medical intervention.

97.     Defendants were deliberately indifferent to Michael Wilson's serious medical need, which caused harm to the decedent.

98.     By failing to communicate Michael Wilson's serious medical state when he had trouble breathing, Defendants Doe were deliberately indifferent to Michael's serious medical need.

99.     As a direct consequence of Defendants Doe's failures, Michael's serious medical condition was ignored and the staff failed to communicate critical medical information.  As a result, Does 1-50 never communicated Michael's critical condition to the jail staff; never referred Michael for diagnosis or treatment; never provided medication.

100.   As a direct and proximate result of all Defendants' deliberate indifference to Michael Wilson's serious medical need, Michael experienced physical pain, severe emotional distress, and mental anguish for days, as well as loss of his life and other damages alleged herein.

101.   The conduct alleged herein caused Michael Wilson to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Michael Wilson to suffer emotional distress, pain and suffering and further damages according to proof at the time of trial.

102.   The conduct alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights; justifying the award of exemplary damages against defendants in an amount according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiff is also entitled to attorney fees and costs of suit herein.

## SECOND CAUSE OF ACTION
### (Right of Association (42 U.S.C. §1983))
### [By Plaintiff Phyllis Jackson against Defendant Does 1-50]

103.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

104.   Defendants deprived Michael Wilson of his rights under the United States Constitution to be free denial of medical care and denial of due process.

105.   The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to serious medical needs, health, and safety, which caused the untimely and wrongful death of Michael Wilson; violating Michael Wilson's civil rights; and deprived Plaintiff Phyllis Jackson of her liberty interest in the

parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

106.    There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in medical distress.  Defendants' actions shock the conscience.

107.    The deprivation of the rights alleged above has destroyed the Constitutional rights of Michael Wilson's mother, Phyllis Jackson, to the society and companionship of their son which is protected by the substantive due process clause of the Fourteenth Amendment.

108.    The conduct alleged herein violated Michael Wilson's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiffs to suffer emotional distress, pain and suffering, and further damages according to proof at the time of trial.

### THIRD CAUSE OF ACTION
### (Failure to Properly Train (42 U.S.C. § 1983))
### [By the Estate of Michael Wilson against Gore, Lee, Joshua, and Supervisory Doe Defendants 51-100]

109.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

110.    Defendants Gore, Lee, Joshua and supervisory Does failed to properly train defendant Doe deputies and medical staff in the performance of their duties. They failed to properly train their subordinates on how to deal with inmates in medical distress.

111.    Defendants failed to properly train their employees with regard to the need to communicate critical medical information to jails that would house their patients.

- 17

112. As a result of Defendants' failures to train their officers, Michael's medical condition was not properly communicated to the jail staff. Michael Wilson's death was a foreseeable consequence of Defendants' failures.

113. Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Michael Wilson and other persons similarly situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

114. Defendants have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates; and to prevent the consistent and systematic failure to provide medical care.

115. Despite repeated Constitutional violations, Defendants failed to train nurses and medical staff on the necessary coordination of care of inmates suffering from serious medical conditions; and they failed to implement policies and procedures with respect to proper training on these matters.

116. Does failed to train medical doctors and nurses on the necessary care of inmates suffering from serious medical conditions, and they failed to implement policies and procedures with respect to communicating such sensitive and critical information to ensure that inmates will be cared for.

117. Defendant, with deliberate indifference, disregarded a duty to protect the public from official misconduct.

118. Despite their knowledge of previous instances of wrongful deaths in the jails as a result of the failure to communicate critical medical conditions, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.

119. The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Michael Wilson and others in his position.

- 18

120.   As a result, decedent Michael Wilson suffered, both physically and mentally, and died.

121.   As a direct consequence of the failure of Defendants to properly train their officers and medical staff, Michael Wilson suffered unconstitutional treatment and inhumane conditions during his detention.

## FOURTH CAUSE OF ACTION
### (Failure to Properly Supervise and Discipline (42 U.S.C. §1983))
### [By the Estate of Michael Wilson against Gore, Lee, Joshua, and Supervisory Doe Defendants 51-100]

122.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

123.   Defendants Gore, Lee, Joshua, and Supervisory Doe Defendants 51-100 failed to properly supervise and discipline defendant Does 1-50 in the performance of their duties in evaluating physically ill patients who require hospitalization and treatment.

124.   These Defendants failed to properly supervise their employees with regard to the need to communicate critical medical information to jails that would house their patient/arrestee.

125.   These defendants were personally aware of the repeated Constitutional violations committed by their subordinates vis a vis a pattern of refusal to provide medical care.

126. Defendants Does 1-50 acted under the direction and supervision of Gore, Lee, Joshua, and Supervisory Doe Defendants 51-100 who set forth the standards, policies and procedures on treatment of inmates, including Michael Wilson.

127.   Pursuant to the policies and procedures set by Defendants Gore, Lee, Joshua, and Supervisory Doe Defendants 51-100, Michael Wilson received no medical care despite obvious signs that he was having difficulty breathing.

- 19

128.   As a result of the Defendants' historical failure to properly supervise and discipline their employees, Defendant Does 1-50 were deliberately indifferent to the serious medical needs of Plaintiff.

129.   All Defendants failed to properly supervise their subordinates with regard to the need to communicate critical medical information and the need to provide adequate care.  As a result, correctional officers and medical care providers denied care to Michael Wilson.

130.   Defendants failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meet the standards of the Constitution.

131.   Defendants failed to promulgate and enforce adequate policies and procedures related to misconduct and the violation of citizens' civil rights by correctional officers and medical staff.

132.   Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

133.   Defendants were aware of previous instances of untimely and wrongful deaths in the San Diego County Jails related to inadequate provision of medical care, they and failed to properly supervise and discipline their employees or agents.

134.   Defendants refused to investigate misconduct and/or took no remedial steps or action against correctional officers and medical staff.

135.   Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical staff but failed to supervise or discipline them.

136.   There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

137.   Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

138.   Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

139.   As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Plaintiff.  The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering and death.

### FIFTH CAUSE OF ACTION
**(*Monell* Municipal Liability Civil Rights Action (42 U.S.C. §1983))**
**[By all Plaintiffs Against Defendants the County of San Diego]**

140.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

141.   There were longstanding and systemic deficiencies in San Diego jails' treatment of inmates.  Deficiencies included improper cell checks, inadequate medical staffing, lack of required training on screening, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

142.   The County's failure to train its deputies and medical staff on treatment of inmates in medical distress gives inference of a municipal custom that authorized or condoned deputy misconduct.

143.    Upon information and belief, the permanent, widespread, well-settled practice or custom of Defendant was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or general population instead of the medical ward when inmates are in need of medical care.

144.    There was a custom and practice of disbelieving complaints of inmates when they request medical attention and denying them access to medical care.

145.    There was a custom and practice of not properly screening inmates for medical care or treatment.

146.    There was a custom and practice of failing to communicate the medical needs of inmates between the medical staff and deputies.

147.    There was a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious medical needs.

148.    There was a custom and practice of failing to conduct proper cell checks as required by County's own written policies.

149.    There was a custom and practice of not properly investigating misconduct of deputies and medical staff.

150.    There was a custom and practice of falsifying information during investigations of misconduct and misleading the investigations by the independent citizens' review board.

151.    There were longstanding and systemic deficiencies in San Diego County of failing to investigate in-custody deaths by CLERB.

152.    Defendant County of San Diego was deliberately indifferent to the widespread unconstitutional acts by its jail staff and failed to set forth appropriate policies regarding the treatment of inmates. The County knew its failure to adequately train its jail staff made it highly predictable that its jail staff would engage in conduct that would deprive persons such as Michael Wilson of his rights.

153.    During the relevant period, all Defendant deputies, medical staff, and Does 1-50 were acting pursuant to the policies of Defendant County of San Diego.

154.   The County was aware of the following:  that San Diego County had the highest mortality rate among California largest jail systems; that there had been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct; and that failures to communicate critical medical information to coordinate care for inmate-patients with serious medical and psychiatric needs led to the deaths of Adrian Correa, Daniel Sisson, Bernard Victorianne, Ronnie Sandoval, Heron Moriarty, Kristopher NeSmith. Jerry Cochran, Ruben Nunez, and many other patients.

155.   Defendant County of San Diego was deliberately indifferent to the right of the plaintiff and others to be free from, and protected from, harm by the misconduct of its employees.

156.   The Sheriff Department's longstanding practice or custom was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to inmates.

157.   As a direct result of the practice or custom of the County of San Diego, Defendants, including Doe Defendants, denied medical care to Michael Wilson, causing Michael's death.

158.   The unlawful and illegal conduct of Defendant deprived Michael Wilson of the rights, privileges and immunities secured to him by the Constitutions of the United States.

159.   As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

## SIXTH CAUSE OF ACTION
### (Wrongful Death & Survival Action – CCP §§ 377.30, 377.60 *et seq.*)
### [By Estate of Michael Wilson and Phyllis Jackson against All Defendants]

160.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

161.   Plaintiffs allege all California state law claims as basis for state law wrongful death cause of action and incorporate later torts by reference.

162.   Defendants committed wrongful acts which proximately caused the death of Michael Wilson.  Specifically, Defendants, including Does 1-100, deprived Michael Wilson of his rights under the United States Constitution to be free from the punishment without due process and cruel and unusual punishment.

163.   Defendant Does' decision to deviate from the County of San Diego's own protocol as to the medical care of inmates was a substantial factor in causing Michael's death.  It was reasonably foreseeable that failure to communicate that Michael Wilson was having trouble breathing when his lungs were filling with liquid caused his death.

164.   These acts resulted in the death of Michael Wilson.

165.   The County of San Diego are responsible for the act of individual and Doe Defendants under the theory of *respondeat superior*.

166.   The wrongful acts alleged above has destroyed the relationship between Plaintiff Phyllis Jackson and Michael Wilson and has legally, proximately, foreseeably and actually caused severe emotional damages, including the loss of society, companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial.

## SEVENTH CAUSE OF ACTION
### (Negligence)
### [By The Estate of Michael Wilson against All Defendants]

167.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

168.   Defendants had a duty to Plaintiff Michael Wilson to act with ordinary care and prudence so as not to cause harm or injury to another.

169.   In evaluating, assessing and handling Michael Wilson's medical condition, Defendants failed to comply with professional and legal standards.

- 24 -

170.    Defendants improperly, negligently, wrongfully, and recklessly failed communicate Michael's serious medical need to the appropriate jail staff.

171.    Defendants improperly, negligently, wrongfully, and recklessly failed to provide any medical care for Michael Wilson's hypertrophic cardiomyopathy.

172.    Defendants improperly, negligently, wrongfully, and recklessly failed to take any action to monitor Michael Wilson despite his obvious symptoms of being serious medical distress.

173.    Defendants improperly, negligently, wrongfully, and recklessly delayed and failed to render medical care to Michael Wilson who was in obvious physical distress and in acute need of medical care.

174.    Defendants Does improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding medical treatment of inmates suffering from serious mental health conditions.

175.    Defendants Does improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding proper screening, evaluation, treatment, and transportation of inmates suffering from a serious medical condition.

176.    By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Michael Wilson.

177.    The County of San Diego are responsible for the act of individuals and Doe Defendants under the theory of *respondeat superior*.

178.    Plaintiffs are informed and believe that Defendant County of San Diego, and Does maintained policies, practices and procedures that allowed for and encouraged the denial of care which ultimately caused the death of Michael Wilson. These policies, practices and procedures include without limitation Defendants' training procedures and practices with respect to supervision of the officers and policies and procedures with regard to providing necessary medical attention.

179.    By engaging in the acts alleged herein, all defendants failed to act with ordinary care and breached their duty of care owed to Michael Wilson.

180.   As a direct and proximate result of the Defendants' negligent conduct as herein described, Michael Wilson suffered physically and mentally in the amount to be determined at the time of trial.

181.   As a further proximate result of the Defendants' negligent conduct, Michael Wilson died.

182.   As a further proximate result of the Defendants' negligent conduct, Plaintiff Phyllis Jackson has lost her son and suffered great emotional and mental harm in the amount to be determined at the time of trial.

183.   The conduct of the Defendants also amounts to oppression, fraud or malice within the meaning of Civil Code Section 3294 et seq. and punitive damages should be assessed against each defendant for the purpose of punishment and for the sake of example.

**EIGHTH CAUSE OF ACTION**
**(Violation of the Americans With Disability Act of 1990**
**42 U.S.C. 12101, *et seq*.)**
**[By the Estate of Michael Wilson against the County of San Diego]**

184.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

185.   Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity."

186.   Under Title II of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability.  The ADA sets an affirmative requirement to act appropriately with respect to inmates with physical and mental disabilities.

187.   ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation."

188.    Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

189.    To establish a violation of Title II of the ADA, a plaintiff must allege that: "(1) he 'is an individual with a disability;' (2) he 'is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;' (3) he 'was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;' and (4) 'such exclusion, denial of benefits, or discrimination was by reason of [his] disability.'" *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (internal citation omitted).

190.    **Qualified individual with a disability**.    Michael Wilson was a qualified disabled individual, as set forth in 42 U.S.C. § 12102, because of the following: (1) he suffered from hypertrophic cardiomyopathy, a physical impairment that substantially limited one or more of his major life activities; (2) Michael had a record of suffering from hypertrophic cardiomyopathy; and (3) Michael was regarding as having the impairment of hypertrophic cardiomyopathy. Michael's impairment affected his ability to care of himself, walk, speak, breathe, learn, and work - all major life activities.

191.    Whether Michael Wilson suffered a disability requires an individualized factual inquiry.    *See* 29 C.F.R. § 1630.2(j)(1)(iv).    Moreover, even if Michael managed his medical condition with medication, he is still considered disabled because "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." *Id*. § 1630.2(j)(1)(vi).    In addition, an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id*. § 1630.2(j)(1)(vii).

192. **Denied the benefits of the Central Jail's services**.  The County of San Diego is a "public entity" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.  The ADA applies to correctional facilities, such as prisons and jails, and medical services provided at these correctional facilities are services and programs that benefit inmates such as Michael Wilson.  *See, e.g.*, *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in').")(internal citation omitted); *United States v. Georgia*, 546 U.S. 151, 157 (2006); *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 286-87 (1st Cir. 2006), *citing*  ("Access to prescription medications is part of a prison's medical services and thus is one of the 'services, programs, or activities' covered by the ADA.").

193. **Denied the benefits of medical services on the basis of his disability**.  Central Jail officials discriminated against Michael Wilson on the basis of his disability because they denied him access to prescribed medication and monitored care in the Medical Unit pursuant to a court order.  Defendant DOES, Central Jail officials, were aware that Michael Wilson required specific prescribed medication to treat his condition, hypertrophic cardiomyopathy.  They knew that Michael Wilson had to be monitored in the Medical Unit because a court had ordered him to be placed there due to his fragile medical condition. Plaintiff Phyllis Jackson and other family members had specifically advised these Defendants of Michael Wilson's disability and need for specialized care.  Despite their awareness of Michael Wilson's need for prescribed medication to treat his condition and monitoring in the Medical Unit, Defendant DOES persistently refused to provide such medication and care to Michael Wilson, causing his death.  Doe Defendants had no legitimate penological reason to deny Michael

Wilson prescribed medication that he needed and to ignore a court order to place Michael Wilson in the Medical Unit for monitoring of his condition. *See Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 286–87 (1st Cir. 2006) (failure to give inmate access to prescribed medication was "an outright denial of medical services" in violation of ADA).

194.    Defendants were deliberately indifferent to Michael Wilson's serious medical condition.  Defendants had actual knowledge of the substantial risk of harm to Michael Wilson from his serious diagnosed condition.  They responded with deliberate indifference by failing to provide him with his prescribed medication and place him in the Medical Unit for monitoring as ordered by the court.

195.    As a direct and proximate result of the Defendants' conduct as herein described, Michael Wilson suffered in the amount to be determined at the time of trial.

### NINTH CAUSE OF ACTION
### (Violation of the Rehabilitation Act 29 U.S.C. § 794(a))
### [By the Estate of Michael Wilson against the County of San Diego]

196.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

197.    The Rehabilitation Act of 1973 ("Section 504") states in pertinent part, provides that "No otherwise qualified individual with a disability in the United States  . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

198.    Defendant County of San Diego is a program that receive federal financial assistance as defined in 29 U.S.C. § 794(b).

199.    Michael Wilson was a "qualified individual with a disability" under

the Rehabilitation Act.

200.   Defendants violated the Rehabilitation Act by failing to provide Michael Wilson the prescribed medication he needed to manage his condition. They further discriminated against Michael Wilson by failing to adhere to a court order to place him in the Medical Unit for monitoring.

201.   Instead of providing Michael Wilson with medical monitoring, prescribed medication, and required treatment, Defendant the County of San Diego refused to provide him with medical care as his condition deteriorated.  Defendants knew of the substantial risk of harm to Michael Wilson from his serious, diagnosed condition, yet they did not take the required actions.

202.   As a direct and proximate result of the Defendants' conduct as herein described, Michael Wilson suffered in the amount to be determined at the time of trial.

<strong>WHEREFORE</strong>, Plaintiffs pray as follows:

1.   For general and special damages according to proof at the time of trial;

2.   For attorneys' fees and costs of suit and interest incurred herein;

3.   For punitive damages against individual defendants; and

4.   Any other relief this court deems just and proper.

<strong>DEMAND FOR A JURY TRIAL</strong>

Pursuant to Rule 38 of the Federal Rues of Civil Procedure and the Seventh Amendment to the Constitution, Plaintiffs hereby demand a jury trial of this action.

Respectfully Submitted,

**IREDALE AND YOO, APC**

Dated:  March 10, 2020          s/ *Julia Yoo*

JULIA YOO
Attorney for Plaintiffs
THE ESTATE OF MICHAEL WILSON by and through its successor-in-interest, PHYLLIS JACKSON