1 EUGENE G. IREDALE: SBN 75292
2 JULIA YOO: SBN 231163
  GRACE JUN: SBN 287973
3 IREDALE & YOO, APC
4 105 West F Street, Fourth Floor
  San Diego, CA 92101-6036
5 TEL: (619) 233-1525
6 FAX: (619) 233-3221
  Attorneys for Plaintiffs
7

8 **UNITED STATES DISTRICT COURT**
9 **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10 THE ESTATE OF MICHAEL WILSON by and through its administrator PHYLLIS JACKSON, and PHYLLIS JACKSON, Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, WILLIAM GORE in his individual capacity, BARBARA LEE, in her individual capacity, LOUIS GILLERAN, in his individual capacity, LAUCET GARCIA, in his individual capacity, RIZALINA BAUTISTA, in her individual capacity, MACY GERMONO, in her individual capacity, MARYLENE IBANEZ, in her individual capacity, ANIL KUMAR, in his individual capacity, VINCENT RONALD GATAN, in his individual capacity, PETER FREEDLAND, in his individual capacity, MARK O'BRIEN, in his individual capacity, COAST CORRECTIONAL MEDICAL GROUP, and DOES 1-100 <br><br> Defendants. | CASE NO. 20-cv-0457-BAS-DEB <br><br> **FIRST AMENDED COMPLAINT** <br><br> **(1) Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983)** <br> **(2) Failure to Properly Train (42 U.S.C. §1983)** <br> **(3) Failure to Properly Supervise and Discipline (42 U.S.C.§1983)** <br> **(4) *Monell* (42 U.S.C. §1983)** <br> **(5) Wrongful Death** <br> **(6) Negligence** <br><br><br> **JURY TRIAL DEMANDED** |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COME NOW, the ESTATE OF MICHAEL WILSON by and through its administrator PHYLLIS JACKSON, and PHYLLIS JACKSON, by their attorneys of record, and allege and complain as follows:

## I.
## INTRODUCTION

At the time of his death, Michael Wilson was 32 years old. He had been booked into the Central Jail on February 5, 2019 after being sentenced to "two weeks flash incarceration." The minutes of the hearing included the judge's notes in large handwriting, "**Court orders medical staff to be aware that this defendant has some serious medical issues.**" This order was sent to the Jail.

Michael had suffered from hypertrophic cardiomyopathy since he was three months old. This is a serious but treatable condition. When treated with medication and/or a pacemaker, the patient will have a normal lifespan. Michael was prescribed Lasix, among others, to treat this condition. Without medication, Michael's lungs would fill with fluids, causing a serious medical emergency.

Despite their awareness of Michael's serious medical condition, medical and correctional staff at San Diego Central Jail failed to provide proper medication. Michael was booked on February 5, 2019. He did not receive Lasix. He likewise did not receive a dose of his life saving drug on February 6, 7, 8, 9, or 10. Michael twice filled out a complaint notifying the medical staff that he had a cough that won't go way. No medication was given in response to the complaints. On February 11, after multiple frantic calls from his family, Michael as seen in medical. A nurse noted continuous cough and difficulty breathing when lying down. He had an abnormal oxygen saturation and chest pains. The Jail gave Michael one dose of Lasix after Michael had already missed six days of treatment. Instead of taking Michael to the hospital to address his lungs which had filled with fluids, the Jail gave Michael Robitussin. From the 11th to February 14th when Michael died, no Medical personnel treated him for heart failure. No Medical personnel communicated to any other staff that Michael

needed to be monitored.  Michael, instead of being placed int the Medical Observation Bed (MOB) where he could be watched by the nursing staff, was placed in a unit for inmates who have severe psychiatric disabilities. Inexplicably, Michael was placed on the top bunk, to which he would have to jump up each time.



Michael was placed in a cell where the control deputies in the cell towers could not see into the cell.  On Valentine's Day, February 14, 2019, Michael slid down from the top bunk and lost consciousness.  Michael died of heart failure.

## II.
## GENERAL ALLEGATIONS

1.     Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343(3) and (4), *et. seq*.

2.      Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District.

3.      At all times relevant to this complaint, decedent Michael Wilson was an individual residing in San Diego County, California.

4.      Phyllis Jackson, Decedent's equitably adopted mother, has been appointed the special administrator to the Estate of Michael Wilson. This action on behalf of the Estate of Michael Wilson is brought through Plaintiff Ms. Jackson who has been ordered by Probate Court "to substitute in as plaintiff and to litigate the matter of the Estate of Michael Wilson v. County of San Diego, William Gore, in his individual capacity, Barbara Lee, in her individual capacity, and Does 1-100, in federal court in the Southern District of California, 20-cv-0457-BAS-DEB, alleging certain tort claims for lack of medical care and wrongful death." (Exhibit 1)

5.      Phyllis Jackson brings this action in her own right, as well, for the loss of her son, Michael.

6.      Ms. Jackson began taking care of Michael Wilson when he was approximately three months old.  Ms. Jackson attempted to adopt Michael when he was two years old, after Michael's birth mother's rights were terminated.  Ms. Jackson told Michael that he would be adopted and she intended to adopt him. Due to the extraordinary medical costs related to Michael's heart condition, Ms. Jackson's attorney opted to obtain a legal guardianship in lieu of formal adoption. After this legal guardianship was approved on May 4, 1989, Ms. Jackson and everyone in the family referred to Michael as Ms. Jackson's son.   Michael throughout his entire life referred to Ms. Jackson either as "his mother" or "his adopted mother."  Michael resided with Ms. Jackson throughout his childhood and after he turned 18.  Up to the time of his death, Michael continued to reside

with Ms. Jackson in her home. Michael Wilson was Phyllis Jackson's equitably adopted child.

7.     Plaintiffs Estate of Michael Wilson and Phyllis Jackson have properly complied with the Government Claim Act. Their claims were submitted to the County of San Diego on August 12, 2019.

8.     The County of San Diego rejected Plaintiffs' claims on September 19, 2019.

9.     Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Diego operates and manages the San Diego Central Jail, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Central Jail, and its respective employees, contractors and/or agents.

10.     Defendant William Gore was, at all relevant times, the Sheriff of the County of San Diego, the highest position in the San Diego County Sheriff's Department. As Sheriff, Defendant Gore was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff and Doe Defendants.

11.     At all times relevant to this complaint, Defendant William Gore was a policy-maker for the San Diego Sheriff's Department (hereinafter "Sheriff's") and responsible for promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sheriff's Department alleged herein were committed, as well as the supervision and control of officers who are or were employed by the Sheriff's, who are under his command and/or who report to him, including the Defendants to be named.

12.     At all times relevant to this complaint, Defendant Barbara Lee was the Medical Administrator for the Sheriff's Department.   She supervised the

medical and nursing staff, including Doe defendants and contractors.  She directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures.

13.    At all times relevant to this complaint, Defendant Louis Gilleran was the interim Chief Medical Officer for the Sheriff's Department.  He supervised the doctors, nurse practitioners, and other medical staff, including defendants and contractors.  He oversaw the Sheriff's Department's relationship with medical contractors and was a primary point of contact for Coast Correctional Medical Group.  He directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures.

14.    At all times relevant to this complaint, Mark O'Brien was the President and CEO of Coast Correctional Medical Group (CCMG), a third-party contractor who employed, supervised, and trained Freedland, Gatan and Does.

15.    Defendants Joshua, Lee, Gore and O'Brien are sued in their individual capacity for their own personal actions or inaction for supervisory liability.

16.    At all times relevant to this complaint, all individual defendants and Does were San Diego sheriff deputies or medical personnel and agents of Defendant County of San Diego; and/or agents or contractors authorized to work at the San Diego Central Jail.

17.    San Diego Central Jail is owned and operated by County of San Diego and staffed by County of San Diego Sheriff's deputies.

18.    Plaintiffs are truly ignorant of the true names and capacities of Does 1 through 100, inclusive, and/or is truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

19.    These defendants were agents, servants and employees of each other of the other named defendants and were acting at all times within the full course

and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants and each of the defendants had approved or ratified the actions of the other defendants thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

**III.**
**FACTS**

20.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

21.     At the time of his death, Michael Wilson was 32 years old.

22.     Michael has had hypertrophic cardiomyopathy since he was three months old.

23.     Hypertrophic cardiomyopathy can cause shortness of breath, chest pain, fainting, heart palpitations, heart murmurs, an irregular and rapid heart rate known as atrial fibrillation, mitral valve problems that caused blood to flow backward into his heart, heart failure, and sudden cardiac death.

24.     Hypertrophic cardiomyopathy is a treatable condition. When treated with medication and/or a pacemaker, an individual diagnosed with hypertrophic cardiomyopathy will have a normal lifespan.

25.     Michael treated his hypertrophic cardiomyopathy by getting a pacemaker or a defibrillator and taking medications, such as Digoxin, Lisinopril, and potassium chloride. Digoxin strengthens the heart by making it beat stronger and with a more regular rhythm. Lisinopril treats high blood pressure, and potassium chloride increases blood levels of potassium.

26.     Michael took Lasix each day.  Lasix is a diuretic.  Without this medication, Michael's lungs would fill with fluids, which in turn make it impossible for Michael to breathe, causing a serious medical emergency.

27.     Michael was booked into the Central Jail on February 5, 2019 after

being sentenced to "two weeks flash incarceration." The minutes of the hearing included the judge's notes in large handwriting, "**Court orders medical staff to be aware that this defendant has some serious medical issues.**"  This order was sent to the Jail.

28.    At 4:45 p.m. on February 5, Defendant Nurse Rizalina Bautista documented that Michael took Lasix, Invega and Albuterol. Bautista noted "CRT Order Defendant has serious medical conditions that need to be seen."  Bautista made an entry for "MDSC and Psych SC sched" but there was no indication as to when Michael would see a doctor.

29.    Michael received no Lasix or any other medication on February 5, 2019.

30.    On February 6, Nurse Frederick Wycoco ordered medication and noted them in Sapphire.  But Michael received no medication.

31.    On February 7, 2020, Michael wrote a request to see a doctor because he still had not received his medication.  This was his third day without his Lasix or the other live saving heart medication.

32.    On the following day, February 8, Defendant nurse Anil Kumar responded that Michael was scheduled for an assessment.  But there was no indication when this assessment was to take place.  Defendant Kumar did nothing to check the medication chart to provide him his medication, now on his fourth day with no heart medication.

33.    Michael's cough and trouble breathing was caused by the fluids in his lungs.

34.    On February 9, Michael filled out a complaint notifying the medical staff that he had a cough that "won't go away."

35.    In response, Defendant Marylene Ibanez wrote "you are already scheduled to see the nurse."  By then, Michael had been denied his life saving medication for five days.

36. For some reason, having reviewed Michael's medical chart, and knowing of his serious medical condition, Defendant Ibanez still refused to provide Michael his Lasix or the other heart medication.

37. Defendant Ibanez failed to expedite the medical visit or schedule a visit with a doctor given Michael's severe condition.

38. As a result, Michael received no care and no medication on February 9 or February 10.

39. By February 11, Michael's lungs were full of fluids. He had multiple conversations with his family members who frantically called the Jail reporting that he needed urgent medical care. There were calls from Michael's sisters and his mother that Michael could not breathe. Michael was having chest pains.

40. Michael spoke with his sister at 9:14 a.m. and told her that he could not breathe and that he had been struggling to breathe since he had been in Jail. He told her that they had given him medication that day but that not all of the medication he needed had been given.

41. Nurse Melissa Burns spoke with Ms. Jackson, who called the Jail at 9:32 am. Ms. Jackson told Burns that Michael needed to go to the hospital because his lungs were full of fluids and that he was now suffering from wheezing and chest pains.

42. At 10:30 a.m., nurse Samantha Macanlalay noted an emergency visit to Medical and noted continuous cough and difficulty breathing when lying down. Michael had an oxygen saturation level of 90-94%, which is abnormal. A normal oxygen saturation level should fall between 95% and 100%. When blood oxygen levels drop below normal, hypoxemia occurs which causes serious damage to one's brain, liver and other organs.

43. Despite these findings, Dr. Peter Freedland, an employee of the private contractor, Coast Correctional Medical Group (CCMG), failed to treat

Michael on February 11 for his serious medical condition.  Dr. Freedland knew that the reason for the visit was a medical emergency; knew Michael had a history of congestive heart failure and cardiomyopathy; and had access to Sapphire medication records which showed that Michael had missed six days of Lasix

44.   Freedland gave Michael one single oral dose of Lasix after Michael had already missed six days of treatment and gave Robitussin cough syrup to Michael.

45.   Dr. Freedland noted that Michael had a history of congestive heart failure but that the patient "denied being in chf (congestive heart failure)."

46.   Dr. Freedland knew that Michael suffered from a severe congenital heart defect to the left side of his heart.  He knew this was potentially fatal.

47.   According to Nurse Rognlien-Hood, when Michael came into Medical, Dr. Freedland told Michael that they had just seen him in Medical a few days prior.  This was the first time Michael had seen a medical doctor.

48.   Dr. Freedland told Michael that Mrs. Jackson had called again regarding his health.  This visit was as a result of Ms. Jackson calling the facility again.

49.   Dr. Freedland provided no further treatment.

50.   After Michael's death, Dr. Freedland admitted to the investigative staff that he did not have Michael's medical chart during this visit.

51.   Freedland made no inquiry as to what treatment Michael had been given for six days or why Michael, who had a pacemaker, was having chest pains.

52.   He conducted none of the objective or subjective tests or do an assessment that is required when a patient presents with chest pains.  Dr. Freedland was required to obtain a 12 lead EKG.  He didn't even take Michael's blood pressure.[1]

---

[1] A deputy named Powroznik reported that one of Michael's sisters had called to report that Michael as having chest pains so he escorted the medication nurse to

53.    At 8:55 p.m., nurse Echon received a call from Michael's sister Yujane, who reported that Michael was in medical distress.  Echon documented this in Michael's medical charts.

54.    At 10:50 p.m. on February 11, Defendant Germono entered "Standard Nursing Protocol" for asthma.  She noted that Michael would catch his breath whenever he spoke and that he was in moderate distress.  There was wheezing and coughing.  Germono knew that Michael had a history of congestive heart failure.  She also knew that Michael had been denied his heart medication for days. Germono did not refer to the County's Standardized Nursing Procedure for chest pain which takes into consideration cardiac disease.  She failed to assess whether the chest pain was cardiac v. non-cardiac.

55.    Germono gave Michael more Robitussin and a nebulizer.

56.    On February 12, 2020, Michael was seen at Medical.  He was again denied Lasix on the 12th.  Defendant Nurse Practitioner Vincent Ronald Gatan saw Michael at 6:22 p.m.  Defendant Gatan noted that Michael had received no medication; that Michael has a history of trouble breathing; and that Michael suffers from congenital heart failure.  Gatan reviewed the Sapphire med check, which would have shown that Michael had received no heart medication for seven days out of eight.  Gatan knew that Michael had been denied Lasix that very morning.  Gatan gave Michael Colace for mild constipation.

57.    Nurse Macy Germono wrote "noted, med on sapphire."  There was no explanation as to what she meant or why she did not administer the medication that is listed on sapphire and she personally noted.

58.    No one took his vitals or oxygen level.  No one took an EKG.  This is in violation of the standardized nursing procedures for chest pains.

---

Michael's cell.  According to Powroznik, another deputy escorted Michael to see the doctor (Freedman) but Michael came back "a short time later" to his cell.

59.    For some reason, instead of treating his chest pains and inability to breathe related to his heart condition, the medical staff decided to treat him only for his asthma.

60.    According to another inmate who was in the same housing unit, they had to ask a nurse for emergency medical help in the two days before Michael's death because he could not breathe.

61.    An inmate named Drew Crane told the investigators that Michael was coughing because Michael had fluid in his lungs.  Michael had told Mr. Crane that the Jail already knew that he was having trouble breathing.  Two days prior to his death, Michael could barely speak because he was coughing so much.  Mr. Crane noted that Michael could barely sleep or eat because of the fluid in Michael's lungs.

62.    Another inmate named Dwight Hayes told the investigators that Michael was complaining the day before about his inability to breath and his defibrillator.  Michael had told Mr. Haye that Michael could feel his defibrillator moving around and that was scaring Michael.

63.    An inmate named Demarco Gregory told the investigators that they had to call the nurse a few times for Michael's asthma inhaler because Michael was breathing so hard and was wheezing.

64.    Another inmate named Gustavo Flores, Jr. told the investigators that Michael was coughing and overheard Michael say something about his lung and asthma.  Mr. Flores heard Michael coughing a lot.

65.    Remarkably, the Housing staff placed Michael, who could barely breathe, in a top bunk in his cell.[2]

66.    Sworn staff within JPMU are responsible for housing assignments

---

[2] On February 1, 2018, a year before Michael's death, Mr. Frankie Greer, who jail knew suffered from a seizure disorder, was placed on the top bunk of a triple bunk bed and denied his seizure medication.  Mr. Greer fell after a seizure and nearly died.

- 11

for every inmate at the Central Jail.  Alerts regarding an inmate's medical and psychiatric condition must be communicated to JPMU deputies so inmates can be placed in appropriate housing units consistent with their need for medical or psychiatric accommodations and care.

67.    Defendant Laucet Garcia was the deputy from JPMU who made housing determinations for Michael.

68.    During medical screening, which occurs when an inmate first arrives at the Central Jail, a nurse must place medical orders, and any alerts regarding an inmate's medical and psychiatric condition, in the "details" screen of the Jail Information Management System (JIMS).  The medical screening / intake nurse will also call JPMU deputies to notify them of an inmate's serious medical needs for housing purposes.  JPMU deputies are only able to access medical orders and alerts regarding medically fragile and/or mentally ill inmates in the JIMS "details" screen.  They do not have access to all medical information in JIMS that medical staff can access.  JPMU deputies will place these medical orders and alerts on an inmate's "face card" so that correctional deputies responsible for monitoring a specific floor or area of jail housing are aware of an inmate's serious medical needs.

69.    Michael's Facecard contained no information on his critical medical condition or the fact that Michael had a pacemaker.  There was no notation that Michael needed a bottom bunk due to his severe medical condition.

70.    According to the housing deputies, not a single one of them was notified that Michael suffered from a serious medical condition. Michael was housed on the 6th floor, Module B.  This is a unit for inmates who have severe psychiatric disabilities.

71.    Nurse Rizalina Bautista conducted the medical screening of Michael Wilson on February 5, 2019.  Nurse Bautista noted that Michael suffered from congestive heart failure, cardiomyopathy, and asthma and took multiple

medications; and further noted that a court order had explicitly stated Michael had serious medical conditions that "need to be seen."  Per the Court's order, Michael was to be monitored in the Medical Unit specifically because of his potentially serious medical condition.   Upon information and belief, Defendant Baustista failed to give JPMU deputies such critical information.   As a result, JPMU deputies did not house Michael in MOB and they did not place medical alerts on Michael Wilson's Facecard.

72.   The Medical Unit, or MOB, is a housing unit within the Central Jail reserved for seriously ill inmates who require constant monitoring and heightened care.  Inmates within MOB receive clinical care in an acute hospital-like setting.

73.   As the housing deputy, Defendant Garcia did nothing to place Michael in the MOB.  Garcia spoke to no Medical staff to have Michael admitted to a place where he could be monitored.  JPMU staff responsible for housing must interview an inmate before making a housing decision.   Garcia would have known from the Court order and his interview of Michael Wilson that Michael had serious medical issues which required vigilant care and monitoring within MOB.

74.   Per the Court's order, Michael was to be monitored in the Medical Unit specifically because of his potentially serious medical condition.  Defendant Garcia ignored Michael's medical condition.  He placed Michael in Enhanced Observation Housing (EOH), which is for suicidal inmates.  Michael was not being seen by psychiatry for suicidal ideation and there was no indication that Michael was suicidal.  Michael should have been housed in Medical, not the psych floor.

75.   Garcia placed Michael on the **top bunk** of Cell B10, where the control deputy from the tower in the center of the floor could not see into the cell as a result of the location of the stairs immediately in front of the cell blocking the view.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



(Cell B10 is behind the stairs to the second floor.  In the Center of this diagram is the control tower)

(The view of the entrance to Michael's cell is obstructed by the staircase)

76.     On February 14, 2019, Michael was lying on the top bunk of his cell. He could not walk over to the panic button.  He sat up on his bed then slid down, collapsing on the floor.

- 14

77. The jail staff began resuscitation efforts and transported him to UCSD Hospital where resuscitation efforts continued. These resuscitation efforts failed, and Michael died.

78. After Michael's death, a nurse named Rognlien-Hood told the investigators that they order medications from Pennsylvania and that storage limitations do not allow them to store all of the inmate medications at the facility. The nurse stated that Michael's medications were on order, but had not arrived. She believed that this was for high blood pressure.

79. A review of Sapphire, the program the Jail uses to track patient's medication, shows that Medical failed to give Michael any of the medication he had been prescribed. During the ten-day period, the Medical staff administered Invega, one single dose of Prinivil, which prevents high blood pressure and heart failure, and possibly two doses of Lasix. Prinivil reduces the risk of death after a heart attack. Michael was also prescribed Toprol, which likewise prevents heart failure and reduces the risk of death. This medication which is to be administered twice a day was administered one single morning on February 13 and in the evening on February 12 and 13. There is no explanation as to why the staff failed to administer these critical medications.

80. According to an inmate named Luis Donate, two days prior to Michael's death. Mr. Donate reported that Michael was having trouble breathing and that Medical staff would not help him.

81. The Medical Examiner determined that Michael died from sudden cardiac death due to acute congestive heart failure that was caused by his hypertrophic cardiomyopathy.

82. According to the autopsy report, Michael's lungs were twice the average size, indicating that they filled with liquid as Phyllis Jackson predicted.

83. Michael's hospital lab results were negative for any alcohol, amphetamines, opiates, methadone, barbiturates or cocaine.

- 15

84.     Despite the fact that Michael was not provided with his medication and had difficulty breathing, no medical staff tended to Michael.

85.     He received no medication for his hypertrophic cardiomyopathy.

86.     Michael was instead given cough syrup.

87.     All corrections staff worked under the direction and supervision of Defendant Gore, who set the policies and procedures with respect to housing and security.

88.     All medical staff worked under the direction and supervision of Doe and Lee, who set the policies and procedures with respect to medical services.

89.     There had been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails.

90.     There had been a systemic failure in San Diego County to investigate incidents of medical neglect, staff misconduct, and deaths in the Jail.

91.     San Diego County officials, including Defendant Doe, were aware of the systemic problems with preventable deaths in the jails, but took no action to prevent further Constitutional violations.

92.     At the time of Michael Wilson's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

93.     Defendants were well aware of these problems before Michael's death.

**Allegations against the County, Gore, Lee, and Gilleran: Defendants Have Notice of Previous Deaths and Injuries as a Result of Neglect and Misconduct**

94.     Deaths of sixty (60) inmates in the San Diego County jails in a span of five (5) years prompted a series of articles by Citybeat, a local newspaper. Citybeat reported that San Diego County had the highest mortality rate among California's largest jail systems based on data from 2007 to 2012.

95.     Other than to dispute the methodology Citybeat used (one used by the Department of Justice) to determine that San Diego had the highest mortality rate, the County of San Diego took no action to review its practices.

96.     In 2019, after the Union-Tribune published a series of articles titled "Dying Behind Bars" showing that San Diego's jail death rate significantly exceeds the rate in California's five other largest counties, Sheriff Gore wrote an explanation that the statistics were wrong because it did not account for counties that have city lockups.

97.     The Union Tribune then reviewed the death rates of inmates in California using the Department of Justice statistics from 2009 to 2018, taking into account deaths in city lockups.  The UT published the following statistics:

**Mortality rate with city deaths**

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|---|---|---|---|
| San Diego | 5,211.9 | 12.8 | 245.6 |
| Los Angeles | 17,060.6 | 30 | 175.8 |
| San Bernardino | 5,643.5 | 8.9 | 157.7 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 8.1 | 136.6 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

**Mortality rate without city deaths**

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|---|---|---|---|
| San Diego | 5,211.9 | 12.7 | 243.7 |
| Los Angeles | 17,060.6 | 25.5 | 149.5 |
| San Bernardino | 5,643.5 | 8.8 | 155.9 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 7 | 118.1 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

Source: California Department of Justice                                        U-T

98.     No matter which data was used, San Diego County had the highest death rate.

99.     According to the state Department of Justice data, The San Diego County death rate over the past 10 years was 50 percent higher than Los Angeles County's and two-and-a-half times the Orange County rate.

100.    There had been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct.

101.    At the time of Michael Wilson's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

102.    County Defendants were aware of the following examples of failure to coordinate and share critical medical information among personnel, such as the following:

   a. Between 2007 and 2012, there were eight deaths in San Diego's jails that were drug related.  They were either overdoses or physical complications due to withdrawal.  Richard Diaz, a 40-year-old addict, died from a stomach obstruction after three days of seizures and vomiting due to heroin withdrawal. Had jail staff not failed to communicate Diaz's serious medical state, he would still be alive.

   b. In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who had threatened to kill himself multiple times, CLERB expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing."  The County rejected this recommendation.

   c. On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead

- 18

for several hours when a fellow inmate found him.  The jail staff had failed to monitor him despite his exhibiting signs of withdrawal and his vomiting in his cell due to the lack of communication between staff.

d.   In September 2012, Bernard Victorianne suffered for five days from drug overdose because the staff ignored his medical information that he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose.  Bernard Victorianne was placed in segregation instead of Medical, where he was found dead face-down, naked in his cell. Staff had failed to input critical medical information in the JIMS system.  Staff had failed to communicate with each other Mr. Victorianne's medical alerts which required that the staff report symptoms of overdose and take him immediately to the hospital.

e.   In 2014, former U.S. Marine Kristopher NeSmith committed suicide after the jail staff failed to treat Mr. NeSmith for his significant and known mental illness and a history of suicide attempts.  When Mr. NeSmith was last seen alive about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety throughout the detention center.  The deputy, without breaking stride, said something to the effect of, "NeSmith, what are you trying to do? Kill yourself? Take that thing down."  This deputy failed to communicate this information to other jail staff. No other jail staff took any further action.  Mr. NeSmith was later found dead, having hung himself.

f.   In 2014, Ronnie Sandoval died in the Jail from drug overdose.  Mr. Sandoval showed obvious symptoms of overdose, sweating profusely and disoriented. The corrections staff told the nursing staff that Mr. Sandoval needed medical treatment, two of them stating that Mr. Sandoval was withdrawing from drugs.  The nursing staff did not summon help or treat him for overdose.  The nurses failed to pass down information regarding Mr. Sandoval's condition during the shift change.  The staff failed to monitor Mr. Sandoval and failed to place him in a properly designated medical cell.

g.   In 2014, Jerry Cochran, a known diabetic, was arrested after mumbling gibberish on the street. At the time of his arrest, Mr.

- 19 -

Cochran was wearing his medical ID bracelet with an alert for diabetes, but his condition was not communicated. At the Jail, he fell face-forward off a bench. Mr. Cochran died from diabetic ketoacidosis, a condition caused by an insulin shortage that is rarely fatal if treated properly.

h.  In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication.  The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS.  One of the psychiatrists testified that she did not know how to use JIMS to add "alerts", meaning the most critical information regarding a patient's care.  She testified that she was never trained.

i.  Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse noted in Mr. Nunez's chart:

> "Informed I/P that he will seen [sic] by psych for f/u
> Exercise as tolerated and ***drink plenty of water***
> I/P verbalizes understanding and agrees to plan."
> (Emphasis added).

This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank. According to one of the nursing staff, the intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once.  The intake nurses only have sufficient time to look to whether the Jail will book he person into jail.

j.  In 2016, Heron Moriarty was arrested after having a psychotic break.  Despite multiple warnings by family members, including 28 telephone calls by his wife, the Jail staff failed to communicate his condition and failed to provide him psychiatric care.  On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself.

k. In 2016, Jason Nishimoto killed himself with a bedsheet on his fourth night in Jail, the evening before he was scheduled to see a psychiatrist. His psychiatric condition was well known to the Jail staff, who ignored it.

l. In January 2018, Frankie Greer, a United States veteran with a seizure disorder was placed on a top bunk as a result of the failure of staff to communicate his bottom bunk requirement.  Mr. Greer suffered a seizure that same night and fell to the cement floor onto his head.  The corrections staff ignored the desperate calls of his cell mates through the emergency panic button and did not respond for another 15 minutes.  As a result, Mr. Greer went into a coma and suffered catastrophic injuries, including a life altering brain injury.

m. In February 2018, Paul Silva died in Central Jail after deputies pepper sprayed, tased, and beat Paul to death in his cell. The Central Jail staff knew Paul suffered from schizophrenia as it was well documented in the Jail's database system.  Law enforcement encountered Paul after his mother requested Paul be hospitalized because he refused to take his schizophrenia medication.  Paul was obedient with police officers at all times.  Jail staff classified Paul as a "book and release" meaning he was supposed to be released after 8 hours.  Instead, Paul decompensated as he stayed in temporary holding cells with little food, no blankets, no bed, and with constant light and noise for almost 36 hours.  The staff failed to communicate Paul's critical medical condition and failed to monitor him. After he went without food, sleep, and any medication, Paul began acting bizarrely. He could not comprehend deputies' commands and questions.  A CCMG nurse practitioner did not check Paul's medical record or review his medical history to determine whether he needed psychiatric care.  She did not consult a medical doctor or psychiatrist.  Instead, deputies killed Paul Silva after they entered his jail cell.

n. In April 2018, George Gallegos died in the Central Jail from acute pneumonia and dehydration.  After being transferred to the San Diego County Jail from a psychiatric facility, Mr. Gallegos lost 50 pounds, nearly a quarter of his body weight.  A deputy only checked on Mr. Gallegos only because his pants were slightly pulled down, revealing feces soiled underwear.  Mr. Gallegos had been dead so long that he

- 21

was cold to the touch.  His bunk and parts of his cell were covered in feces.

o.   In April of 2018, Colleen Garot was denied medical care despite entering the Las Colinas with visible and severe head and facial injuries.  The medical staff failed to properly diagnose and treat Ms. Garot who was obviously symptomatic of a serious brain injury.  For three days, the staff provided no medical care despite the fact that Ms. Garot was delusional and foaming at the mouth.  As a result of the delay in care, Ms. Garot is now completely incapacitated.

103.   These are just a few examples of the customs and/or policies of the Sheriff's Department which sent the message to staff that negligence, dishonesty, and improprieties will be tolerated by the Department, even when a death results.

104.   The County and its officials were well aware of the problems of the jail staff failing to use JIMS.  The Grand Jury took issue with the Jail Information Management System (JIMS), a database used for maintaining inmate records. According to jail staff who commented to jurors for the report, the staff have trouble sorting and retrieving information and the eleven-year old software was in need of an update.  See https://www.nbcsandiego.com/investigations/Grand-Jury-Report-Criticizes-San-Diego-County-Jail-Facilities-381590761.html

105.   The Jail staff did not know how to use JIMS, the only system used in the Jails to communicate the medical needs of inmates.  The medical staff did not know how to use JIMS to input critical information and they had not been trained on how to use JIMS to obtain patient information.

106.   Jail nurses had complained to the supervisors, including Lee, that they did not have sufficient time to read, to understand or to document patient information during booking.

107.   On November 8, 2016, the San Diego Sheriff's Department contracted for assistance regarding compliance with the NCCHC Standards for Health Services in Jails.

- 22

108.   In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails.   Of the 38 "essential standards" all of which must be met in order to attain accreditation, the Central Jail failed to meet 26 standards.

109.   NCCHC found that the Jails were failing to review inmates' deaths in a timely manner.

110.   Health care providers were not being informed of any results of death reviews.

111.   NCCHC found that there was no formal peer review process for contract medical providers or for nurses.

112.   NCCHC found that the inmate grievances were hard to track and that it was difficult to count the number of medical grievances.   When an inmate filed a grievance related to medical issues, the health care staff would not maintain it in Medical's database.   Because all grievances are kept in the same central database with no ability to sort, health related grievances filed per month or year were not available.

113.   NCCHC found that there was no central log of training of correctional officers in health-related topics.   Verification of participation were kept only in the individual officer's files.

114.   NCCHC found that there was no policy addressing the time frame between ordering medication and receiving from the pharmacist.   NCCHC found that some essential medications are delayed due to the length of the booking process.

115.   NCCHC found that it can take up to 30 hours to complete booking an inmate into the Jail without the inmate being evaluated by health staff.

116.   NCCHC found that nurses were routinely taking a stock bottle to administer to patients without taking the patients' medication administration record with them to keep track.

117.   NCCHC found "There is no safety check for names or allergies or which medications are to be administered at that time. This is actually dispensing and only pharmacists and providers may dispense. This violation of nursing practice is serious and a violation of the Nurse Practice Act. A change to individual patient-specific or individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery) that are ordered, which medications are delivered, and when a medication container is empty."

118.   NCCHC found that missing in the screening form was the "disposition" of the inmate, which would communicate to the next health care provider where the patient would be housed.

119.   NCCHC advised, "we confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient."

**Allegations Against CCMG and Mark O'Brien.**

120.   CCMG and Mark O'Brien were aware of the following examples of the failures of CCMG's doctors and nurse practitioners to properly check inmates' medical charts and review inmates' medical history to administer urgent care to seriously ill inmates:

    a.   On February 1, 2018, a CCMG medical doctor, Mauricio Martinez, failed to administer seizure medication to Frankie Greer.   Dr. Martinez had access to Mr. Greer's medical chart that clearly documented that Mr. Greer suffered from a seizure disorder, took medication to control his seizures twice a day, and had taken his last dose of medication on the morning of January 31, 2018.   Dr. Martinez ordered seizure medication for Mr. Greer.   Dr. Martinez, however, failed to order immediate administration of that medication

to Mr. Greer. Defendant Martinez had the ability to order that medication be immediately administered. He did not. Later that evening, Mr. Greer suffered several grand mal seizures, which were so severe that he fell over 6 feet from the top bunk of his jail cell where he was housed.

b. On February 21, 2018, a CCMG nurse practitioner, Keri Cavallo, failed to check the JIMS medical history of Paul Silva, who had a documented history of schizophrenia and diabetes and had not been provided food, bedding, medication, or care for his illnesses for over 36 hours. Mr. Silva had only been scheduled to be in jail for 8-12 hours as a "book and release" inmate. Ms. Cavallo was asked to assess Mr. Silva who was experiencing a medical and psychiatric emergency. Although Ms. Cavallo observed Mr. Silva acting in a bizarre and erratic manner, she made no effort to review his medical history; no effort to consult with a medical doctor or psychiatrist; made no effort to request emergency administration of psychotropic medication; and took no steps to determine the safest course of action for treatment and care of Mr. Silva's medical emergency. A computer terminal providing access to Mr. Silva's medical history and records stood only 15-20 feet away from Ms. Cavallo, but she made no effort to access the computer terminal for over 30 minutes. Instead, she stood by and watched as the heavily armed "Tactical Team" assembled to extract Mr. Silva from his jail cell, ostensibly for the purpose of taking him to the hospital to address his medical emergency. The 7-member Tactical Team used such tremendous force against Mr. Silva during the cell extraction that they killed him. Ms. Cavallo watched this occur and took no action. She was not reprimanded or disciplined, or given further training, or more closely

- 25

monitored and supervised.  She faced no consequence and CCMG and Dr. O'Brien took no action.

c.  On April 16, 2018, Dr. Friedrike Von Lintig made contact with Colleen Garot at the Las Colinas jail.  Ms. Garot had been observed walking around her cell naked and attempting to climb a wall.  She was delusional with a black eye.  She had bruises on her chest and shoulders and had been suffering from "shakes."  Dr. Von Lintig took no action.  Later that same day, after Dr. Von Lintig's assessment of Ms. Garot,  a deputy found Ms. Garot nonresponsive in her jail cell and had her transported to the ER.  Doctors at Sharp Memorial Hospital diagnosed Ms. Garot with a left basilar skull fracture, acute hypoxemic respiratory failure, encephalopathy after traumatic brain injury, subdural hematoma and seizure.

d.  On November 11, 2019, Elisa Serna at the Las Colinas jail presented clear symptoms that she was dying of dehydration.  Dr. Friederike C. Von Lintig, who noted that Elisa was admitted to MOB for her fainting spells, denied any medical care to Elisa.  Elisa asked Von Lintig for an IV, telling her that she had vomited all of her food and drinks.  Von Lintig did not even take Elisa's vitals.  Later, at 2:03 p.m. on November 11, 2019, Elisa sat in a wheelchair, straightened her body, head resting on the back of the wheelchair.  She was not verbally responsive.  Her eyes were opened and slightly dilated, with her body stiff.  Elisa's oxygen saturation level was 87%.   A normal oxygen saturation level should fall between 95% and 100%. When blood oxygen levels drop below normal, hypoxemia occurs which causes serious damage to one's brain, liver and other organs. Defendant Von Lintig again saw Elisa.  Von Lintig noted "'fainting spell': doubt true seizure and suspect second gain."  Von Lintig took

no vitals and conducted no examination.  She ran no blood tests. Von Lintig's determination that Elisa was faking her symptoms was made despite the entry from the day before indicating abnormal blood pressure.  Ms. Serna died later that evening.

121.   On information and belief, CCMG and Mark O'Brien took no steps to review the actions of these CCMG doctors and nurse practitioners to determine whether their conduct fell below the standard of care; took no action to further train or further monitor/supervise these practitioners; and took no action discipline or reprimand these practitioners.

## FIRST CAUSE OF ACTION
**(Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983))**
**[By the Estate of Michael Wilson Against Defendants Bautista, Germono, Ibanez, Kumar, Gatan, Freedland and Does 11-50]**

122.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

123.   Defendants violated Michael Wilson's Fourteenth Amendment right to medical care.

124.   Defendants knew that Michael Wilson faced a serious medical and mental health need.

125.   Defendants were made aware that Michael suffered from hypertrophic cardiomyopathy and that he needed medication to treat it.

126.   Defendants were also made aware that Michael was in a serious medical condition because Phyllis Jackson, Michael's mother, and other family members notified them that Michael was having difficulty breathing.

127.   Defendants were deliberately indifferent to a known and serious medical need.

128.   Defendants failed to properly communicate to other medical and security staff the necessary medical information so that Michael would receive medical attention.

129.   Defendants ignored the obvious signs of medical distress. Defendants failed to provide proper medication as Michael's lungs were filling up with fluids.

130.   Defendants failed to transport him to the hospital despite repeated warnings by family members that Michael may die without medical intervention.

131.   Defendants were deliberately indifferent to Michael Wilson's serious medical need, which caused harm to the decedent.

132.   By failing to communicate Michael Wilson's serious medical state when he had trouble breathing, Defendants Doe were deliberately indifferent to Michael's serious medical need.

133.   As a direct consequence of Defendants Doe's failures, Michael's serious medical condition was ignored and the staff failed to communicate critical medical information.   As a result, Does 1-50 never communicated Michael's critical condition to the jail staff; never referred Michael for diagnosis or treatment; never provided medication.

134.   As a direct and proximate result of all Defendants' deliberate indifference to Michael Wilson's serious medical need, Michael experienced physical pain, severe emotional distress, and mental anguish for days, as well as loss of his life and other damages alleged herein.

135.   The conduct alleged herein caused Michael Wilson to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Michael Wilson to suffer emotional distress, pain and suffering and further damages according to proof at the time of trial.

136.   The conduct alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights; justifying the award of exemplary damages against defendants in an amount according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiff is also entitled to attorney fees and costs of suit herein.

**SECOND CAUSE OF ACTION**
**(Failure to Properly Train (42 U.S.C. § 1983))**
**[By the Estate of Michael Wilson against Gore, Lee, , Gilleran, O'Brien and Supervisory Doe Defendants 61-100]**

137.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

138.   Defendants Gore, Lee, Gilleran, O'Brien and supervisory Does failed to properly train individual deputies and medical staff in the performance of their duties.  They failed to properly train their subordinates on how to deal with inmates in medical distress.

139.   Defendants failed to properly train their employees with regard to the need to communicate critical medical information to jail housing deputies that would assign housing and beds.

140.   As a result of Defendants' failures to train their officers, Michael's medical condition was not properly communicated to the jail staff. Michael Wilson's death was a foreseeable consequence of Defendants' failures.

141.   Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Michael Wilson and other persons similarly situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

142.   Defendants have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of

inmates; and to prevent the consistent and systematic failure to provide medical care.

143.   Despite repeated Constitutional violations, Defendants failed to train nurses and medical staff on the necessary coordination of care of inmates suffering from serious medical conditions; and they failed to implement policies and procedures with respect to proper training on these matters.

144.   Defendants failed to train medical doctors and nurses on the necessary care of inmates suffering from serious medical conditions, and they failed to implement policies and procedures with respect to communicating such sensitive and critical information to ensure that inmates will be cared for.

145.   Defendants failed to train their staff on assessing and assigning appropriate housing and beds.  Despite prior Constitutional violations resulting in serious injuries, defendants County and Gore failed to train their housing deputies on assigning bottom bunks to patients who are medically vulnerable.

146.   Defendant, with deliberate indifference, disregarded a duty to protect the public from official misconduct.

147.   Despite their knowledge of previous instances of wrongful deaths in the jails as a result of the failure to communicate critical medical conditions, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.

148.   The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Michael Wilson and others in his position.

149.   As a result, decedent Michael Wilson suffered, both physically and mentally, and died.

150.   As a direct consequence of the failure of Defendants to properly train their officers and medical staff, Michael Wilson suffered unconstitutional treatment and inhumane conditions during his detention.

### THIRD CAUSE OF ACTION
### (Failure to Properly Supervise and Discipline (42 U.S.C. §1983))
### [By the Estate of Michael Wilson against Gore, Lee, Gilleran, O'Brien, and Supervisory Doe Defendants 61-100]

Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

151.  Defendants Gore, Lee, Gilleran, O'Brien and Supervisory Doe Defendants 51-100 failed to properly supervise and discipline defendant Does 1-50 in the performance of their duties in evaluating physically ill patients who require hospitalization and treatment.

152.  These Defendants failed to properly supervise their employees with regard to the need to communicate critical medical information to jails that would house their patient/arrestee.

153.  These defendants were personally aware of the repeated Constitutional violations committed by their subordinates *vis a vis* a pattern of refusal to provide medical care.

154.  Defendants Does 11-50 acted under the direction and supervision of Gore, Lee, Joshua, and Supervisory Doe Defendants 61-100 who set forth the standards, policies and procedures on treatment of inmates, including Michael Wilson.

155.  Pursuant to the policies and procedures set by Defendants Gore, Lee, Joshua, and Supervisory Doe Defendants 61-100, Michael Wilson received no medical care despite obvious signs that he was having difficulty breathing.

156.  As a result of the Defendants' historical failure to properly supervise and discipline their employees, Defendant Does 11-50 were deliberately indifferent to the serious medical needs of Plaintiff.

157.  All Defendants failed to properly supervise their subordinates with regard to the need to communicate critical medical information and the need to

provide adequate care.   As a result, correctional officers and medical care providers denied care to Michael Wilson.

158.   Defendants failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meet the standards of the Constitution.

159.   Defendants failed to promulgate and enforce adequate policies and procedures related to misconduct and the violation of citizens' civil rights by correctional officers and medical staff.

160.   Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

161.   Defendants were aware of previous instances of untimely and wrongful deaths in the San Diego County Jails related to inadequate provision of medical care, they and failed to properly supervise and discipline their employees or agents.

162.   Defendants refused to investigate misconduct and/or took no remedial steps or action against correctional officers and medical staff.

163.   Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical staff but failed to supervise or discipline them.

164.   There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

165.   Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

166.   Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct

it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

167.   As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Plaintiff.  The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering and death.

## FOURTH CAUSE OF ACTION
### (*Monell* Municipal Liability Civil Rights Action (42 U.S.C. §1983))
### [By all Plaintiffs Against Defendants the County of San Diego and Coast Correctional Medical Group]

168.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

169.   There were longstanding and systemic deficiencies in San Diego jails' treatment of inmates.   Deficiencies included improper cell checks, inadequate medical staffing, lack of required training on screening, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

170.   The County's failure to train its deputies and medical staff on treatment of inmates in medical distress gives inference of a municipal custom that authorized or condoned deputy misconduct.   CCMG's failure to train its doctors and nurse practitioners on the treatment of inmates in medical distress gives inference of a custom that authorized or condoned misconduct by medical practitioners.

171.   Upon information and belief, the permanent, widespread, well-settled practice or custom of Defendants was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or

general population instead of the medical ward when inmates are in need of medical care.

172.   There was a custom and practice of disbelieving complaints of inmates when they request medical attention and denying them access to medical care.

173.   There was a custom and practice of not properly screening inmates for medical care or treatment.

174.   There was a custom and practice of failing to communicate the medical needs of inmates between the medical staff and deputies.

175.    There was a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious medical needs.

176.   There was a custom and practice of failing to review the medical charts and/or medical history of inmates in medical distress to formulate appropriate treatment plans.

177.   There was a custom and practice of failing to conduct proper cell checks as required by County's own written policies.

178.   There was a custom and practice of not properly investigating misconduct of deputies and medical staff.

179.   Defendants County of San Diego and CCMG were deliberately indifferent to the widespread unconstitutional acts by its jail staff and medical staff.  They failed to set forth appropriate policies regarding the treatment of inmates. The County and CCMG knew its failure to adequately train its jail staff and medical staff made it highly predictable that their subordinates would engage in conduct that would deprive persons such as Michael Wilson of his rights.

180.   During the relevant period, all Defendant deputies, medical staff, and Does were acting pursuant to the policies of Defendant County of San Diego.

181.   The County and CCMG were aware of the following:  that San Diego County had the highest mortality rate among California largest jail

systems; that there had been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct; and that failures to communicate critical medical information to coordinate care for inmate-patients with serious medical and psychiatric needs led to the deaths of Adrian Correa, Daniel Sisson, Bernard Victorianne, Ronnie Sandoval, Heron Moriarty, Kristopher NeSmith. Jerry Cochran, Ruben Nunez, and many other patients.

182.   Defendants County of San Diego and CCMG were deliberately indifferent to the right of the plaintiff and others to be free from, and protected from, harm by the misconduct of its employees.

183.   Defendants' longstanding practice or custom was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to inmates.

184.   As a direct result of the practice or custom of the County of San Diego and CCMG, Defendants denied medical care to Michael Wilson, causing Michael's death.

185.   The unlawful and illegal conduct of Defendant deprived Michael Wilson of the rights, privileges and immunities secured to him by the Constitutions of the United States.

186.   As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

**FIFTH CAUSE OF ACTION**
**(Wrongful Death & Survival Action – CCP §§ 377.30, 377.60 *et seq*.)**
**[By Estate of Michael Wilson and Phyllis Jackson against All Defendants]**

187.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

188.   Plaintiffs allege all California state law claims as basis for state law wrongful death cause of action and incorporate later torts by reference.

189.   Defendants committed wrongful acts which proximately caused the death of Michael Wilson.   Specifically, Defendants, including Does 1-100, deprived Michael Wilson of his rights under the United States Constitution to be free from the punishment without due process and cruel and unusual punishment.

190.   Defendant Does' decision to deviate from the County of San Diego's own protocol as to the medical care of inmates was a substantial factor in causing Michael's death.   It was reasonably foreseeable that failure to communicate that Michael Wilson was having trouble breathing when his lungs were filling with liquid caused his death.

191.   These acts resulted in the death of Michael Wilson.

192.   The County of San Diego are responsible for the act of individual and Doe Defendants under the theory of *respondeat superior*.

193.   The wrongful acts alleged above has destroyed the relationship between Plaintiff Phyllis Jackson and Michael Wilson and has legally, proximately, foreseeably and actually caused severe emotional damages, including the loss of society, companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial.

## SIXTH CAUSE OF ACTION
### (Negligence)
**[By The Estate of Michael Wilson against County of San Diego; Garcia; Bautista; Germono; Ibanez; Kumar; Gatan; Freedland; Mark O'Brien; and CCMG]**

194.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

195.   Defendants had a duty to Plaintiff Michael Wilson to act with ordinary care and prudence so as not to cause harm or injury to another.

196.   In evaluating, assessing and handling Michael Wilson's medical condition, Defendants failed to comply with professional and legal standards.

- 36 -

197. Defendants improperly, negligently, wrongfully, and recklessly failed communicate Michael's serious medical need to the appropriate jail staff.

198. Defendants improperly, negligently, wrongfully, and recklessly failed to provide any medical care for Michael Wilson's hypertrophic cardiomyopathy.

199. Defendants improperly, negligently, wrongfully, and recklessly failed to take any action to monitor Michael Wilson despite his obvious symptoms of being serious medical distress.

200. Defendants improperly, negligently, wrongfully, and recklessly delayed and failed to render medical care to Michael Wilson who was in obvious physical distress and in acute need of medical care.

201. Defendant Garcia improperly, negligently, wrongfully, and recklessly failed to place Michael in MOB where he could be monitored. He improperly, negligently, wrongfully, and recklessly placed Michael on the top bunk in a unit where he could not be monitored. As a result, Michael who could barely breathe, had to overexert himself to get in and out of bed. Michael could not walk over to the panic button when he knew that he would die.

202. Defendants CCMG and O'Brien improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding medical treatment of inmates suffering from serious mental health conditions.

203. Defendants CCMG and O'Brien improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding proper screening, evaluation, treatment, and transportation of inmates suffering from a serious medical condition.

204. By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Michael Wilson.

205. The County of San Diego are responsible for the act of individuals and Doe Defendants under the theory of *respondeat superior*.

206.   By engaging in the acts alleged herein, all defendants failed to act with ordinary care and breached their duty of care owed to Michael Wilson.

207.   As a direct and proximate result of the Defendants' negligent conduct as herein described, Michael Wilson suffered physically and mentally in the amount to be determined at the time of trial.

208.   As a further proximate result of the Defendants' negligent conduct, Michael Wilson died.

209.   As a further proximate result of the Defendants' negligent conduct, Plaintiff Phyllis Jackson has lost her son and suffered great emotional and mental harm in the amount to be determined at the time of trial.

210.   The conduct of the Defendants also amounts to oppression, fraud or malice within the meaning of Civil Code Section 3294 et seq. and punitive damages should be assessed against each defendant for the purpose of punishment and for the sake of example.

## PRAYER FOR DAMAGES

1.   For general and special damages according to proof at the time of trial;

2.   For attorneys' fees and costs of suit and interest incurred herein;

3.   For punitive damages against individual defendants; and

4.   Any other relief this court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rues of Civil Procedure and the Seventh Amendment to the Constitution, Plaintiffs hereby demand a jury trial of this action.

- 38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

**IREDALE AND YOO, APC**

Dated:  April 13, 2021          <u>s/ *Julia Yoo*</u>

JULIA YOO
Attorney for Plaintiffs
THE ESTATE OF MICHAEL WILSON by
and through its successor-in-interest,
PHYLLIS JACKSON

- 39