1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 THE ESTATE OF MICHAEL WILSON, by and through its administrator, 12 PHYLLIS JACKSON, and PHYLLIS JACKSON, 13 | Case No. 20-cv-0457-BAS-DEB |
| 14 Plaintiffs, | **ORDER GRANTING IN PART AND DENIING IN PART DEFENDANTS' MOTIONS TO DISMISS** |
| 15 v. | |
| 16 COUNTY OF SAN DIEGO, *et al.*, | **[ECF Nos. 47, 54]** |
| 17 Defendants. | |

11 THE ESTATE OF MICHAEL WILSON, by and through its administrator, PHYLLIS JACKSON, and PHYLLIS JACKSON,

Plaintiffs,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

Case No. 20-cv-0457-BAS-DEB

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

**[ECF Nos. 47, 54]**

18
19

Before the Court are County Defendants' and CCMG Defendants' motions, respectively, to dismiss Plaintiffs' First Amended Complaint ("FAC") (ECF No. 43) pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).[1]  (*See* Cty. Defs. Mot., ECF No. 47; CCMG Defs. Mot., ECF No. 54.)  Plaintiffs oppose (Opp'n to Cty. Defs. Mot. ("Opp'n"), ECF Nos. 58; *see also* ECF No. 59) and Defendants reply (Reply in Support of Cty. Defs. Mot. ("Reply"), ECF No. 61; *see also* ECF No. 61).  The Court finds resolution

---

[1] County Defendants consist of Defendants William Gore, Barbara Lee, Louis Gilleran, Rizalina Bautista, Anil Kumar, Marylene Ibanez, Macy Germono, Laucet Garcia, and the County of San Diego. CCMG Defendants consist of Mark O'Brien, Peter Freedland, Vincent Gatan, and Coast Correctional Medical Group.

of this matter is suitable without the need for oral argument.  *See* Civ. L.R. 7.1(d)(1).  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motions before it.  (ECF Nos. 47, 54.)

**BACKGROUND**

**I.    Pertinent Procedural Background**[2]

**A.    Initial Complaint**

Phyllis Jackson ("Jackson") initiated this action on March 10, 2020, by filing the initial Complaint.  (Compl., ECF No. 1.)  She sought damages "in her own right" as the alleged mother of the decedent Michael Wilson ("Wilson"), and on behalf of Wilson's Estate ("Estate," together with Jackson, "Plaintiffs"), as its purported successor-in-interest.  (*Id.*)

According to the initial Complaint, Wilson suffered practically his entire life from a heart disease known as hypertrophic cardiomyopathy ("HCM").  (*Id.* ¶ 21); *Dorland's Illustrated Medical Dictionary*, 254, 708 (24th ed. 1965) (defining "hypertrophic" and "cardiomyopathy").    Left untreated, HCM can cause "shortness of breath," "heart palpitations," "fainting," "heart murmurs," "atrial fibrillation," "mitral valve problems" affecting circulation, "heart failure," and, in severe instances, "sudden cardiac death." (*Id.*) To treat this condition, Wilson was implanted with a pacemaker and took several heart medications.  (*Id.* ¶ 23.)

For reasons that are not explained in the initial Complaint, Wilson was booked into the San Diego Central Jail ("Jail") on a date uncertain.  (*Id.* ¶ 24.)  The initial Complaint alleged that Jail staff "knew that [Wilson] suffered from [HCM]" and took heart medications to treat his HCM, yet Jail staff failed to provide Wilson with any heart medication or medical treatment during the period of his confinement.  (*Id.* ¶¶ 23–26.)

---

[2] The facts are all taken from the initial Complaint (Compl., ECF No. 1) and the FAC (ECF No. 43).  For the pending Motions, the Court accepts all of Plaintiffs' factual allegations as true.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The Court incorporates the facts set forth in its Order, dated July 10, 2010 (First Order, ECF No. 17), and repeats those facts here only to the extent necessary to frame the issues pertinent to the instant Motions.

Consequently, Wilson began having difficulty breathing due to fluid build-up in his lungs. (*Id.* ¶¶ 25, 29.)  Members of Wilson's family—namely Jackson and Wilson's sister, Tujane—grew concerned about his condition following their telephone conversations with him. (*Id.* ¶¶ 30–32.)  They called the Jail to alert officials of Wilson's worsening condition, warning Wilson "would die if he was not taken to a hospital because his lungs were filling up with [fluid]." (*Id.* ¶¶ 29, 31–32.)  Nevertheless, Wilson still did not receive heart medication or medical attention from Jail staff.  Instead, the initial Complaint averred that his worsening symptoms of heart failure were treated with cough syrup. (*Id.* ¶ 40.)[3]

On February 14, 2019, after spending an unspecified number of days confined at the Jail, Wilson lost consciousness in his cell. (*Id.* ¶ 34.)  Staff attempted to resuscitate him and transported him to UCSD Hospital ("Hospital") for emergency treatment.  Wilson died that same day. (*Id.*)  He was 32 years old. (*Id.* ¶ 19.)  "The [m]edical [e]xaminer determined that [Wilson] died from sudden cardiac death due to acute congestive heart failure that was caused by his [HCM]." (*Id.* ¶ 35.)  Wilson's autopsy revealed that his "lungs were twice the average size, indicating that they had filled with liquid." (*Id.* ¶ 82.)

Set forth in the initial Complaint are allegations about "systemic failure[s]" within the County of San Diego ("County")'s jails (1) "to adhere to the written policies and procedures with respect to providing adequate health care to inmates" and (2) "to investigate incidents of medical neglect, staff misconduct, and deaths." (*Id.* ¶¶ 43–44.)  The initial Complaint further alleged the County's jails had long-standing "custom[s] and practice[s] of improper and inadequate investigations; cover[ing] up misconduct; and fail[ing] to discipline and train deputies and medical staff." (*Id.* ¶ 46.)  The initial Complaint cited an audit prepared at the request of the County by the National Commission of Correctional Health Care ("NCCHC Audit"), which details the essential medical-care standards of which the County's jails fall short.  Finally, the initial Complaint listed

---

[3] The initial Complaint did not name as Defendants the Jail's staff involved in providing medical care to Wilson because Plaintiffs did not know their identities at the time.  Plaintiffs instead refer to them as "Doe Defendants." (Compl. ¶¶ 17–18.)

previous deaths and injuries that occurred in the County's jails resulting from the aforementioned pattern and practice of medical neglect and misconduct by jail staff.  (*Id.* ¶¶ 48–87.)

The initial Complaint named as Defendants the County, along with its employees Sheriff William Gore ("Gore") and Medical Administrator for the Sheriff's Department Barbara Lee ("Lee").[4]  (*Id.* ¶¶ 9–12, 15.)   The initial Complaint lodged nine causes of action:  (1) five claims under 42 U.S.C. § 1983 ("Section 1983") (deliberate indifference to serious medical needs and right of association against Doe Defendants, failure to properly train and failure to properly supervise and discipline against Gore and Lee, and a claim under *Monell* against the County); (2) state law claims for wrongful death and negligence against all Defendants; and (3) violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against the County.  (*Id.* ¶¶ 88–102.)

## B.    First Motion to Dismiss

On April 24, 2020, the County, Gore, and Lee moved to dismiss all claims against them under Rule 12(b)(6) ("First Motion to Dismiss").  (ECF No. 12.)  This Court granted in part and denied in part that Motion on July 10, 2020.  (First Order.)  In pertinent part, this Court held that:

- Jackson—but not the Estate—had adequately alleged a statutory cause of action for wrongful death under California law against Gore, Lee, and the County.  (First Order 10–12);

- Plaintiffs had adequately alleged Section 1983 claims against Gore and Lee for failure to train and failure to supervise and discipline, both predicated upon theories of supervisory liability.  (*Id.* 4–9);

- Plaintiffs had adequately alleged a Section 1983 claim under *Monell* against the County. (*Id.* 9–10)

- Plaintiffs failed to state a claim for negligence against any Defendant. (*Id.* 12–14.); and

---

[4] The initial Complaint also named as a Defendant Alfred Joshua.  However, Plaintiffs voluntarily dismissed without prejudice their claims against him.  (*See* ECF No. 11.)

- •    Plaintiffs failed to state a claim under the ADA or the Rehabilitation Act against the County.  (*Id.* 14–16.)

## C.    First Amended Complaint

On January 15, 2021, Plaintiffs sought leave to file their proposed First Amended Complaint ("FAC").  (*See* Mot. for Leave, ECF No. 33; *see also* Redline Comparison of Compl. and FAC ("Redline"), ECF No. 33-2.)  This Court granted Plaintiffs' request on April 13, 2021 (ECF No. 41) and Plaintiffs filed a final version of their proposed FAC that same day (ECF No. 43).

Although the FAC incorporates nearly all of the initial Complaint's factual allegations, it also contains new and amended allegations bearing upon the Motions before this Court.  These allegations (1) modify the nature of the legal relationship between Jackson and Wilson; (2) shed light upon the circumstances under which Wilson was confined; (3) name ten new Defendants and describe in detail their involvement in Wilson's alleged injuries; and (4) modify the causes of action alleged in the prior iteration of the pleading.

### 1.    Jackson's Relationship with Wilson

As mentioned above, Jackson brought a wrongful death action the basis that she was Wilson's "mother" and he her "son."  (Compl. ¶¶ 4, 6.)  The FAC now retracts that allegation.  (FAC ¶ 6.)  Instead, Jackson alleges in the amended pleading that she was neither Wilson's adoptive nor natural mother but was his "legal guardian."  (*Id.* ¶ 6.) Specifically, she avers that she had cared for Wilson since he was just three-months old and that, from the time she took custody over him, she had held him out as though he was her natural son.  (*Id.* (alleging Wilson resided with Jackson his entire life).)  Jackson alleges that when Wilson turned two his natural mother's parental rights terminated; at that time, Jackson sought to adopt Wilson.  However, she instead "opted to obtain legal guardianship in lieu of formal adoption due to the extraordinary medical costs related to [Wilson's] heart condition."  (*Id.*)  Jackson concedes that she is not Wilson's legally adoptive mother.  (*Id.*)

20cv0457

Additionally, Jackson alleges that on January 6, 2021, the San Diego Superior Court in *Estate of Michael R. Wilson*, 37-2021-00000401-PR-LS-CTL appointed her "special administrator" of the Estate and ordered her to "substitute in as plaintiff" in the instant matter.  (*Id.*; Probate Court Order, annexed as Ex. A to Request for Judicial Notice, ECF No. 47-2.)[5]  By the FAC, Jackson, in her capacity as special administrator of the Estate, substitutes Jackson, in her capacity as the Estate's purported successor-in-interest, to represent the Estate in this matter.  (FAC ¶ 4.).

### 2.      Flash Incarceration Allegations

For the first time, the FAC alleges that Wilson was confined at the Jail beginning on February 5, 2019 "after being sentenced to two weeks flash incarceration."  (*Id.* ¶¶ 17, 27 (internal quotation marks omitted).)  "Flash incarceration" refers to "a period of detention in a county jail due to a violation of an offender's conditions of probation or mandatory supervision[,]" *Id.* § 1203.35(b), or for violation of an offender's conditions of parole.[6]  *Id.* § 3454(c).   It is "a relatively new procedure adopted as part of California's 2013 'realignment of its parole system.'"  *Gaines v. Reynolds*, No. CV-5011-TJH (JPR), 2017 WL 10562981, at *5 n.6 (C.D. Cal. Dec. 13, 2017) (citing *Valdivia v. Brown*, 956 F. Supp. 2d 1125, 1130–31 (E.D. Cal. 2013)); *see also* Cal. Penal Code § 3450(b)(8) (introducing several "supervision policies, procedures, programs and practices," including "flash incarceration," which have been "demonstrated by scientific research to reduce recidivism among individuals under probation, parole, or postrelease supervision").   Although the FAC does not allege whether Wilson's flash incarceration was imposed for his violating

---

[5] A federal district court may consider documents to which a plaintiff "refers extensively" in the pleading but that plaintiff does not annex, without converting a Rule 12(b)(6) motion into one for summary judgment.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  Here, Plaintiffs not only refer directly and repeatedly to the Probate Court Order but also appear inadvertently to have failed to append that document to the FAC.  (FAC ¶ 4 (listing the Probate Court Order as "Ex. A" but failing to append any extraneous document to pleading).)   Accordingly, this Court incorporates by reference the Probate Court Order.

[6] Flash incarcerations "may range between one and 10 consecutive days," but that period may be truncated or elongated under certain conditions.  Cal. Penal Code §§ 1203.35(b), 3454(c).

parole, probation, or some other form of postrelease supervision, the distinction does not bear upon the pending Motions.

### 3.    Newly Added Defendants

The FAC names ten new Defendants.  In doing so, Plaintiffs plead additional factual content that sheds light upon Wilson's confinement, which this Court attempts to weave in as it describes the newly added Defendants.

#### a.    Louis Gilleran

The FAC now names as a Defendant Louis Gilleran ("Gilleran"), the interim Chief Medical Officer for the Sheriff's Department at the time of Wilson's death.  (FAC ¶ 13.) According to the FAC, Gilleran supervised the Jail's medical staff and "directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures."  (*Id.*)  Because Plaintiffs seek to hold Gilleran liable on the same supervisory basis as they do Gore and Lee, the Court hereinafter refers to those Defendants, collectively, as "Supervisory Defendants."

#### b.    Medical Staff Defendants

The FAC also names as Defendants four members of the Jail's medical staff— Nurses Rizalina Bautista, Anil Kumar, Marylene Ibanez, and Macy Germono (collectively "Medical Staff Defendants").  According to the FAC, these Defendants were directly involved with providing medical care to Wilson during the period of his confinement.

Nurse Rizalina Bautista.  As mentioned above, Wilson was booked into the Jail on February 5, 2019.  (*Id.* ¶ 17.)  That same day, Bautista performed Wilson's initial medical screening.  (*Id.* ¶ 27.)  In her notes from the screening, Bautista recorded that (1) she had seen the sentencing court's order indicating Wilson "ha[d] serious medical conditions that need to be seen"[7]; (2) Wilson suffered from "congestive heart failure," "cardiomyopathy,"

---

[7] Plaintiffs allege that the minutes of the hearing at which Wilson was sentenced contain the sentencing judge's handwritten notes, which state, in pertinent part, "[the] Court orders medical staff to be aware that [Wilson] has some serious medical issues."  (FAC ¶ 27.)  Plaintiffs allege this order was sent to the Jail.  (*Id.*)

and asthma; and (3) Wilson took asthma and heart medication, including "Lasix," a diuretic which Wilson took daily to treat his HCM[8]; and (4) Wilson was scheduled for an appointment to see a physician at the Jail. (*Id.* ¶ 27.) According to the FAC, despite Bautista's notations, Wilson did not receive *any* heart medication on February 5 or February 6, 2019. (*Id.* ¶¶ 30–31.) Nor was Wilson seen by a physician. (*Id.*) The FAC alleges Jail staff's neglect of Wilson's HCM was due to Bautista's failure to communicate his serious medical needs to those responsible for administering care to Wilson. (*Id.*)

Furthermore, the FAC alleges that not only did Bautista fail to communicate her findings from Wilson's initial screening to the pertinent members of the Jail's medical staff, but she also failed to communicate Wilson's serious medical needs to the Jail Population Management Unit ("JPMU")—the unit responsible for inmate housing assignments—in accordance with standard practice. (*Id.* ¶¶ 66, 68.) Consequently, JPMU assigned Wilson to a housing unit ill-suited for the "constant monitoring and heightened care" he needed due to his HCM, *see infra* Bkgd. Sec. I.C.3.c. (*Id.* ¶¶ 71–72.)

<u>Nurse Anil Kumar</u>.  By February 7, 2019, Wilson still had not received his heart medication for two straight days. (*Id.* ¶ 31.) Accordingly, he wrote a request to see a doctor. (*Id.*) Again, Wilson did not receive any medication on February 7. On February 8, 2019, Kumar responded to Wilson's written request from the previous day. She informed him that he was "scheduled for an assessment" but did not indicate when. (*Id.* ¶ 32.) Moreover, even though Sapphire—the Jail's record-keeping system used to track inmate medication—reflected he had not received his heart medication once during his four days of confinement, Kumar did not administer to Wilson his heart medication. (*Id.*) Thus, Wilson went yet another day without treatment for his HCM.

<u>Nurse Marylene Ibanez</u>.  After approximately five days without a single dose of Lasix, Wilson began having trouble breathing due to fluid build-up in his lungs. (*Id.* ¶¶ 33–34.) On February 9, 2019, Wilson filled out a complaint notifying the Jail's medical

---

[8] A "diuretic" is a "drug which causes diuresis"—"the increased secretion of urine"—"through increasing the force of the heartbeat." *Dorland's* at 442.

staff "that he had a cough that '[would] not go away.'"  (*Id.* ¶ 34.)  In a written response drafted that same day, Ibanez informed Wilson he "already [was] scheduled to see the nurse."  (*Id.* ¶ 35.)  Despite Ibanez's assurances, Wilson was not seen by a nurse on February 9 or February 19, 2019.  (*Id.* ¶ 35.)  Nor did Ibanez or any other member of the Jail's medical staff administer to Wilson his heart medication.  (*Id.* ¶ 35.)  Consequently, his condition deteriorated further.  (*Id.* ¶¶ 39–41.)

On February 11, 2019, Wilson had multiple conversations with family members during which he complained of having trouble breathing, having chest pains, and being deprived of his heart medication.  (*Id.* ¶ 39.)  Wilson's family member's "frantically called" the Jail on the morning of February 11 to impress upon staff that Wilson urgently needed medical attention because his lungs were filling with fluids.  (*Id.* ¶¶ 39–41.)   Later that morning, Wilson was taken on an emergency visit to the Jail's medical unit.  (*Id.* ¶ 42.)  Tests showed that his oxygen saturation levels were slightly below normal.  (*Id.* (alleging Wilson's oxygen saturation level was 90-94%, one percent below the normal range).)  Defendants Dr. Peter Freedland and Nurse Practitioner Vincent Gatan, who, as explained below, *infra* Bkgd. Sec. I.C.3.d, were private medical contractors of the County, assessed Wilson.  (*Id.* ¶ 42.)  They administered to Wilson a single dose of Lasix and cough syrup.  (*Id.* ¶ 44.)  Despite knowing Wilson suffered from HCM, neither Dr. Freedland nor NP Gatan ran "objective or subjective tests [or] assessments" to determine whether Wilson's symptoms were signs of congestive heart failure due to his untreated HCM.  (*Id.* ¶¶ 51–52.)

Nurse Macy Germono.  On the evening of February 11, 2019, Wilson's condition had not improved despite having seen Dr. Freedland and NP Gatan; Wilson's sister called the Jail to alert officials he was "in medical distress."  (*Id.* ¶ 53.)  Germono examined Wilson, noting that he "was in moderate distress," had a persistent cough, and had shortness of breath.  She entered Wilson into "Standard Nursing Protocol" for asthma and administered more cough syrup and a nebulizer, as opposed to "the County's Standardized Nursing [Protocol] for chest pain which takes into consideration cardiac disease."

According to the FAC, Germono did not even "assess whether [Wilson's] chest pain was cardiac [or] non-cardiac [in nature]." (*Id.* ¶ 54.)

Plaintiffs allege that by February 12, 2019, Wilson had reached a critical state, as reflected by other inmates' observation of Wilson's medical distress. Plaintiffs allege that an inmate named Drew Crane told investigators that on approximately February 12, 2019, Wilson could barely speak, eat, or sleep because "he was coughing so much." (*Id.* ¶ 61.) Other inmates informed investigators that Wilson had a terrible cough and was complaining about his lungs and an inability to breath. (*Id.* ¶¶ 62–64.) Wilson was seen once more by Dr. Freedland and NP Gatan, and then Germono, on February 12, 2020. According to the FAC, "Germono wrote 'noted, med on [S]apphire,'" but "did not administer the [heart] medication that is listed on [S]apphire." (*Id.* ¶ 57.)

### c. Laucet Garcia

The FAC also adds as a Defendant Laucet Garcia, the Deputy within JPMU responsible for determining which housing unit to assign Wilson. (*Id.* ¶ 67.) Garcia assigned Wilson to the Enhanced Observation Housing unit ("EOH"), which is reserved for suicidal inmates, as opposed to the Medical Unit ("MOB"), which is "reserved for seriously ill inmates who require constant monitoring and heightened care.". (*Id.* ¶¶ 72–75.) According to the FAC, Garcia made Wilson's housing determination without first consulting the Jail's medical staff. (*Id.* ¶ 73.) He placed Wilson in the "top bunk of Cell B10, where the control deputy from the tower in the center of the floor could not see into the cell." (*Id.* ¶ 75 (containing a sketch of the EOH and a picture of Cell B10).)

On February 14, 2019, Wilson was lying on his bed when he became medically distressed. (*Id.* ¶ 76.) "He could not walk over to the panic button. He sat up on his bed then slid down, collapsing on the floor." (*Id.*) Jail staff began resuscitating him and transported him to the Hospital where those efforts continued; ultimately, they were unsuccessful and Wilson died. (*Id.* ¶ 77.) The FAC alleges that Garcia's housing assignment caused Wilson's injuries because (1) Wilson did not receive the vigilant care and monitoring that he would have had he been assigned to the MOB; (2) Jail staff could

not see into Cell B10 to determine whether Wilson was in medical distress; and (3) Wilson could not reach the cell's panic button from the top bunk.  (*Id.* ¶¶ 72–76.)

### d.   CCMG Defendants

Finally, the FAC adds as Defendants Coast Correctional Medical Group ("CCMG"), its Chief Executive Officer and President Mark O'Brien ("O'Brien"), and its employees Dr. Peter Freedland ("Dr. Freedland") and Nurse Practitioner Vincent Gatan ("NP Gatan" and, collectively "CCMG Defendants").  The FAC avers that CCMG is a third-party medical group with whom the County contracts to provide medical care to inmates at the Jail.  (*Id.* ¶ 13.)  CCMG purportedly employed, supervised, and trained Dr. Freedland and NP Gatan, who allegedly misdiagnosed and failed to treat Wilson for his HCM when they assessed him on February 11 and February 12, 2019.  (*Id.* ¶¶ 43–51, 56.)

### 4.   Modified Causes of Action

The FAC removes the initial Complaint's claims of right of association and the alleged violations of the ADA and the Rehabilitation Act.  Moreover, the FAC no longer asserts negligence against Gore and Lee, nor does it lodge such a claim against newly added Supervisory Defendant Gilleran.  As presently constructed, the FAC asserts the following causes of action:

- <u>Count 1</u>:  Deliberate indifference to serious medical needs under Section 1983 by the Estate against the Medical Staff Defendants, Dr. Freedland, and NP Gatan. (*Id.* ¶ 122–36);

- <u>Count 2</u>:  Failure to properly train under Section 1983 by the Estate against Supervisory Defendants and O'Brien.  (*Id.* ¶¶ 137–50);

- <u>Count 3</u>:  Failure to properly supervise and discipline under Section 1983 by the Estate against Supervisory Defendants and O'Brien.  (*Id.* ¶¶ 151–67);

- <u>Count 4</u>:  A *Monell* claim under Section 1983 by all Plaintiffs against the County and CCMG.  (*Id.* ¶¶ 168–86);

- <u>Count 5</u>:  A wrongful death action pursuant to California Civil Code § 377.60 and a survival action under California Civil Code § 377.30 by all Plaintiffs against all Defendants.  (*Id.* ¶¶ 187–93); and

20cv0457

- Count 6: Negligence by the Estate against the County, Medical Staff Defendants, and CCMG Defendants.  (*Id.* ¶¶ 194–210.)

## II.   Motions to Dismiss

On June 21, 2021, the County, Medical Staff Defendants, Supervisory Defendants, and Garcia (previously defined as "County Defendants") jointly moved to dismiss all claims lodged against them in the FAC.  (Cty. Defs. Mem., ECF No. 47-1.)   County Defendants seek dismissal on numerous grounds.

First, they argue Jackson lacks statutory standing to pursue a wrongful death action (and, thus, a *Monell* claim) under California law because the FAC's amendments disclose that she was neither Wilson's adoptive nor natural mother.  (*Id.* 6–7.)  Accordingly, County Defendants ask the Court to dismiss Jackson from this action.

Second, County Defendants argue that all of the Estate's Section 1983 claims are defective.   County Defendants argue Count 1 fails to provide Medical Staff Defendants with fair notice of the claims against them.   Moreover, they assert Count 1 is governed by the Eighth Amendment's more rigorous standard, which the FAC's allegations assertedly do not satisfy, and that Plaintiffs fail to demonstrate a causal connection between any Medical Staff Defendant's action or inaction and Wilson's death.   County Defendants argue Counts 2 and 3 fail as a matter of law because Plaintiffs fail to allege adequately that Supervisory Defendants knew of the pattern and practice of constitutionally substandard medical care at the Jail, a requisite element of supervisory liability under Section 1983.   County Defendants further assert that even if Counts 1 through 3 are well-pleaded, the Medical Staff Defendants and Supervisory Defendants are protected by qualified immunity.   Finally, County Defendants argue Count 4 fails because there is no "pervasive practice" of unconstitutional medical care at the Jail alleged on the face of the FAC sufficient to hold the County liable under *Monell*.  (*Id.* 10–20.)

Third, County Defendants argue that the FAC's state law claims also are deficient.  (*Id.* 21–24.)  They contend the Estate failed to comply with the California Tort Claims Act

20cv0457

("CTCA")'s pre-litigation claim-presentment requirement.  They also argue that the Estate's negligence claims (Count 6) against each Defendant are missing requisite elements.  (*Id.* 21–24.)

On July 8, 2021, CCMG Defendants also moved to dismiss.  (CCMG Defs. Mem., ECF No. 54-1.)  That Motion is far more circumscribed than County Defendants' Motion.  In essence, CCMG Defendants principally argue that California law limits by statute the types of damages recoverable in a survival action, and the injuries identified in the FAC plainly fall outside of the scope of the pertinent statute.  (*Id.* 5–7.)[9]

## LEGAL STANDARD

A complaint must plead sufficient factual allegations to "state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001).  The court must accept all factual allegations pleaded in the complaint as true and must construe them and draw all reasonable inferences therefrom in favor of the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).  To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations, rather, it must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A Rule 12(b)(6) dismissal may be based on either a 'lack of cognizable legal theory' or 'the absence of sufficient facts

---

[9] CCMG Defendants also argue that Jackson lacks standing to bring a survival action and that the Estate lacks standing to bring a wrongful death action.  (*Id.* 7–8.)  Plaintiffs clarify in their opposition to CCMG Defendants' Motion that neither Jackson nor the Estate intend to bring such claims.  (ECF No. 60.)  Thus, this Court **GRANTS** the unopposed strand of CCMG Defendants' Motion to Dismiss the survival action to the extent it is brought by Jackson and the wrongful death action to the extent it is brought by the Estate.

alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

# ANALYSIS

## I.  Jackson's Statutory Standing to Bring Wrongful Death Action

County Defendants argue that Jackson's claims should be dismissed because she lacks statutory standing under California law to bring a wrongful death action (and, thus, a *Monell* claim).  (Cty. Defs. Mem. 6–7.)[10]

"California Civil Code § 337.60 [("Section 337.60")] specifies who may bring a wrongful death action and is 'strictly construed.'" *J.K.J. v. City of San Diego*, No. 19-CV-2123-CAB-RBB, 2020 WL 738178, at *4 (S.D. Cal. Feb. 13, 2020) (quoting *Stennett v. Miller*, 34 Cal. App. 5th 284, 290 (Cal. Ct. App. 2012)).  A plaintiff who lacks statutory standing to bring a claim under Section 377.60 may not bring a claim under Section 1983. *See Estate of Perez v. City of Orange*, No. 18-cv-0028 JVS (KESx), 2019 WL 4228375, at *3 (C.D. Cal. May 13, 2019) (citing *Reynolds v. Cty. of San Diego*, 858 F. Supp. 1064, 1069 (S.D. Cal. 1994), *aff'd in part, remanded in part* 84 F.3d 1162 (9th Cir. 1996)).

Section 337.60 provides, in pertinent part:

> A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:

> (a) The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession.

---

[10] Statutory standing "does not implicate subject-matter jurisdiction," and, thus, challenges thereto are not examined through the lens of Rule 12(b)(1).  *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 129 n.4 (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)).  Rather, "a dismissal for lack of statutory standing is properly viewed as a dismissal for failure to state a claim."  *Harris v. Amgen, Inc.*, 573 F.3d 728, 732 n.3 (9th Cir. 2009) (citing *Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1024 (9th Cir. 2009)).

Cal. Code Civ. § 377.60(a).  The California Probate Code prescribes the disposition of property subject to intestacy.  *See* Cal. Prob. Code § 6400; *see also id.* §§ 6401–6404. There is no provision in the relevant portion of the California Probate Code that endows a decedent's former legal guardian with inheritance rights.[11]

Jackson argues that she has statutory standing to bring a Section 377.60 claim because she is "entitled to [Wilson's property] by intestate succession."  *See* Cal. Code Civ. § 377.60(a); (Opp'n 7–9.)  Although she acknowledges that she is precluded from inheriting intestate and, thus, suing for wrongful death on behalf of Wilson as his natural or adoptive mother under California Probate Code § 6402(b), she argues that the doctrine of equitable adoption, codified at California Probate Code § 6455, operates to enable her to inherit intestate from Wilson as his "equitable parent," and, therefore, places her squarely among the class of persons to maintain this Section 377.60 action.  (Opp'n 7–9.) Alternatively, she argues she should be allowed to maintain this suit even if she lacks statutory standing on the ground that there exists "no family member" of Wilson's who can do so.  (*Id.* 9.)  The Court addresses both arguments in turn.

## A.  Equitable Adoption

The courts of numerous jurisdictions, including California, have developed the doctrine of equitable adoption as a mechanism to grant foster children the right to inherit intestate "outside the ordinary statutory course of intestate succession and without the formalities required by adoption statutes[.]"  *Estate of Ford*, 32 Cal. 4th 160, 170–71 (2004); *see* Stanley P. Atwood, Comment *Virtual Adoption & Rights of Inheritance*, 21 Wash. & Lee L. Rev. 312, 312 (1964) ("Since adoption is entirely statutory, equity courts in many jurisdictions have developed the doctrine of virtual," or equitable, "adoption to cover certain situations where, for some reason, the statutory procedures have not been

---

[11] The Court observes that under Cal. Code Civ. § 377.60(b), a legal guardian may sue for the death of his or her ward if she or he alleges dependency.  However, this provision is inapplicable here. Jackson does not allege she was Wilson's dependent.  Moreover, Jackson's status as Wilson's legal guardian terminated by operation of California law when Wilson reached majority.  She does not allege that she applied for an extension of that status.  *See* Cal. Prob. Code § 1600.

completed so as to result in a legal adoption. Under this doctrine, mere foster children are granted such rights of inheritance from their foster parents as they would have enjoyed had they been legally adopted.").

The California doctrine of equitable adoption is a "relatively narrow" one, predicated upon principles of contract, which has been applied by California courts to bestow inheritance rights *to children* who, though "having filled the place of [decedents'] natural[ly] born child, through inadvertence, fault, or invalidity, had not been legally adopted [by the decedents]." *See Estate of Ford*, 32 Cal. 4th 160 at 170–71 (recounting the jurisprudential origins of California's equitable adoption doctrine). Equitable adoption does not arise "merely from existence of a familial relationship between the decedent and the claimant[.]" *Pope v. Colvin*, No. 14-cv-3175-YGR, 2015 WL 4999965, at *2 (N.D. Cal. Aug. 20, 2015) (quoting *Estate of Ford*, 32 Cal. 4th at 170).

California's doctrine of equitable adoption is codified at California Probate Code § 6455 ("Section 6455"), which provides: "Nothing in [Chapter 2 of part 2 of division 6 of the California Probate Code] affects or limits application of the judicial doctrine of equitable adoption *for the benefit of the child or the child's issue*." Cal. Prob. Code § 6455 (emphasis added). The emphasized language of Section 6455 unambiguously precludes application of the doctrine for the benefit of claimants in Jackson's position, seeking the right to inherit from their predeceased "equitable" child. *Cal. Sch. Emps. Ass'n v. Governing Bd.*, 8 Cal. 4th 333, 340 (1994) ("If the clear statutory language is clear and unambiguous, [the court's] task is at an end, for there is no need for judicial construction."); *see also Delaney v. Superior Court*, 50 Cal.3d 785, 798 (1990) (holding where a statute deploys clear and unambiguous language, there is nothing for the court to interpret or construe); *accord Smith v. Workers' Comp. Appeals Bd.*, 46 Cal. 4th 272, 277 (2009) ("In construing a provision, 'we presume the Legislature meant what it said' and the plain meaning governs." (quoting *People v. Snook*, 16 Cal. 4th 1210, 1215 (1997))).[12]

---

[12] Jackson argues that Section 6455 does not preclude her from invoking equitable adoption because the statute "does not define or limit [the phrase] 'benefit of the child' nor does it reference passing

1    This Court's interpretation of Section 6455 comports not only with basic cannons of

2    statutory interpretation but also the decisional law that Section 6455 embodies.  Indeed,

3    California's doctrine of equitable adoption has only been employed when the equitable

4    parent—not the child—dies intestate.  *See Estate of Ford*, 32 Cal. 4th at 171 (holding the

5    doctrine is a "relatively narrow one, applying *only* to those who though having filled the

6    place of a natural born child, through inadvertence or fault [have] not been legally

7    adopted") (listing cases); *Estate of Rivolo*, 194 Cal. App. 2d 773, 775–77 (Cal. Ct. App.

8    1961) ("The question on appeal is whether respondent . . . is entitled to the entire estate of

9    [the decedent] as his equitably adopted daughter"); *Estate of Wilson*, 111 Cal. App. 3d 242

10   (Cal. Ct. App. 1980) (analyzing whether child could inherit intestate from decedent under

11   doctrine of equitable adoption); *Estate of Bauer*, 111 Cal. App. 3d 554, 560 (Cal. Ct. App.

12   1980) (same);  *Estate of Furia*, 103 Cal. App. 4th 1, 5 (Cal. Ct. App. 2002) ("The doctrine

13   of equitable adoption principally applies when the equitable parent dies intestate.");

14   *Carlson v. Marcel*, No. B227661, 2011 WL 3841218, at *6 n.11 (Cal. Ct. App. Aug. 31,

15   2011) ("Equitable adoption permits a person who was accepted and treated as a natural or

16   adopted child, and as to whom adoption was promised or contemplated but never

17   performed, to share in the inheritance of the foster parents (estate)."); *Estate of Chambers*,

18   175 Cal. App. 4th 891, 894 n.3 (Cal. Ct. App. 2009) ("[Section] 6455 permits proof of a

19   parent-child relationship for purposes of intestate succession by the theory of equitable

20

21   ———————————

     of the estate specifically to parent or child," this Court still is not persuaded.    (Opp'n 9 (citing Cal. Prob.
22   Code § 6455).)   This Court does not accept Jackson's rather conclusory attempt to drum up ambiguity
     where none exists.  The Court finds significant that her interpretation violates two of the most basic canons
23   of statutory interpretation all at once—(1) that words must be given their common meaning and (2) that
     interpretations should not render whole clauses superfluous. *See Cleveland v. City of Los Angeles*, 420
24   F.3d 981, 989 (9th Cir. 2005) ("When a statute does not define a term, a court should construe that term
     in accordance with its ordinary, contemporary, common meaning.") (internal quotation marks and citation
25   omitted); *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) ("To
     determine the 'plain meaning' of a term undefined by a statute, resort to a dictionary is permissible.");
26   *Boise Cascade Corp. v. U.S. Envtl. Agency*, 942 F.2d 1427, 1432 (9th Cir. 1991) (holding statutory
     interpretation should not render language superfluous).  Accordingly, the Court need not delve into the
27   morass of interpreting the meaning of "for the benefit of the child" to conclude Jackson is not among the
     persons whom Section 6455 was designed to bestow inheritance rights.
28

adoption.  The doctrine applies when an adult treats a child not his own as if it were his natural born child, the evidence establishes an intent to adopt the child, and through inadvertence or fault, the child was not adopted."); *accord Mingo v. Heckler*, 745 F.2d 537, 538–40 (9th Cir. 1984) (holding child who had lived with her grandmother and grandmother's cohabitant from infancy was entitled to Social Security benefits as cohabitant's equitably adopted child); *Pope*, 2015 WL 4999965, at *3 (assessing whether child was entitled to purportedly equitably adopted parent's Social Security benefits)

In fact, the lone case in California to address the question whether equitable adoption may be deployed to enable a foster parent to commence a wrongful death action on behalf of his or her predeceased foster child answers in the negative.  *Reynolds v. City of Los Angeles*, 176 Cal. App. 3d 1044 (Cal. Ct. App. 1986) ("*Reynolds*").  *Reynolds* involved a plaintiff who, while stationed at an Air Force base in England, took custody of a child whom another man in plaintiff's unit had fathered out of wedlock.  Immediately after the child's birth, plaintiff initiated adoption proceedings in England.  However, those proceedings were abandoned when plaintiff and the child returned to the United States. Plaintiff did not take any further legal action to formalize his adoption of the child, but nevertheless held himself out as the child's natural parent for his entire life, much like Jackson in the instant case.  The child died at age 17, shortly after which plaintiff commenced a wrongful death action.  The *Reynolds* trial court dismissed plaintiff's claim on the ground "[he] was not the surviving parent of [the decedent] and therefore was not a person or party empowered to prosecute a wrongful death case within the meaning of [Section 377]."  *Id.* at 1047.  The plaintiff appealed.  The *Reynolds* Court affirmed the trial court's verdict, rejecting the plaintiff's argument that equitable adoption enabled him to sue for the decedent's wrongful death, *inter alia*, because the Court could not overlook plaintiff's failure to consummate his purported promise to formalize decedent's adoption despite having "abundant opportunity" to do so.  *Id.* at 1051 n.1.[13]

13 The *Reynolds* Court also held equitable adoption inapplicable because that doctrine "connotes a consensual agreement between parties not otherwise incapacitated from entering into a contract" and the

1    Notably, the Court observes that *Reynolds* stands on all fours with well-settled
2    principles of contract law upon which equitable adoption rests.  In *Estate of Ford*, 32 Cal.
3    4th 160 (2004), the California Supreme Court made clear that in equitable adoption cases,
4    a court must give credence to the legal fiction that there existed between the parent and
5    child an unconsummated adoption contract, and that, where the requisite evidentiary
6    showing of an intent to adopt is met, the child can, through equitable estoppel or specific
7    performance, enforce that adoption contract to procure the inheritance rights of a natural
8    or adoptive child.   As *Reynolds* reveals, those contractual principles militate *against*
9    enforcement of an adoption contract where, as here and in *Reynolds*, the claimant is the
10   "foster" or "putative" parent, as opposed to the child.   Indeed, under California law,
11   equitable estoppel is unavailable where the counterparty to a contract or a promise has not
12   fully performed his or her duties thereunder.  *See Poway Royal Mobilehome Owners Ass'n*
13   *v. City of Poway*, 149 Cal. App. 4th 1470 (2007) (holding the remedy for equitable estoppel
14   is "measured by the extent of the obligation assumed and *not performed*").  So, too, then,
15   must equitable adoption be unavailable to an assertedly equitable parent, because the
16   equitable child has fully performed his or her "obligations" under the fictitious adoption
17   contract, *i.e.*, filling the role of a natural child.  *See Estate of Ford* 32 Cal. 4th at 166.
18   Similarly, under California law, specific performance is available only those who are
19   "ready, willing and able to perform" their contractual obligations.  *See Ninety Nine Invs. v.*
20   *Overseas Courier Serv. (Singapore) Private*, 113 Cal. App. 4th 1118, 1126 (Cal. Ct. App.
21   2003).  Thus, it would make little sense to entitle a parent who has not formalized adoption
22   to then benefit from the doctrine.   Simply put, the absence of authority supporting
23   Jackson's proposed application of equitable adoption is not simply "a reflection of the
24   natural order of things," *i.e.*, "parents typically die before their children" (Opp'n 8–9), but
25
26
27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     decedent had not reached the age of majority when plaintiff first manifested his intent to adopt him.  The
28   Court notes that under California Family Code § 6700, a minor has the same capacity to contract as an
     adult.  Nevertheless, the other *Reynold*'s holding, articulated above, dictates the same result.

rather is a reflection that enabling putative parents to invoke equitable adoption betrays the contract principles upon which the doctrine relies.

This conclusion is further supported by the Court's examination of decisions from other jurisdictions, which reveals that, uniformly, courts in other states use equitable adoption to vindicate the inheritance rights of *children only*. *See Travelers Ins. Co. v. Young*, 580 F. Supp. 421, 424 (E.D. Mich. 1984) (finding, after canvassing body of law nationwide, "equitable adoption does not allow an adoptive parent to inherit from a child absent a formal, legal adoption" and collecting cases); *see also Whitchurch v. Perry*, 137 Vt. 464, 472 (1979) ("[H]ere the prospective adoptive parents not the child seek the benefit of an equitable adoption.  Attempts to obtain such relief have failed because foster parents who through neglect or design breach an agreement to adopt and those claiming through them are in no position to invoke the equitable powers of a court."); *Heien v. Crabtree*, 369 S.W.2d 28 (Tex. 1963) (similar); *Rumans v. Lighthizer*, 363 Mo. 125 (1952) (similar); *see also Martin v. Summers*, 576 S.W.3d 249, 256 (Mo. Ct. App. 2019) ("We find no basis extending the holdings of these [equitable adoption] cases to create a legal benefit for the alleged parent to proceed with a cause of action for damages."); *Matter of Edwards' Estate*, 106 Ill. App. 3d 635 (Ill. App. Ct. 1982) (similar); *see also* George A. Locke, Am. Jur. Proof of Facts 2d. 531 § 3 (2022) ("The strongest resistance to extending the use of the equitable adoption principle has been met in cases where the person benefiting from its application would be someone other than the child who was subject of the adoption.").

Accordingly, this Court finds Jackson that the equitable adoption doctrine does not confer Wilson with statutory standing under Section 377.60.

## B.    Absence of Successor-in Interest

Alternatively, Jackson appears to concede she lacks statutory standing, but avers that there is *no person* who falls within the statutorily prescribed group of people under Section 377.60 who can bring a claim in connection with Wilson's death.  (Opp'n 9 ("[T]here is no other family member who can inherit").)   Accordingly, Jackson requests that she be allowed to maintain her Section 377.60 action in the interest of justice.  (*Id.*)

As an initial matter, this argument is devoid of any supporting factual allegations in the FAC. *See Buddhaful Designs, LLC v. Mitchell*, No. CV 14-08730-JEM, 2015 WL 4131068, at *2 (C.D. Cal. July 8, 2015) ("[A court] must limit its review to the operative complaint and may not consider facts presented in briefs[.]" (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). In fact, the FAC's allegation that Wilson has a sister—Yujane—suggests there *does* exist a person entitled to bring a Section 377.60 claim here. (FAC ¶ 53); *see* Cal. Prob. Code § 6402(c). Even assuming *arguendo* Wilson has no successor-in-interest who could bring a Section 377.60 claim, Jackson has cited to no legal theory that would enable her to step into that void. For these reasons, Jackson's alternative argument also fails.

For the foregoing reasons, the Court **GRANTS** County Defendants' Motion to Dismiss all claims brought by Jackson. This dismissal applies to Jackson's claims against all Defendants, including CCMG Defendants.

*     *     *     *

It is felt by this Court important to emphasize that its ruling should not be mistaken for a lack of sympathy towards Jackson or for doubt that she and Wilson shared a relationship equivalent to that between a natural parent and child in all aspects except for legal recognition under the California Probate Code. However, federal district courts cannot rewrite state law purely to achieve equitable results in particular instances. It is a fundamental principal of American jurisprudence and comity that federal courts not act in such a manner. *Wilson v. Good Humor Corp.*, 757 F.2d 1293 (D.C. Cir. 1985) (instructing federal district courts do not have the authority to rewrite state law to achieve what it perceives as the "fair result"); *Barnes v. Thompson*, 58 F.3d 971 (4th Cir. 1995) (similar); *United States ex rel. Little v. Curtis*, 452 F. Supp. 388, 391 (S.D.N.Y. 1978) ("[I]t is not for federal courts to rewrite state law on an ad hoc basis.").

Nevertheless, this Court finds that dismissal with prejudice is not yet warranted. If it is true, as Jackson says, that Wilson lacks a successor-in-interest, and Jackson can identify a legal theory that supports her maintaining a Section 377.60 claim on such

20cv0457

grounds, then conceivably an amendment would not be futile.  *See Lopez v. Smith*, 203 F.3d 1122, 1130–31 (9th Cir. 2000) (en banc) (holding that district court abuses discretion in not granting leave to amend where amendment is not futile).  Accordingly, Jackson's claims are **DISMISSED WITHOUT PREJUDICE**.  Jackson is warned that failure to plausibly allege such a theory in a subsequent amended pleading will result in dismissal with prejudice of her wrongful death action and any other claims brought on that basis.

## II.   Sufficiency of Federal Claims

The Estate asserts four claims under Section 1983 against County Defendants (with the exception of Garcia):  (1) deliberate indifference to serious medical needs against Medical Staff Defendants; (2) failure to train against Supervisory Defendants; (3) failure to supervise and discipline against Supervisory Defendants; and (4) a claim under *Monell* against the County.[14]  The County Defendants contest the legal sufficiency of each claim.

### A.   Deliberate Indifference

The FAC alleges that Medical Staff Defendants were "deliberately indifferent" to Wilson's HCM, *inter alia*, by "failing to communicate to other medical and security staff the necessary medical information so that [Wilson] would receive medical attention"; "fail[ing] to provide [Wilson with] proper medication"; "ignore[ing] the obvious signs [Wilson was in] medical distress"; and "fail[ing] to transport [Wilson] to [a] hospital" when it became clear he was in serious danger. (FAC ¶¶ 128–31.)  The FAC alleges that this deliberate indifference amounts to a violation of Wilson's Fourteenth Amendment Due Process Clause right to medical care by each Medical Staff Defendant.  (*Id.* ¶ 123.)

County Defendants launch several attacks at Count 1.  First, County Defendants argue this claim does not satisfy the fair notice requirement of Rule 8(a)(2).  Second, and more prominently, they argue that the FAC misapprehends the Estate's deliberate indifference claim as arising under the Fourteenth Amendment when, in reality, the Eighth Amendment's Cruel and Unusual Punishment Clause—and, thus, its more rigorous

---

[14] The FAC also alleges Section 1983 claims against CCMG Defendants, which this Court does not address because CCMG Defendants do not challenge those claims.

analytical framework—governs. County Defendants assert that the Estate falls short of plausibly alleging deliberate indifference under this standard.

### 1. Rule 8(a)(2)

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claims showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The primary purpose of Rule 8(a)(2) is "to give the defendant fair notice of the factual basis of the claim[.]" *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 841–42 (9th Cir. 2007). "A complaint which fails to comply with [Rule 8(a)(2)] may be dismissed." *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 673 (9th Cir. 1981).

A plaintiff need not provide detailed factual allegations to comply with Rule 8(a)(2). However, "[s]pecific identification of the parties to the activities alleged by plaintiffs is required . . . to enable the defendant to plead intelligently." *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1067–68 (E.D. Cal. 2012); *Clark v. Mayfield*, 74 A.F.T.R.2d 94-7323 (S.D. Cal. Nov. 21, 1994 ("[F]ederal courts repeatedly have required a plaintiff suing multiple defendants to set forth sufficient facts to lay a foundation for recovery against each particular defendant named in the suit." (citing *Morabito v. Blum*, 528 F. Supp. 252, 262 (S.D.N.Y. 1981))). Furthermore, district courts in this Circuit have found in some instances that the fair notice requirement is not satisfied where a complaint requires the defendant and the court to match allegations to claims, "as if [the] complaint is a puzzle to be solved." *Dowkin v. Honolulu Police Dep't*, No. 10-00087 SOM/RLP, 2012 WL 3012643, at *6 (D. Haw. July 23, 2012); *see also In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (holding "puzzle pleading" violates the principles of Rule 8(a)(2)); *Schwartz v. Bank of Am., N.A.*, No. CV12-525 KSC, 2013 WL 12132070, at *3 (D. Haw. Jan. 7, 2013). This practice is commonly referred to as "puzzle" or "shotgun pleading."

As best the Court can tell, County Defendants contend Count 1 is deficient under Rule 8(a)(2) because (1) the FAC fails to specify the individual roles of each Medical Staff Defendant in the constitutional deprivations alleged in the FAC and (2) the Count 1 allegations amount to puzzle pleading. (Cty. Defs. Mem. 9.)

County Defendants' group-pleading argument is without merit.  Whatever the bare minimum a plaintiff must allege about the specific involvement by each defendant in a multi-defendant suit, the FAC's allegations far surpass it.  *See Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1048–49 (9th Cir. 2012) ("As the text of Rule 8(a)(2) itself makes clear, even a 'short and plain' statement can state a claim for relief.").  The FAC delineates each Medical Staff Defendants' involvement in Wilson's alleged constitutionally substandard medical treatment, *see supra* Bkgd. Sec. 1.C. 3.  (*See* FAC ¶¶ 28–29, 71 (factual allegations regarding Bautista); *id.* ¶¶ 31–32 (Kumar); *id.* ¶¶ 33–38 (Ibanez); *id.* ¶¶ 54–55 (Germono).)  These allegations provide ample notice to each Medical Staff Defendant, and this Court, of the factual bases of the Estate's deliberate indifference claim and the legal theory upon which it proceeds.

County Defendants' puzzle-pleading argument also is unavailing.  While some degree of assembly is required to match the allegations in the "Facts" portion of the FAC with the elements of Count 1 alleged in the enumerated paragraphs 122 through 136 of the FAC (*see* FAC ¶ 122 (realleging and incorporating by reference "all prior paragraphs of this complaint" as opposed to only those paragraphs relating to Medical Staff Defendants)), this Court does not find the pleading deprives Medical Staff Defendants of fair notice because the FAC provides Medical Staff Defendants' visibility into the factual and legal bases of the Estate's deliberate indifference claim.  *See Lindblad v. Presidio Trust Bd.*, No. 21-cv-6806, 2021 WL 5048347, at *3 (N.D. Cal. Sept. 7, 2021) (holding that only where a purported puzzle pleading deprives a defendant of fair notice is dismissal warranted).

Accordingly, this Court declines County Defendants' invitation to dismiss Count 1 on the ground it fails to satisfy Rule 8(a)(2).

### 2.    Identifying the Appropriate Constitutional Framework

As explained by the Ninth Circuit in *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021)

> Individuals in state custody have a constitutional right to medical treatment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  For inmates serving custodial

20cv0457

sentences following a criminal conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual punishment. *Id*. However, pretrial detainees have not yet been convicted of a crime and therefore are not subject to punishment by the state. Accordingly, their rights arise under the Fourteenth Amendment's Due Process Clause. *Bell v. Wolfish*, 441 U.S. 520, 535–36, 535 n.16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

The standards that apply to claims of deliberate indifference to serious medical needs under the Eighth and Fourteenth Amendments, respectively, are not the same. *See also Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) ("*Kingsley*").

A claim governed by the Eighth Amendment is assessed under the "subjective deliberate indifference standard." *Sandoval*, 985 F.3d at 667 (quoting *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018) ("*Gordon*")); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) (per curiam), *cert denied sub nom. Idaho Dep't of Corr. v. Edmo*, No. 19-1280, 141 S.Ct. 610 (U.S. Oct. 13, 2020). The hallmark of the Eighth Amendment's deliberate indifference standard is the requirement that a plaintiff demonstrates the defendant's "subjective state of mind," *i.e.*, his or her mental culpability. David C. Gorlin, *Evaluating Punishment in Purgatory*, 108 Mich. L. Rev. 417, 424 (2009) (observing defendant's subjective culpability "is a central feature of the Supreme Court's Eighth Amendment jurisprudence" (citing *Estelle*, 429 U.S. at 104–05)).

Conversely, deliberate indifference claims brought by pretrial detainees are assessed under the Fourteenth Amendment's less scrutinizing objective deliberate indifference standard. *See Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) ("*Castro*"). (interpreting U.S. Supreme Court's decision in *Kingsley* as casting doubt upon propriety of applying Eighth Amendment to claims concerning conditions of confinement by pretrial detainees who had not been found guilty of any crime in accordance with due process and, thus, could not be "punish[ed]" within the meaning of that Amendment); *Gordon*, 888 F.3d at 1124–25 (extrapolating the reasoning in *Castro* to hold Fourteenth Amendment governs pretrial detainee's claims concerning deliberate indifference to serious medical needs); *Sandoval*, 985 F.3d at 667–69 (reversing district court on ground

that *Gordon* mandated that Fourteenth Amendment's objective deliberate indifference standard apply to pretrial detainee's claims).  Under this standard, the reasonableness of a defendant's action or inaction is measured objectively, and it matters not what the defendant's state of mind was at the time he or she committed the alleged constitutional violation.  *Gordon*, 888 F.3d at 1124–25.  Objective deliberate indifference requires "'something more than mere negligence,' but 'something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1970)).

It is not immediately clear on which side of the line drawn by the Ninth Circuit Wilson falls as he was neither a "pretrial detainee" nor an inmate serving a "custodial sentence following a criminal conviction" when he was confined at the Jail from February 5 through February 14, 2019.  Rather, Wilson was serving a two-week long flash incarceration sentence for violating a condition of his probation, parole, or postrelease supervision, imposed due to his conviction for a prior, unspecified crime.  Cal. Penal Code §§ 1203.35(b), 3454(c).

Based on this Court's research, no precedential Ninth Circuit case has addressed under which Amendment a probationer or parolee's claims of deliberate indifference to serious medical needs arise.[15]  However, in an unpublished disposition, the Ninth Circuit held in *Flores v. Mesenbourg*, 116 F.3d 483 (Table), 1997 WL 303277, at *1 (9th Cir. 1997) ("*Flores*"), that the "Eighth Amendment provides the proper standard for [a probationer or parolee]."[16]  Specifically, the *Flores* Court found that because the plaintiff's

---

[15]  It goes without saying that neither has the Ninth Circuit addressed whether deliberate indifference to a flash incarceree's right to medical care is governed by the Eighth Amendment or Fourteenth Amendment, no doubt due to that procedure's relative newness.

[16]  In *Flores*, the plaintiff was a parolee.  However, "[t]he distinction between parole and probation is primarily one of procedure, rather than one of substance.  Probation, which is granted by the trial judge, is a judicial unction; parole, on the other hand, is at the discretion of a [state agency] and is given only after the service of part of the sentence."  Victoria E. Armstrong, *The Impossible Dream:  Due Process Guarantees for Cal. Parolees & Probationers*, 25 Hastings Law J. 602, 603 (1972) (footnotes omitted).

"original conviction is the authority under which he was confined after his parole violation . . ., he must rely on the Eighth Amendment to support his claim." *Id.* Since *Flores*, numerous district courts in this Circuit have applied its framework to conclude probationers and parolees' claims concerning conditions of confinement, including deliberate indifference to serious medical needs, arise under the Eighth Amendment. *See, e.g., Flores v. Cty. of Fresno*, No. 1:19-cv-1477-DAD-BAM, 2020 WL 4339825, at *3 (E.D. Cal. July 28, 2020) ("Plaintiff also mentions the Fourteenth Amendment in her allegations, but she alleges that she was incarcerated in the county jail for a parole violation.  As such, the Eighth Amendment provides the proper standard for assessing her claim[.]" (citing *Castro*, 833 F.3d at 1067–68))); *Nordenstrom v. Corizon Health, Inc.*, No. 3:18-cv-1754-HZ, 2021 WL 2546275, at *7 (D. Or. June 18, 2021) (finding a parolee in custody for violating conditions of postrelease is a "convicted prisoner" because the initial conviction "supplied the basis for his punishment," and applying Eighth Amendment standard to claims that his right to adequate medical care were recklessly disregarded); *Jensen v. Cty. of Los Angeles*, No. CV 16-01590 CJC (RAO), 2017 WL 10574058, at *7 (C.D. Cal. Jan. 6, 2017) (holding Eighth Amendment applied to claims brought by plaintiff incarcerated for a parole violation because "[h]e was subject for incarceration for parole violation [only] because he had originally been convicted and given the sentence which was moderated by parole").

This Court finds *Flores*' reasoning persuasive and concludes the Estate's deliberate indifference claims arise under the Eighth Amendment because Wilson was confined at the Jail for violating parole, probation, or postrelease supervision. While the FAC is silent as to Wilson's underlying conviction, the California Penal Code provisions relating to flash incarceration make clear that a criminal conviction is a prerequisite to its imposition.  Cal. Penal Code. §§ 1203.35(a)(1) (stating flash incarceration may be imposed "[i]n any case where the court grants probation or imposes a sentence that includes mandatory supervision"), 3454(c) (stating flash incarceration may be imposed   as "one method for violations of an offender's condition of postrelease supervision").   Whatever Wilson's

20cv0457

original conviction might have been, it formed the authority under which he was committed to flash incarceration.[17]

### 3.    Applying Eighth Amendment Standard

The Eighth Amendment's deliberate indifference standard consists of two parts. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).   The plaintiff must show that (1) the inmate had "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) the "defendant's response to the need was deliberately indifferent."  *Id.* ((citing *McGuckin*, 974 F.2d at 1059) (internal quotation marks and citation omitted).  To satisfy this second prong, the plaintiff must demonstrate (A) "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and (B) "harm caused by the indifference."  *Id.*

County Defendants do not contest that the FAC alleges adequately that Wilson's HCM constituted a "serious medical need."  Rather, they challenge the sufficiency of the allegations pursuant to the second prong of the subjective deliberate indifference standard only.

---

[17] The Estate suggests that flash incarcerees like Wilson enjoy the same constitutional protections as pretrial inmates but does not piece together any argument in support of its theory.  No distinction of a constitutional dimension is apparent to the Court.  The Court finds significant that the language of the relevant provisions of the California Penal Code illustrate that the imposition of flash incarceration is part and parcel of the "punishment" that emanates from a flash incarceree's initial conviction, rendering the Estate's comparison between Wilson and a pretrial detainee inapt.  *See* Cal. Penal Code § 1203.35(b) ("The length of the detention period may range between one and 10 consecutive days.  Shorter, but if necessary more frequent, periods of detention for violations of an offender's conditions of probation or mandatory supervision *shall appropriately punish an offender* while preventing the disruption in a work or home establishment that typically arises from longer periods of detention.") (emphasis added); *id.* § 3454(b) ("Periods of flash incarceration are encouraged as *one method of punishment* for violation of an offender's condition of postrelease supervision.") (emphasis added).  The Court finds this language undermines completely the Estate's position.  *See Sandoval*, 986 F.3d at 667 ("[P]retrial detainees have not been convicted of a crime and therefore are not subject to punishment by the state.").

20cv0457

### a. Purposeful Act or Failure to Respond

To satisfy the subjective deliberate indifference standard, a plaintiff must allege adequately that the defendant knew of and disregarded a substantial risk of serious harm to inmate health resulting from the inmate's serious medical need. *Farmer*, 511 U.S. at 837. "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "[N]either an inadvertent failure to provide adequate medical care, nor mere negligence or medical malpractice, nor a mere delay in medical care (without more), nor a difference of opinion over proper medical treatment, is sufficient to constitute an Eighth Amendment violation." *Lopez v. Ko*, 20-cv-2236-CAB-NLS, 2022 WL 480677, at *6 (S.D. Cal. Jan. 21, 2022) (citing *Estelle* 429 U.S. at 105–06); *see also Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1984). "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin*, 974 F.2d at 1060.

County Defendants argue that the Estate fails to adequately state a claim for deliberate indifference because it has not alleged a "purposeful act" on the part of a single Medical Staff Defendant. (Cty. Defs. Mem. 10–13.) However, to sustain a deliberate indifference claim, it is sufficient to allege that defendants had knowledge of the inmate's serious medical condition yet took no action to prevent further harm arising therefrom. *See Merriman v. Ponder*, No. 2:19-cv-1446-WBS-CKD P, 2021 WL 973950, at *1 (E.D. Cal. Mar. 16, 2021); *Ortiz v. City of Imperial*, 884 F.2d 1312, 1313–14 (9th Cir. 1989) (reversing district court's grant of summary judgment on ground that defendant's inaction could constitute deliberate indifference to serious medical needs). "The fact that [a] [defendant] sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the [inmate's] suffering." *McGuckin*, 974 F.2d at 1060–61 (citing *Estelle*, 429 U.S. at 106 (holding defendant's action or inaction could be "sufficiently harmful to evidence deliberate indifference to serious medical needs")).

Construing all facts and inferences in a light most favorable to the Estate, the Court analyzes whether the Estate has alleged adequately deliberate indifference against each Medical Staff Defendant under the Eighth Amendment.

Nurse Rizalina Bautista:  The allegations in the FAC enable this Court to plausibly infer Bautista both (A) knew of Wilson's serious medical needs, *i.e.*, his HCM, and (B) purposefully ignored or failed to respond to that need.  Bautista's notes from her initial medical screening of Wilson reflect that she was aware that the sentencing court's warning that Wilson had "serious medical conditions"; that Wilson suffered from "congestive heart failure" and "cardiomyopathy"; and that Wilson took heart medication, including Lasix, daily, to treat those conditions.  (FAC ¶ 27.)  Indeed, that Bautista was well-aware of the severity of Wilson's medical condition is further reflected by her scheduling for Wilson a medical appointment.  (*Id.*)  These allegations satisfy the "knowledge" prong of the subjective deliberate indifference standard.

Bautista's purposeful inaction towards Wilson's serious medical needs is demonstrated by the FAC's allegations that Jail staff did not administer to Wilson a single dose of heart medication during the approximately six days following his medical screening *and* that Wilson was only seen by a physician after his family incessantly prodded Jail staff for him to be evaluated.  (*Id.* ¶¶ 31–32, 35, 39–42.)  These allegations raise the reasonable inference that Bautista utterly failed to communicate to the relevant Jail staff Wilson's serious medical needs, therefore inhibiting the provision of adequate medical care during his confinement.  At this stage, the FAC need not plead more to demonstrate Bautista's inaction reflected her deliberate indifference to Wilson's constitutional rights.  *See Merino v. Cty. of Santa Clara*, No. 18-cv-2899-VKD, 2019 WL 2437176, at *7 (N.D. Cal. June 11, 2019) ("Whether the alleged acts rise beyond negligence or malpractice to the level of deliberate indifference is a question of fact that the Court cannot resolve at the pleading stage." (quoting *Farmer*, 511 U.S. at 842)).

Nurses Anil Kumar, Marylene Ibanez, and Macy Germono:  The Estate's theories of deliberate indifference against Kumar, Ibanez, and Germono are substantially similar.

(*See* FAC ¶¶ 32, 34–35, 57 (alleging Kumar, Ibanez, and Germono failed to administer Wilson's heart medications).)  Thus, the Court addresses the sufficiency of Count 1 against those Medical Staff Defendants collectively.   First, this Court finds that the FAC adequately alleges Kumar, Ibanez, and Germono knew Wilson suffered from HCM. Specifically, the FAC alleges that Kumar was the recipient of a complaint drafted by Wilson indicating that he had not received his heart medication (FAC ¶ 32); that Ibanez reviewed Wilson's records on Sapphire, which reflected that he took heart medication daily and had not received any such medication in approximately five days (*id.* ¶¶ 34–35); and that Germono had observed Wilson was "in moderate distress" and reviewed Wilson's Sapphire records (*id.* ¶¶ 54, 57.)  The FAC also raises a "strong indicum of callousness and deliberate indifference" on the part of Kumar, Ibanez, and Germono respecting Wilson's suffering.  *McGuckin*, 974 F.2d at 160–61.  In particular, Kumar's failure to administer Wilson's heart medications after he notified her that he had not received any for approximately three days, and Ibanez and Germono's failure to do so despite reviewing Wilson's Sapphire profile, render plausible the inference these Defendants acted with deliberate indifference towards Wilson's constitutional right to adequate medical care.[18] *See, e.g.*, *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) (holding that allegations prison officials failed to provide inmate of prescribed medication sufficient to defeat Rule 12(b)(6) challenge to Eighth Amendment deliberate indifference claim).

---

[18] To the extent the Estate seeks to proceed with deliberate indifference against Germono on the ground she entered Wilson into a standard nursing protocol for asthma as opposed to a cardiac-related one, it may not do so.  It is well-established that "[a] difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference."  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (quoting *Sanchez*, 891 F.2d at 242). Rather, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'"  *Toguchi*, 391 F.3d at 1058 (quoting *Jackson*, 90 F.3d at 332).  The Estate's theory that Germono should have entered Wilson into a protocol taking into consideration his HCM amounts to a difference of medical opinion.  The FAC does not allege Germono consciously disregarded an excessive risk to Wilson's health by entering him into an asthma protocol, particularly considering the FAC, itself, avers Wilson suffered from asthma and that he took medication to treat that condition.  (FAC ¶ 27.)

20cv0457

### b.     Proximate Cause

To allege adequately a claim under Section 1983, "[a] plaintiff must [allege] that the official's actions were both the actual and proximate cause of plaintiff's injuries." *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1245 n.3 (9th Cir. 2010) (citing *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)). "Causation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation." *Constance B. v. State of California*, 178 Cal. App. 3d 200, 207 (Cal. Ct. App. 1986).

When assessing whether the element of causation is satisfied in Section 1983 actions, federal courts look to "traditional tort law." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citation omitted).  Actual cause exists if the defendant's conduct was "a substantial factor in bringing about the [plaintiff's] injury." *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1049 (1994).  Proximate cause "exists if the actor's conduct is a 'substantial factor' in bringing about the harm and there is no rule of law relieving the actor from liability." *Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 665–66 (Cal. Ct. App. 2001) (citing *Rosh v. Cave Imaging Sys., Inc.*, 26 Cal. App. 4th 1225, 1235 (Cal. Ct. App. 1994)).  "The doctrine of proximate cause limits liability; *i.e.*, in certain situations where the defendant's conduct is an actual cause of the harm, he will nevertheless be absolved because [of] the manner in which the injury occurred." *Id.* (quoting *Hardison v. Bushnell*, 18 Cal. App. 4th 22, 26 (1993)).  "Thus, where there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the 'legal' or proximate cause." *Id.* (quoting *Hardison*, 18 Cal. App. 4th at 26).

County Defendants argue that the Medical Staff Defendants' conduct was not the proximate cause of Wilson's death because the FAC alleges Wilson was misdiagnosed and improperly treated by Dr. Freedland and NP Gatan *after* each of his interactions with the Medical Staff Defendants.[19] (Cty. Defs. Mem. 10–13.)  While it is true that the FAC alleges

---

[19] It is not actually clear on the face of the FAC whether Germono's interaction with Wilson on February 12, 2019 took place before, after, or contemporaneous with Dr. Freedland and NP Gatan's assessment that same day.  (FAC ¶¶ 56–57.)

20cv0457

Wilson was seen by Dr. Freedland and NP Gatan on February 11, 2019, after Wilson's interactions with Bautista, Kumar, Ibanez, and, possibly, Gatan, the County Defendants' attempt to lay blame solely upon CCMG Defendants does not hold water.

"An independent intervening act is a superseding cause relieving the actor of liability . . . *only* if the intervening act is highly unusual or extraordinary and hence not reasonably foreseeable." *Lombardo*, 91 Cal. App. 4th at 666 (citing, *inter alia*, Restatement 2d of Torts §§ 435, 447) (emphasis added).  The question of reasonable foreseeability is a highly factual one, which generally should not be determined at the pleading stage. *See Estate of Claypole v. Cty. of San Mateo*, No. 14-cv-02730, 2014 WL 5100696, at *5 (N.D. Cal. Oct. 9, 2014); *Cline v.* Watkins, 66 Cal. App. 3d 174, 178 (Cal. Ct. App. 1977) (holding reasonable foreseeability is a "question for the trier of fact").  The Court declines to decide at this stage the highly factual question of reasonable foreseeability here.  Indeed, it would be inappropriate to conclude that, as a matter of law, the Medical Staff Defendants were entitled to expect Dr. Freedland and NP Gatan to cure Wilson of the damage their deficient medical care had caused up until that point.  A reasonable jury could just as well conclude that Dr. Freedland and NP Gatan's misdiagnosis and mistreatment of Wilson's HCM were the reasonably foreseeable result of Medical Staff Defendants' initial substandard medical care.  *Cf. Duque v. United States.*, No. Civ. A 1:05-CV-1417-CC, 2006 WL 2348533, at *9 (N.D. Ga. Aug. 9, 2006) (denying motion to dismiss for lack of proximate cause, *inter alia*, on ground reasonable jury could find subsequent mistreatment of plaintiff's ailment was foreseeable consequence of initial misdiagnosis).

For the foregoing reasons, the Court **DENIES** County Defendants' Motion to Dismiss Count 1 of the FAC against Medical Staff Defendants.

## B.   Failure to Properly Train and Failure to Properly Supervise

### 1.   Gore and Lee

In its First Order, this Court held that the initial Complaint stated Section 1983 claims for failure to properly train and failure to properly supervise against Defendants Gore and Lee.  (First Order 4–9.)  As this Court explained in its First Order, a supervisor

may be held liable under Section 1983 "if there exists either (1) his or her personal involvement in a constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." (*Id.* 4 (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks and citation omitted)).)   In its First Order, this Court concluded that the initial Complaint plausibly alleged claims under the latter form of supervisorial liability because the initial Complaint contained factual content to render reasonable the inference that Gore and Lee (1) knew of the unconstitutional conditions at the Jail through, *inter alia*, their receipt of the NCCHC Audit detailing the substandard policies at the Jail "regarding the ordering and dispensing of medicine" and (2) failed to remediate these unconstitutional conditions, which were the moving force behind Wilson's injuries, despite their knowledge thereof.   (Order 5–6.) Nevertheless, County Defendants move for a second time to dismiss claims this Court previously found valid, principally on the ground that the FAC fails to allege Gore and Lee had knowledge of the Jail's pattern and practice of substandard medical care.

District courts have the authority to entertain motions for reconsideration of interlocutory orders at any time before the entry of final judgment.  *See* Fed. R. Civ. P. 54(b); *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996) ("[I]nterlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment."); *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989) ("Courts have inherent power to modify their interlocutory orders before entering a final judgment . . . .  In addition, [Rule 54(b)] explicitly grants courts the authority to modify their interlocutory orders.").  To determine the merits of a request to reconsider an interlocutory order, courts apply the standard required under a Rule 59(e) reconsideration motion.  *See Hydranautics v. FilmTec Corp.*, 306 F. Supp. 2d 958, 968 (S.D. Cal. 2003).

County Defendants argue that they are not challenging this Court's interlocutory First Order but rather new allegations in the FAC pertaining to Counts 2 and 3.  Thus, they ask the Court to assess its arguments under the lens of Rule 12(b)(6).  Specifically, County

Defendants argue Rule 12(b)(6) should govern this strand of their Motion because (1) the FAC contains new allegations concerning the Medical Staff Defendants' conduct that assertedly bears upon this Court's supervisorial liability analysis and (2) County Defendants wish to argue for the first time that the NCCHC Audit does not establish Gore and Lee knew of unconstitutional conditions at the Jail.  Neither of these arguments is persuasive.  (Reply 7.)

As an initial matter, the Court finds that County Defendants import unfounded significance into the FAC's new allegations Wilson received at most two doses of his heart medication while confined at the Jail over a ten-day period.  The Ninth Circuit has held repeatedly that "the provision of some medical treatment . . . does not immunize officials from the Eighth Amendment's requirements."  *Edmo*, 935 F.3d at 793–94; *see also Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (en banc) (explaining that "[a] prisoner need not prove that he was *completely denied* medical care" to make out an Eighth Amendment claim).  Moreover, the precise manner in which Medical Staff Defendants administered substandard medical care to Wilson in this particular instance does not bear upon Supervisory Defendants' Section 1983 liability, for the Estate's claims are not predicated upon the theory that Supervisory Defendants were personally involved in Wilson's constitutional deprivations, but rather that they are liable on a supervisory basis for failing to take action to remediate the unconstitutional conditions at the Jail, *i.e.*, ineffective dispensation of inmate medication, of which Wilson was one of many victims..  (Order 4 (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).)  The allegations concerning supervisorial liability in the FAC are substantially identical to those set forth in the initial Complaint.  Thus, County Defendants essentially seek a second bite at the apple to defeat the Estate's Section 1983 claims against Gore and Lee.  Rule 59(e) does not afford County Defendants such an opportunity.

County Defendants assertion that the Court should entertain as a Rule 12(b)(6) challenge its argument that Gore and Lee's knowledge of the unconstitutional conditions at the Jail should not be imputed from the NCCHC Audit is even less unpersuasive.  By

this argument, County Defendants definitionally seek reconsideration of the First Order, in which the Court held that it could plausibly infer Gore and Lee's knowledge of the pattern and practice of substandard medical treatment at the Jail from their receipt of the NCCHC Audit. (First Order 6 (citing Compl. ¶¶ 10, 61).) County Defendants' thinly veiled attempt to fashion its argument as aimed at the FAC as opposed to the First Order is belied further by the fact the FAC essentially realleges the allegations concerning the NCCHC from the initial Complaint. (*See* Redline at pp. 25–26.)

Accordingly, this Court finds a motion for reconsideration under Rule 59(e) would have been the proper vehicle in which to present the County Defendants' arguments respecting Counts 2 and 3 as alleged against Gore and Lee, not a Rule 12(b)(6) Motion. However, County Defendants did not timely seek reconsideration because the present Motion comes nearly one year after the Court's ruling. *See* Civ. L.R. 7.1.i.2 (requiring a motion for reconsideration to be filed within 28 days of the order for which reconsideration is sought).

Even if the Court excused County Defendants' untimeliness, they still fail to show reconsideration is warranted. "A motion to reconsider must (1) show some valid reason why the court should reconsider its prior decision, and (2) set forth facts or law of a strongly convincing nature to persuade the court to reverse its prior decision." *Cancino-Castellar v. Nielsen*, 338 F. Supp. 3d 1107, 1110 (S.D. Cal. 2018). A motion for reconsideration is not an avenue for County Defendants to re-litigate issues and arguments the Court has already addressed. *Brown v. Kinross Gold, U.S.A.*, 378 F. Supp. 2d 1280, 1288 (D. Nev. 2005). Nor is "[m]ere disagreement with a previous order is a sufficient basis for reconsideration." *Haw. Stevedores, Inc. v. HT&T Co.*, 363 F. Supp. 2d 1253, 1269 (D. Haw. 2005). County Defendants identify no valid reason for reconsideration of a strongly convincing nature because the legal theories it proffers are ones that this Court has already thoroughly considered and rejected.

### 2.    Gilleran

The FAC seeks to hold newly added Defendant Gilleran liable for failure to train and failure to properly supervise and discipline on precisely the same grounds as Gore and Lee.  Specifically, it alleges that Gilleran was the interim Chief Medical Office for the Sheriffs Department at the time of Wilson's death.  (FAC ¶ 13.)  According to the Estate, Gilleran was responsible for, *inter alia*, "supervis[ing] the doctors, nurse practitioners, and other medical staff, including defendants and contractors [like CCMG]."  (*Id.*)  County Defendants do not argue that Gilleran is situated any differently than Gore and Lee, nor is any distinction apparent to this Court.  For the reasons explained in detail in this Court's First Order, this Court finds that Counts 2 and 3 against Gilleran also pass the scrutiny of County Defendants' Rule 12(b)(6) challenge.  (*See* First Order 4–9)

For the foregoing reasons, this Court **DENIES** the County Defendants' Motion to Dismiss Counts 2 and 3.

### C.    Qualified Immunity

 "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald* 457 U.S. 800, 818 (1982)).  Qualified immunity shields an officer from liability even if his or her action resulted from a "mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  "Determining whether officials are owed qualified immunity involves two inquiries:  (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

For the reasons set forth above, the Estate plausibly alleges direct and supervisory constitutional violations against Medical Staff and Supervisory Defendants, respectively.

Thus, the only question posed here is whether the rights County Defendants violated were "clearly established."

To determine whether the subject constitutional right was clearly established at the time of the violative conduct, a court must answer whether the contours of the right in question were "'sufficiently clear' [such] that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 739 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[C]learly established law should not be defined at a high level of generality." *Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019) (quoting *White v. Pauly*, – – – U.S. – – –, 137 S.Ct. 548, 552 (2017)). The dispositive question is "whether the violative nature of *particular* conduct is clearly established" in the specific context of the case. *Id.* (internal quotation marks and citation omitted). That is not to say there must be a "case *directly* on point" to deem a constitutional violation clearly established. *al-Kidd*, 563 U.S. at 740 (emphasis added). The Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel circumstances. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *accord Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 417 (4th Cir. 2020) ("That there is little precedent imposing liability under . . . specific circumstances does not necessarily mean that an office lacks notice that his conduct is unlawful."), *cert denied sub nom. McKinney v. Dean*, – – – U.S. – – –, 141 S.Ct. 2800 (2021). However, for a right to be clearly established, "existing precedent must have placed. . . the constitutional question beyond debate." *al-Kidd*, 563 U.S. at 740.

The Court "begin[s] by looking to binding precedent form the Supreme Court or the Ninth Circuit. *Martinez*, 943 F.3d at 1275. If there is no binding precedent, the Court looks to "whatever decisional law is available . . . including decision of state courts, other circuits, and district courts." *Id.* (quoting *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014)); *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("The precedent must be controlling from the Ninth Circuit or the Supreme Court—or otherwise be

20cv0457

embraced by a consensus of courts outside the relevant jurisdiction.") (omitting internal quotation marks).

Applying this framework in its First Order, this Court held Wilson's right against being intentionally denied or delayed access to medical care while incarcerated was a clearly established one.  (Order 9 (citing *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Estelle*, at 104–05)).)   Crucially, the Court held that it is "also clearly established that Gore and Lee can face supervisorial liability for such unreasonable medical care."  (*Id.* (citing *Starr*, 652 F.3d at 1202).)

County Defendants now argue that the Court should reconsider its determination because the FAC concedes Wilson received two doses of Lasix over the approximately ten-days he was incarcerated, as opposed to none at all as alleged in the initial Complaint. County Defendants' argument essentially boils down to the premise that there is a qualitative difference between prison officials providing inmates with substandard care as opposed to no care at all. But it is well-established that access to medical staff is meaningless unless that staff is competent and can render competent care." *Ortiz*, 884 F.2d at 1314.  "[T]he provision of some medical treatment . . . does not immunize officials from the Eighth Amendment's requirements. *Edmo*, 935 F.3d at 793–94.

"The general law regarding the medical treatment of prisoners [has been] clearly established" since 1995.  *Clement*, 298 F.3d at 906 (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1065 (9th Cir. 1995)).  "The government is required to provide medical care for those whom it punishes by incarceration, and prison officials who act with deliberate indifference to an inmate's serious medical needs violate the Eighth Amendment." *Hamilton*, 981 F.2d at 1065. (citing *Estelle*, 429 U.S. at 104).  It is also clearly established that "offic[ials] [can] not intentionally deny or delay access to medical care.  *See Clement*, 298 F.3d at 906 (citing *Estelle*, 429 U.S. at 104–05).

Numerous decisions in this Circuit have recognized inmates' right to prompt treatment of serious medical needs in a variety of contexts, including in instances in which the inmate's serious medical need was not a life-threatening one.  *See, e.g.*, *Clement*, 298

- 39 -

F.3d at 905 (involving inmates who had been pepper sprayed, but not treated by medical staff until four hours after the event); *Jett*, 439 F.3d at 1097–98 (involving an inmate whose fractured thumb was not promptly reset); *Edmo*, 935 F.3d at 797 (involving inmate suffering from gender dysphoria who was deprived of sexual reassignment surgery); *see also Lolli v. Cty. of Orange*, 351 F.3d 410, 418–19, 421 (9th Cir. 2003) (involving an insulin-dependent diabetic detainee who had not been provided with the insulin or food to regulate his blood glucose levels); *Sandoval*, 985 F.3d at 680 (involving an inmate whom officials failed to treat despite displaying signs of potential drug overdose or other serious medical condition).

Thus, the Court concludes with little difficulty that every reasonable nurse in the position the Medical Staff Defendants would have understood that failure to (1) dispense to an inmate for approximately six days life-saving heart medication and (2) obtain treatment for an inmate with serious medical needs whose condition rapidly deteriorated was constitutionally inadequate. So, too, is it clearly established that supervisorial liability extends to those in Supervisory Defendants' position (Opp'n 9 (citing *Starr*, 652 F.3d at 1202).)

For the foregoing reasons, this Court **DENIES** County Defendants' Motion to Dismiss Counts 1 through 3 on qualified immunity grounds.

### D.   *Monell*

County Defendants seek to dismiss the Estate's *Monell* claim against the County for failure to state a cause of action pursuant to Rule 12(b)(6).  Count 4 is predicated upon substantially the same factual allegations as the *Monell* claim asserted in the initial Complaint, which this Court found well-plead.  As mentioned above, *supra* Analysis Sec. III.B.1, the appropriate vehicle for the County Defendants to challenge Count 4 would have been a Rule 59(e) motion within 28 days after the Order issued.  County Defendants submitted no such motion.  Moreover, even if this Court were to excuse their untimeliness, the County Defendants do not proffer any basis under Rule 59(e) to find reconsideration is warranted.

1    For the foregoing reasons, this Court **DENIES** County Defendants Motion to

2  Dismiss Count 5.

3  **IV.    Sufficiency of State Law Claims**

4    The Estate asserts two state law claims:  (1) a survival action under Section 377.30

5  against all Defendants and (2) negligence against Medical Staff Defendants, Garcia, and

6  the County.[20]  County Defendants and CCMG Defendants argue those claims fail because

7  (A) the Estate did not comply with the pre-litigation claim-presentment requirements of

8  the CTCA; (B) the Estate's survival action alleges only damages that are explicitly

9  unrecoverable under California law; and (C) the Estate does not allege adequately

10  negligence against any County Defendant.[21]  (Cty. Defs. Mem. 21–25.)

11    **A.    California Tort Claims Act**

12    Under California law, "[s]uits for money damages or damages filed against a public

13  entity are regulated by . . . the [CTCA]."  *Di Campli-Mintz v. Cty. of Santa Clara*, 55 Cal.

14  4th 983, 989 (2012).  The CTCA provides, in pertinent part:  "[N]o suit for money damages

15  may be brought against a public entity on a cause of action for which at a claim is required

16  to be presented . . . until a claim therefor has been presented to the public entity and has

17  been acted upon . . ., or has been deemed to have been rejected[.]"  Cal. Gov't Code §

18  954.4.  That presentment requirement also applies to claims against employees of public

19  entities.  *See Dennis v. Thurman*, 959 F. Supp. 1253, 1264 (C.D. Cal. 1997) (citing Cal.

20  Gov't Code §§ 954.4, 950.2).  There is no dispute the Estate's state law claims are covered

21  under the CTCA's pre-litigation presentment requirement.

22    The presentation of a claim to the pertinent public entity prior to the commencement

23  of litigation "is a condition precedent to the maintenance of any cause of action against

24  th[at] public entity" in any court "and is therefore an element that a plaintiff is required to

25  prove in order to prevail."  *DiCampli-Mintz*, 55 Cal. 4th at 990 (quoting *Del Real v. City*

26

27    [20] Jackson also alleged claims for wrongful death under Section 377.60, but that claim was
dismissed without prejudice for lack of statutory standing.  *See supra* Analysis Sec. I.

28    [21] CCMG Defendants do not challenge the sufficiency of Count 6 (negligence).

*of Riverside*, 95 Cal. App. 4th 761, 777 (Cal. Ct. App 2002); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 627 (9th Cir. 1988) (holding that compliance with the Government Claims Act is a prerequisite to maintaining state law claims in federal court).  To comply with the CTCA, a claim presented must contain, *inter alia*, "[t]he date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted"; "[a] general description of the . . . injury, damage or loss incurred so far as it may be known"; and "[t]he name or names of the public employee or employees causing the injury . . ., if known."  Cal. Gov't Code § 910(c)–(e).  If a claim "fails to comply substantially with the requirements of" the CTCA, the public entity may "give written notice of its insufficiency, stating with particularity the defects or omissions therein."  *Id.* § 910.8.  Failure to give notice of a particular defect or omission by the public entity constitutes a waiver of "[a]ny defense as to the sufficiency of the claim based [on that] defect or omission."  *Id.* § 911.

The CTCA's purpose is "to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation."  *Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 446 (2004) (quoting *City of San Jose v. Superior Court*, 12 Cal. 3d 447, 455 (1974)).  "The claim [presentation] requirement is not intended to eliminate meritorious lawsuits or to snare the unwary when the requirement's purpose has been satisfied."  *Burke v. Clovis Unified Sch. Dist.*, F079462, 2021 WL 1569156, at *4 (Cal. Ct. App. Apr. 22, 2021) (citing *Stockett*, 34 Cal. 4th at 446).

The FAC alleges that the Estate presented its claim to the County on August 12, 2019.  (*See* FAC ¶¶ 7–8.)  County Defendants do not suggest that the Estate's presentment was either untimely or factually deficient.  Instead, County Defendants aver that the Estate did not comply with California Government Code § 910, which states "[a] claim shall be presented by the claimant or by a person acting on his or her behalf," or § 910.2, which states a claim "shall be signed by the claimant or by some person on his behalf," because its claim-presentment form was filed with the County and signed by Jackson, who, according to County Defendants, had no authority to do so as she was neither Wilson's

successor-in-interest or the administrator of his Estate.[22]   Accordingly, County Defendants ask the Court to retroactively nullify the Estate's compliance with the CTCA, despite the fact Jackson now is the Estate's special administrator.  (Cty. Defs. Mem. 9.)

Other trial courts in this Circuit have rejected substantially the same argument advanced by County Defendants as incongruous with the CTCA's purpose.  For example, *Sprowl v. City of Barstow*, No. EDCV 1801720-JGB (KKx), 2019 WL 8106291, at *2 (C.D. Cal. Oct. 18, 2019) ("*Sprowl*") involved a plaintiff who presented in a timely fashion to the City of Barstow two tort claims—a wrongful death action on behalf of herself and, believing to be her son's successor-in-interest, a survival action on behalf of her decedent son's estate.  After the City rejected those claims, litigation in federal court ensued in accordance with the CTCA.  During the case, it was disclosed that the decedent had an adult son who, under California's intestacy rules, was his true successor-in-interest.  *Id.* at *5.  Consequently, plaintiff amended her pleading to substitute the decedent's son into the action as the representative of the decedent's estate.  *Id.*  In response, the City argued that because the decedent's mother had no authority to act on behalf of the estate when she presented its survival action, the estate's compliance with the CTCA should be nullified and its claim disposed.  *Id.*  The *Sprowl* Court held dismissal was unwarranted because the proper representative for the estate had been substituted into the action.  In so holding, the *Sprowl* Court found dismissal on the basis proposed would not "compor[t] with the purpose of the [CTCA]":  to provide the public entity of the claim against it so that it may investigate its factual premises and, if warranted, explore settlement.  *Id.* at *5 (citing *Stockett*, 34 Cal. 4th at 446); *see also Knox v. City of Fresno*, 1:14-cv-00799-GSA, 2015 WL 5923531, at

---

[22] Although the FAC does not allege that Jackson presented the Estate's claim, she admits in her Opposition that assertion is true.  (Opp'n 6–7 ("In submitting the tort claim on behalf of the Estate, Mrs. Jackson fully complied with [the CTCA].").)  It is well-established that district courts may, in their discretion, consider as admissions statements of fact contained in an opposition to a motion to dismiss.  *See Mackin v. City of Coeur D'Alene*, 551 F. Supp. 2d 1205, 1207 & n.2 (D. Idaho 2008), *aff'd*, 347 F. App'x 293 (9th Cir. 2009); *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 557 (9th Cir.), *cert. denied*, 540 U.S. 948 (2003) ("[Courts] have discretion to consider a statement made in briefs to be a judicial admission[.]").

20cv0457

\*1 (E.D. Cal. Oct. 9, 2015) (refusing to dismiss for failure to abide by CTCA where plaintiff, purportedly without authorization, submitted a claim on behalf of an estate, but later substituted in the estate's proper representative).

The competing case proffered by County Defendants is neither apposite nor binding. (Cty. Defs. Mem. 8 (citing *King v. Fresno City Police Dep't*, No. CV F 04-6598, 2006 WL 2827706, at \*3–4 (E.D. Cal. Sept. 29, 2006) ("*King*")).)  *King* involved an attorney who presented a wrongful death action to the City of Fresno purporting to represent the decedent's incarcerated son to whom that claim belonged.  The decedent's son filed suit upon the City's rejection of his claim.  During a sworn deposition prior to the summary judgment stage, the son attested that he neither retained nor authorized the attorney to present a claim pursuant on his behalf pursuant to CTCA.  Accordingly, the *King* Court dismissed the son's claim under Rule 56 on the ground he had never, himself, submitted a claim.  Unlike in *King*, in the instant action, the person who presented claims on behalf of the decedent's estate (Jackson) was subsequently appointed the special administrator of the decedent's estate and court-ordered to represent the estate in its survival action.  Moreover, this Court sees not CTCA purpose that would be advanced by requiring Jackson to return to square one and submit a claim on behalf of the Estate a second time.

County Defendants further contend that allowing the Estate's compliance with the CTCA to stand will have "ludicrous" consequences, *i.e.*, it would permit *anyone* to present and sign a claim on behalf of an estate without first showing they have authority to do so. (Reply 8.)  The Court does not share this concern.  It is notable County Defendants effectively concede through their silence that there is "no requirement or even passing reference" on the County's CTCA form as to who may sign or present it.  (*See* Opp'n 7; *see also supra* n.22.)  If the County Defendants are concerned about a flood of unauthorized claims, a good starting point might be to require those who purport to submit claims on behalf of claimants to indicate on the County's CTCA form the basis of their authority to do so.  Moreover, this Court notes that the CTCA empowers the County to serve upon a claimant a notice of insufficiency for any purportedly substantial failure to comply with

California Government Code §§ 910 and 910.2, including the provisions concerning who may present and/or sign a claim.  Cal. Gov't Code § 911.  Such a notice does not operate as a rejection authorizing a claimant to sue, but effectively holds the claim in abeyance for 15 days, including the public entity's requirement to investigate.  *Id.*  Thus, this Court observes that the County is largely in control of whether it must entertain claims from persons it deems unauthorized to submit them.

Accordingly, this Court **DENIES** County Defendants' Motion to Dismiss Counts 5 and 6 for failure to comply with the CTCA.

## B.   Survival Action

"In a survival action, a decedent's estate may recover damages on behalf of the decedent for injuries that the decedent has sustained." *Davis v. Bender Shipbuilding & Repair Co.*, 27 F.3d 426 (9th Cir. 1994).  "[U]nlike a wrongful death action, a survival action is a cause of action that existed while the decedent [was] alive and survives the decedent." *Adams v. Superior Court*, 196 Cal. App. 4th 71, 78–79 (Cal. Ct. App. 2011). A survival action under California law is statutory in origin.  *See* Cal. Code Civ. § 377.30. However, while the survival action involves a separate statutory basis, it is "derivative of" the Estate's other claims under Section 1983 and for negligence, and, therefore "cannot succeed" if those claims are dismissed.  *Oh v. Teachers Ins. & Annuity Ass'n of Am.*, 53 Cal. App. 5th 71, 82 (2020).

CCMG Defendants' Motion seeks to cut off at its knees all claims brought by the Estate as a survival action on the ground that the FAC fails to allege cognizable injuries. The damages recoverable under a survival action are limited by statute to "the loss or damage that the decedent sustained before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived." Cal. Code Civ. § 377.34.  That same provision prohibits recovery of "damages for pain, suffering, or disfigurement" to which the decedent was subjected prior to death, also commonly referred to as pre-death pain and suffering.  Cal. Code Civ. § 377.34.  CCMG Defendants argue that the damages alleged in the FAC relate only to Wilson's pre-death

pain and suffering—*i.e.*, Wilson's distress and physical deterioration during his confinement—and fails to allege any cognizable economic loss.

While not explicitly argued by the CCMG Defendants, to the extent they seek dismissal of the Estate's Section 1983 claims, which have been brought as survival actions, their argument is unpersuasive.  The Ninth Circuit has made clear that "California's prohibition against pre-death pain and suffering damages limits recovery too severely to be consistent with [Section 1983's] deterrence policy" and "therefore does not apply to [Section 1983 claims where the decedent's death was caused by violations of federal law." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1103–05 (9th Cir. 2014).  Accordingly, the damages concerning the pre-death pain and suffering Wilson endured during his confinement and leading up to his death at the Hospital are valid as it pertains to the Estate's federal claims.

To the extent CCMG Defendants seek dismissal of the Estate's state law claims, the FAC adequately alleges Wilson suffered economic injury while he was alive, *i.e.*, any costs incurred as a result of Wilson's transport to the Hospital and medical care received there. (*See* FAC ¶ 77 (alleging Wilson was transported to the Hospital on February 14, 2019, "where resuscitation efforts continued")); *Cavanaugh v. Cty. of San Diego*, 3:18-cv-2557-BEN-LL, 2020 WL 6703592, at *44 (S.D. Cal. Nov. 12, 2020) ("California law authorizes a survival action . . . for the purpose of compensating the estate for losses suffered by the decedent prior to death, or damages that 'survive' the decedent's death, including . . . medical bills . . . ." (citing Cal. Code Civ. §§ 337.30, 337.40, 337.20(a), 366.1)).[23]

For the foregoing reasons, this Court **DENIES** the CCMG Defendants' Motion to Dismiss.

---

[23] Going forward, the Estate should note that it will not be able to pursue damages relating to Wilson's pre-death pain and suffering in connection with its state law claims.

## C.    Negligence

To make out a claim for negligence, a plaintiff must plead four elements:  duty, breach, causation, and damages.  *See Marlene F. v. Affiliated Psych. Med. Clinic, Inc.*, 48 Cal. 3d 583, 588–89 (1989).

### 1.    Medical Staff Defendants

County Defendants do not dispute the FAC alleges Medical Staff Defendants owed Wilson general and professional duties of care; that Medical Staff Defendants breached those duties of care by "fail[ing] to provide . . . medical care for [Wilson's HCM]," "fail[ing] to take any action to monitor [Wilson] despite his obvious symptoms of being [in] serious medical distress," and "delay[ing] and fail[ing] to render medical care to [Wilson]"; or that Medical Staff Defendants' breaches proximately caused Wilson to suffer damages, including pre-death pain and suffering and economic injury resulting therefrom. (*See* FAC ¶¶ 195–200, 206–07.)  Instead, County Defendants argue only that the FAC fails to allege any of the acts or omissions of Medical Staff Defendants were the proximate cause of Wilson's injuries.  (Cty Defs. Mem. 21.)   In so arguing, County Defendants merely incorporate by reference the same argument deployed earlier—that Dr. Freedland and NP Gatan comprise intervening or superseding causes of Wilson's injury—which this Court rejected.  For the reasons stated above, *see supra* Analysis Sec. III.A.3.b, the Court finds the FAC alleges adequately actual and proximate causation between Medical Staff Defendants and Wilson's injuries.

### 2.    Garcia

As mentioned above, Garcia was responsible for assigning Wilson to a housing unit within the Jail.  Despite Wilson's HCM, Garcia assigned him to Cell B10 in EOH, unit "for suicidal inmates," as opposed to the MOB, "reserved for seriously ill inmates who require constant monitoring and heightened care."  (FAC ¶ 72.)  Furthermore, the FAC alleges Garcia assigned Wilson to the "top bunk" into which the "control deputy in the center of the floor could not see" and from which Wilson could not easily access the cell's "panic button" to alert staff he was in medical distress.  (*Id.* ¶¶ 75 (providing sketch of EOH and

showing placement of Cell B10 in relation to control tower and providing picture of Wilson's cell), 76.)  The FAC avers that Garcia "ignored [Wilson's medical condition]" in making these determinations.  (*Id.* ¶ 74.)  These facts form the basis of Jackson's negligence claim against Garcia.

Again, the County Defendants do not challenge the elements of duty, breach, and damages.  Indeed, the FAC alleges that Garcia had a general duty of care to assign Wilson to the proper housing unit (*id.* ¶ 195), and that Garcia breached that duty by failing to consider Wilson's HCM, which Jackson avers would have been apparent from the sentencing court's order and Garcia's intake interview of Wilson, and by failing to consult with the Jail's medical staff in determining which housing unit to assign Wilson (*id.* ¶¶ 72–73, 201.)  The FAC also alleges Wilson suffered pre-death pain and suffering and economic damages.  Instead, the County Defendants argue Garcia's liability is precluded by the doctrine of superseding or intervening cause.  Again, for the reasons stated above, *see supra* Analysis Sec. III.A.3.b, this argument is unavailing.

### 3.    The County

In its initial Order, this Court dismissed without prejudice to renew the Estate's negligence claim against the County on the ground that the initial Complaint did not identify a statutory basis for the claim.  County Defendants now seek dismissal of the Estate's negligence claim against the County for its asserted failure to correct that deficiency.

The Government Claims Act provides that "[a] public entity is not liable for an injury, except as otherwise provided by statute."  *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1179 (2003) (citing Cal. Gov't Code § 815).  To state a claim for tort liability against a public entity, a plaintiff "must plead a statutory basis showing that [the public entity] may be held liable for [its] clai[m]."  *Bianco v. Cty. of Kings*, 142 F. Supp. 3d 986, 1003 (E.D. Cal. 2015) (internal quotations omitted); *Zelig v. Cty. of Los Angeles*, 27 Cal. 4th 1112, 1131 (2002) ("[A] public entity may be liable for an injury directly as a result of its own conduct or omission, rather than through the doctrine of *respondeat superior*, but

only 'as provided by statute.'" (citing Cal. Gov't Code § 815)). However, the statutory scheme in the Act also provides that public entities can be held *vicariously liable* for the injuries caused by an employee acting "within the scope of his [or her] employment if the act or omission would . . . have given rise to a cause of action against the employee or his personal representative." Cal. Gov't Code § 815.2; *see also Van Ort*, 92 F.3d at 840; *Nozzi v. Hous. Auth. of City of Los Angeles*, 425 F. App'x 539, 542 (9th Cir. 2011) (holding that public entities "may be held vicariously liable for the negligent acts of their individual employees").

The FAC seeks to hold the County vicariously liable under California Government Code § 815.2 for the alleged torts committed by the remaining Defendants (FAC ¶¶ 16, 17, 19 (alleging all "individual defendants" were "agents of" the County and "were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either express or implied, of their . . . employer")); *id.* ¶ 205 ("The County . . . [is] responsible for the act of [County Defendants] under the theory of *respondeat superior*.").) The Court therefore understands the Estate's negligence claim against the County to be lodged only on a *respondeat superior* theory of liability, which does not require the Estate to plead a statutory basis for its claim.[24]

Accordingly, this Court **DENIES** County Defendants' Motion to Dismiss the Estate's negligence claim against the County.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Motions to Dismiss as detailed herein. Specifically, the Court:

1) **GRANTS** County Defendants' Motion to Dismiss all claims brought by Jackson in her personal capacity against all Defendants;

2) **DENIES** County Defendants' Motion to Dismiss the Estate's Section 1983 claims for deliberate indifference to serious medical needs against Medical Staff Defendants;

---

[24] Going forward, the Estate should note it will not be able to pursue negligence against the County on a direct theory of liability.

3)   **DENIES** County Defendants' Motion to Dismiss the Estate's Section 1983 claims for failure to supervise and failure to train and discipline against Supervisory Defendants;

4)   **DENIES** County Defendants' Motion to Dismiss the Estate's Section 1983 claim under *Monell* against the County;

5)   **DENIES** Defendants' Motions to Dismiss the Estate's survival action under Section 377.30; and

6)   **DENIES** County Defendants' Motion to Dismiss the Estate's negligence claims against Medical Staff Defendants, Garcia, and the County.

Plaintiffs may file an amended Complaint **by no later than April 8, 2022**.   The Court notes that as an amended pleading would be Plaintiffs' third attempt to correct the deficiencies noted herein, failure to do so will result in dismissal with prejudice of those inadequately pleaded claims.   Should Plaintiffs elect not to file an amended complaint, Defendants' answer shall be due **by no later than April 29, 2022**

**IT IS SO ORDERED.**

**DATED: March 14, 2022**

Hon. Cynthia Bashant
United States District Judge

20cv0457