EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525   FAX: (619) 233-3221

**Attorneys for Plaintiff Estate of Michael Wilson**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF MICHAEL WILSON, by and through its administrator, PHYLLIS JACKSON,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, *et al.*,<br><br>Defendants. | CASE NO. 3:20-cv-0457-RBM-DEB<br><br>**PLAINTIFF'S OPPOSITION TO COUNTY DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S EXPERT DR. HOMER VENTERS AND/OR TO EXCLUDE HIS OPINIONS AT TRIAL** |

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II. LEGAL STANDARD ............................................................................................2

   A. Disqualification of An Expert Due to a Purported Conflict of Interest is Disfavored. ...............................................................................................................2

   B. The District Court's Role as a Gatekeeper. ......................................................3

III. ARGUMENT .........................................................................................................4

   A. The Court Should Not Disqualify Dr. Venters' Testimony Due to A Purported Conflict of Interest Because the County's Disclosures, If Any, to Dr. Venters in Advance of the Formulation of the COCHS Report Were Insubstantial and Dr. Venters Did Not Rely on Any Confidential Information When Rendering Opinions in this Case. ..............................................................................................4

   B. Dr. Venters' Specialized Knowledge and Experience Provide the Adequate Foundation on Which He Can Render an Opinions on Policies in This Case. ......8

   C. Dr. Venters Can Testify Regarding the *De Facto* Custom and Practice Based on the County's Actual Conduct to Render an Opinion As to Whether That Custom Conforms with Proper Practices of Providing Medical Care in a Correctional Setting. ..............................................................................................11

   D. CIRB Materials ...............................................................................................16

IV. CONCLUSION ....................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.* 738 F.3d 960 (9th Cir. 2013)....3, 4

*Canton v. Harris*, 489 U.S. 378 (1989) .................................................................11

*Children's Broad Corp. v. Walt Disney Co.*, 357 F.3d 860 (8th Cir. 2004)..............4

*City of Pomona v. SWM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) ...............3, 4

*Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993).......................................3

*Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311 (9th Cir. 1995) ...........................................................................................................3

*English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F.Supp. 1498 (D. Colo. 1993)......2

*Green, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.*, 202 F.R.D. 426 (E.D. Pa. 2001) ...........................................................................................2

*Greer v. County of San Diego*, No. 3:19-CV-0378-GPC, AGS, 2019 WL 5453955 (S.D. Cal. Oct. 24, 2019) ....................................................................................11

*Hewlett-Packard Co., v. EMC Corp.*, 330 F.Supp.2d 1087 (N.D. Cal. 2004) ..........2

*Paul v. Rawling Sporting Goods Co.*, 123 F.R.D. 271 (S.D. Ohio 1988).................3

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010)..................................................3, 4

*U.S. v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006).........................................4

*Wang Labs, Inc. v. Toshiba Corp.*, 762 F.Supp. 1246 (E.D. Va. 1991)....................2

**Rules**

Federal Rule of Evidence 702..................................................................................3

## I.  INTRODUCTION

The County seeks to disqualify Plaintiff's medical expert, Dr. Homer Venters, from providing expert testimony at trial. Its first argument relies on a claim of conflict of interest because Dr. Venters consulted with the County years ago on a high-level policy review of recommended medical practices. The County makes no showing of any confidentiality agreement, any confidential information actually shared, or any prejudice. Under controlling case law, it has not come close to the requisite showing for the draconian sanction of disqualification.

Next, the County argues that because Dr. Venters relied on the testimony of the person most knowledgeable, individual defendants' and County employees' testimony as to County policy, training and actual practice, as opposed to a paper review of County documents, he should be barred from testifying that the County's policy, training and practice of failing to ensure adequate administration of prescribed medication is inadequate. In short, by relying on the sworn testimony of County witnesses that there was no policy and no training on the issue, Dr. Venters should be forbidden to testify because he accepted their testimony instead of reviewing the written policies that do not exist. The reliance on sworn testimony of witnesses as to the policy, training and practice is appropriate, and there is no basis in law or logic to preclude testimony on this basis.

Finally, the County argues that Dr. Venters violated a protective order by relying on a CIRB report in another case. As explained, this is a manufactured tempest in a teapot. In this case, Dr. Venters limited his use of the facts in that other case, *Greer*, to those facts publicly available in the District Court's order, which summarized the relevant CIRB findings. There was no violation of any protective order.

/ / /

/ / /

## II. LEGAL STANDARD

**A. Disqualification of An Expert Due to a Purported Conflict of Interest is Disfavored.**

Disqualification of an expert is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely. *Hewlett-Packard Co., v. EMC Corp.*, 330 F.Supp.2d 1087, 1092 (N.D. Cal. 2004) (internal citations omitted). Though federal courts have the inherent power to disqualify expert witnesses, in the case of a purported conflict of interest, "it is important to remember that the 'expert disqualification standard must be distinguished from the attorney-client relationship because experts perform very different functions in litigation than do attorneys. Experts are not advocates in the litigation but sources of information and opinions.'" *Id.* (internal citations omitted).

Disqualification of an expert is warranted based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert; and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation. *Id.* at 1092-1093. (citing *Wang Labs, Inc. v. Toshiba Corp.*, 762 F.Supp. 1246, 1248 (E.D. Va. 1991). However, if only one of the two factors is present, disqualification is improper. *Id.* citing *Green, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.*, 202 F.R.D. 426 (E.D. Pa. 2001) and *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F.Supp. 1498, 1502 (D. Colo. 1993) ("If any confidential disclosures were undertaken without an objectively reasonable expectation that they would be so maintained (hence, any confidentiality was waived), or if, **despite a relationship conducive to such disclosures, no significant disclosures were made, disqualification is inappropriate.**") (emphasis added). *Hewlett-Packard Co.* makes clear that disqualification may not be appropriate even if an expert has signed a confidentiality agreement with the adversary. *Hewlett-Packard Co.*, 330 F.Supp. at 1094 (citing *Paul v. Rawling Sporting Goods Co.*, 123 F.R.D. 271, 278 (S.D.

Ohio 1988)). ("[T]here may be situations where, despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, not the interests of the party that retained the expert, would be served by blanket disqualification.") Simply put, even if a confidential relationship existed, if the moving party fails to disclose substantial confidential information that is relevant to the current litigation, disqualification is inappropriate.

### B. The District Court's Role as a Gatekeeper.

Federal Rule of Evidence 702 requires that a district judge ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 597 (1993). "Expert opinion testimony is relevant if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.* 738 F.3d 960, 969 (9th Cir. 2013) (internal citations omitted). To evaluate reliability, the district court must "assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona v. SWM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). These factors are nonexclusive, and "the trial court has discretion to decide how to test an expert's reliability . . . based on the particular circumstances of the particular case." *Id.* quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

The test under *Daubert* is not the correctness of the expert's conclusions, but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1318 (9th Cir. 1995). But the court is "a gatekeeper, not a fact finder." *Primiano*, 598 F.3d at 56 (internal citations omitted). Accordingly, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance that it would be helpful to a jury." *Alaska Rent-A-Car, Inc.*, 738. F.3d at 969-70). If the proposed

testimony meets the threshold of relevance and reliability, its proponent is "entitled to have the jury decide upon [its] credibility, rather than the judge." *U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *City of Pomona*, 750 F.3d at 1044; *accord Alaska Rent-A-Car, Inc.*, 738 F.3d at 969 ["[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."]

As the Ninth Circuit noted in *Primiano*, "shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded. *Children's Broad Corp. v. Walt Disney Co.*, 357 F.3d 860, 868 (8th Cir. 2004).

### III. ARGUMENT

**A. The Court Should Not Disqualify Dr. Venters' Testimony Due to A Purported Conflict of Interest Because the County's Disclosures, If Any, to Dr. Venters in Advance of the Formulation of the COCHS Report Were Insubstantial and Dr. Venters Did Not Rely on Any Confidential Information When Rendering Opinions in this Case.**

The County argues that Dr. Venters should be disqualified as an expert in this case because Dr. Venters, in his capacity as president of the Community Oriented Correctional Health Services ("COCHS"), conducted a best practices review of the County of San Diego and was one of several authors of the final report. The County claims that it engages organizations like COCHS to conduct policy reviews and advise on reform, and the information provided by the County for these reviews "may" include confidential information. (*See* ECF No. 98-1 at p. 2 of 11).

The County admits that it has the burden of proof on the issue of disqualification but does not (1) submit the contract with Dr. Venters, (2) point to any "confidentiality provision" or (3) submitted any proof of "confidential" information and material provided. Instead, the County relies on a single excerpt from Dr. Venters' deposition when asked about the COCHS review, he noted that he "may" have talked to staff from a policy level about how they get medications and if there are any medications that are hard to get. (*Id*. at p. 6 of 11). The County hones in on Dr. Venters' vague recollection of those interviews and uses it to justify its sweeping assertion that due to those interviews, Dr. Venters should be disqualified entirely. But in doing so, the County cherry picks favorable testimony and ignores several other instances when Dr. Venters testified that the COCHS review was not based on specific information, but instead was a top down, "big picture" review:

> Q: And part of that study into the best practices of the County of San Diego, included medication management; is that right?
> A: I - - it may be. I don't recall the report. But it had to do with the kind of a policy review of the big picture policies, both for how people come to be in jail, and then how to manage their care on the way through and out of jail.

(Declaration of Grace Jun ("Jun Decl.") ¶ 2, Exh. A., Deposition Transcript of Homer Venters at 53:23-54:5).

The County asked very broad questions about the topic of medication management as covered in the COCHS report, and Dr. Venters again reiterated that he did not review any specific documents, including medication administration records:

> Q: . . . . But as you sit here today, your memory is that it included medication management; is that right?
>
> A: . . . . I just recall it was a very high-level policy report. So for instance, I don't think we looked at any medical records or we looked at any actual medication administration records or the

> other kind of, like, details. So often when you say medication management, it involves something called the "MAR," the medication administrative record. And I don't recall looking at those things."

(*Id*. at 54:10-20).

Dr. Venters states in his sworn declaration that he specifically recalls the County declining to provide the medical records of any patient or any other patient-specific cases, plans, treatment protocols, medication administration records or mortality reviews in advance of his work on the report. (Declaration of Homer Venters ("Venters Decl."), ¶ 22). Dr. Venters recalls that the extent of his conversations with jail staff was being shown a PowerPoint presentation which provided a generic overview of the jail and how it worked. (*Id*. at ¶ 23). Though he conducted a walk-through of the jail, met the leadership and toured the facility, Dr. Venters did not discuss any specific patients or cases. (*Id.*) The discussions centered on what the national best practices were in correctional health, a subject on which Dr. Venters is an acknowledged expert. (*Id*.) Finally, the COCHS report on its face supports Dr. Venters' assertion that his work on the report was merely a generalized, high-level policy review not based on specific policies or individual cases or people. The section of the report the County claims bears on this case, section E Medication Management, consists solely of general recommendations of best practices related to medication management. (Jun Decl., ¶ 3, Exh. B., Community Oriented Correctional Health Services (COCHS) report, pp. 14-16). Nowhere does it reference any specific practices already in place in San Diego County jails nor COCHS' opinions, whether commending or critical, on the implementation of those practices. *Id*. Nowhere does it specify any particular policies COCHS identified as lacking in the jail. *Id*. Nowhere does it reference specific cases or individuals, nor does it reference any specific feedback allegedly provided by staff on how they get medications or whether there were some

medications that were hard to get. *Id*. Most telling is the disclaimer present on page 21 of the COCHS report:

> The scope of the COCHS Engagement did not enable us to determine which model is actually operational at the jail nor to determine the extent to which the procedures and processes were conforming to policies that had been implicitly or explicitly selected by either the board or the San Diego County Sheriff.

(*Id*. at p. 21).

As *Hewlett-Packard Co.* makes clear, even if a confidential relationship existed between Dr. Venters and the County, Dr. Venters should not be disqualified because, as stated repeatedly by Dr. Venters and corroborated by the disclaimer in the actual report, the County did not make any, much less, significant, confidential disclosures that aided in the preparation of the COCHS report. Likewise, the County had not identified any other confidential privileged information it provided that could have any bearing on this case.

In any event, Dr. Venters was unequivocally clear that any information he gained through his work on the COCHS report had no bearing on any opinions rendered in this case:

> Q: And in forming your opinions that you're providing in this case, did you rely on any information you gained from the best practices review?
>
> A: **Absolutely not.** I'm very clear in my mind that nothing I did as part of that high-level policy review was relevant or bears on any of the work that I've done in this case or the other similar cases that I've been retained to look at specific medical records for.

(Exh. A, Venters Depo at 58:11-19, emphasis added).

Plaintiff requests that the County's motion to disqualify Dr. Venters due to a purported conflict of interest be denied.

### B. Dr. Venters' Specialized Knowledge and Experience Provide the Adequate Foundation on Which He Can Render an Opinions on Policies in This Case.

The County and the County defendants also seek to exclude Dr. Venters' opinions on policies, procedure, oversight and the appropriateness of care provided to Michael Wilson. (ECF no. 98-1, p. 3 of 11). According to defendants, "because Dr. Venters has admittedly not reviewed or familiarized himself with any specific policies, trainings, or procedures of the County, he cannot opine that the County had inadequate policies, trainings or procedures. . . ." (*Id*. at p. 10 of 11).

However, an expert's specialized knowledge and experience can serve as the requisite "facts or data" on which they render an opinion. In *Primiano*, a patient who had received an elbow replacement sued the manufacturer of her prothesis, alleging that the defects in the device's polyethylene components had triggered joint problems that required several additional surgeries to correct. (*Primiano*, 598 F.3d at 562). The patient relied on the testimony of Arnold-Peter Weiss, M.D., who opined that polyethylene prosthesis normally lasted between five and fifteen years, and that it was unlikely the plaintiff's joint issues were caused by "overuse, medical malpractice . . . . or other factors external to the device." (*Id*. at 562-63). The district court granted the defendant's *Daubert* motion and excluded Dr. Weiss's testimony, concluding that Dr. Weiss failed to base his assumptions on an objective source, as he had neither examined the plaintiff personally, nor cited any peer-reviewed publications that corroborated his opinion." (*Id*. at 563, 567).

The Ninth Circuit reversed the district court's exclusion of Dr. Weiss's testimony, holding that the concerns spoke to the weight of the evidence, not the reliability. The Ninth Circuit emphasized that Dr. Weiss's experience and qualifications, the nature of the medical testimony and the unusual issue at hand. (*Id*. at 566). Dr. Weiss's "extensive, relevant experience" with the implantation or revision of prosthetic elbow qualified him to make such a judgment and provided a sufficient foundation for his testimony. (*Id*.) "Given that the judge is 'a

gatekeeper, not a fact finder," the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it." (*Id*. at 568, internal citation omitted).

It is uncontested that Dr. Venters has a wealth of relevant experience in providing health services for incarcerated people. Dr. Venters was the Deputy Medical Director of the New York City Jail Correctional Health Service. (Venters Decl., ¶ 4) As the Deputy Medical Director, Dr. Venters provided direct care to individuals detained in twelve (12) jails and was responsible for direct oversight of the medical policies for their care, including chronic care, sick call, specialty referral and emergency care. (*Id*.) He was later promoted to Medical Director, Assistant Commissioner, and Chief Medical Officer, where he was responsible for all aspects of health services, including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews, as well as training and oversight of physicians, nursing and pharmacy staff. In this role, Dr. Venters was responsible for the care of vulnerable patients, including those with chronic health problems. (*Id*. at ¶ 5).

Dr. Venters' experience in correctional health includes two years visiting detention centers and conducting analysis of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. (*Id*. at ¶ 3).

Dr Venters has led approximately 100 morbidity and mortality reviews of deaths or serious health incidents inside jails and has attended approximately 50 autopsies of correctional health patients. (*Id*. at ¶ 6). In addition, Dr. Venters had led approximately 200 quality improvement projects for jail health services, approximately 40 of which have become peer-reviewed publications. (*Id*. at ¶ 7). As well as his work with COCHS, Dr. Venters had worked as a medical expert in cases involving correctional health since 2017 and wrote and published a book on

the health risks of jail, *Life and Death in Rikers Island*, which was published in early 2019 by John Hopkins University Press. (*Id*. at ¶¶ 10, 11).

Since April 2020, Dr. Venters has worked on a COVID-19 responses in detention settings, including conducting inspections of numerous state, federal and local detention facilities to assess the adequacy of their COVID-19 responses and has served as a court-appointed monitor in multiple cases. (*Id*. at ¶ 12). Dr. Venters was appointed by President Biden to serve on the COVID-19 Health Equity Task Force in 2021 to help create standards for improving health services in correctional settings in response to the pandemic. (*Id*.) Dr. Venters was appointed by the Honorable Consuelo B. Marshall as an expert in the matter of *Yonnedil Carror Torres et al. v. Louis Milusnic, et al.*, Central District of California case no. 20-cv-04450-CBM-PVCx to assess conditions at the federal prison Lompoc. (*Id*. at ¶ 13). Dr. Venters has also been appointed as an expert in the following cases: *Murray et al. v. County of Santa Barbara, et al.*, case no. 17-cv-08805-GW-JPR, *Scott et al. v. Clarke et al.*, Western District of Virginia case no. 12-cv-00036-NKM-JCH, *Lawrence Carty et al v. Albert Bryan Jr. et al.*, District Court of the Virgin Islands, case no. 94-cv-00078-RAM-RM, *Chatman v. Otani*, U.S. District Court for the District of Hawaii, case no. 21-cv-00268; and *McPherson et al. v. Ned Lamont et al*, United States District Court, District of Connecticut, case no. 20-cv-0534(JBA). (*Id*. at ¶¶ 14-18).

Likewise, Dr. Venters has been retained by Plaintiff's counsel in four cases: *Estate of Paul Silva, et al. v. County of San Diego, et al.*, case no. 18-cv-02282-L-MSB, *Frankie Greer v. County of San Diego, et al.*, case no. 19-cv-00378-JO-DEB, *Colleen Garot v. County of San Diego, et al.*, case no. 19-cv-1650-L-SBC, and *Estate of Elisa Serna et al. v. County of San Diego, et al.*, case no. 20-cv-02096-LAB-DDL. (*Id*. at ¶ 21). Dr. Venters submitted expert reports in each of these cases, without any objection from defendants as to his qualifications.

Dr. Venters' history and qualifications speak for themselves. He is a, if not the, leading expert in correctional healthcare in the United States. His established experience and knowledge provide an adequate basis for him to render expert opinions in this case. Defendants' motion should be denied.

### C. Dr. Venters Can Testify Regarding the *De Facto* Custom and Practice Based on the County's Actual Conduct to Render an Opinion As to Whether That Custom Conforms with Proper Practices of Providing Medical Care in a Correctional Setting.

The County argues that Dr. Venters cannot opine on deficiencies in any specific policies, training, or procedures of the County because he has never seen said policies, training or procedures. In doing so, the County misstates the basis for Plaintiff's claim. Plaintiff has not solely alleged that the Sheriff Department's written policies regarding the administration of medication were deficient (though there is no dispute that there existed **no** policy that required nurses to verify that inmate patients were actually receiving their medication. *See* Jun Decl. ¶ C, Exh. C, Deposition Transcript of Serina Rognlien-Hood, p. 76:20-77:12). Instead, Plaintiff has alleged a pattern of constitutional violations against inmates that resulted from the County's custom and practice of failing to provide medical care. See *Canton v. Harris*, 489 U.S. 378, 390-91 (1989) (municipality can be sued directly if a policy or practice was the "moving force" behind the constitutional violation); see also *Greer v. County of San Diego*, No. 3:19-CV-0378-GPC, AGS, 2019 WL 5453955, at *10 (S.D. Cal. Oct. 24, 2019) ("To trigger municipal liability under *Monell* and [*Bd. Of Cty. Com'ers of Bryan Cty., Okl v. Brown*, 520 U.S. 397 (1997)] in the absence of an official policy, Plaintiff must demonstrate a known pattern of similar constitutional violations that resulted from a challenged custom or pervasive practice.")

There was no policy that required nurses to verify that inmate patients were actually receiving their medications. Though medical staff were required to keep track of administration of medication, the nurses' own testimony reveals there was

no consistent or universal understanding on how to record and track medications through the electronic Medication Administration Record. Dr. Venters can look at that testimony, which reveals a wildly variable, *ad hoc* system, and infer a custom and practice through the medical staff's own conduct.

Defendant County misconstrues the basis for Dr. Venters' findings in a pettifogging attempt to exclude his testimony. The gist of his findings, as revealed by a fair review of his report and testimony, is that the deposition testimony of the County's own employees revealed that there was no policy requiring follow up or remediation when a patient was not administered life-saving medication; that there was no training on ensuring that a patient actually receives his/her medication and there is no follow up when critical medications are missed. The actual custom and practice, as reflected in the records, and the testimony of both the County's PMK, Serina Rognlien-Hood, and the individual County employees, was to ignore repeated failures to administer medication, as a matter of course. The uncontradicted testimony in this regard was that the practice involved an absence of any established mechanism to (1) review medical administration records when a dose is missed to determine how many previous doses were missed; (2) notify the physician of missed doses; or (3) take action to prevent future recurrences of medication failures.

Defendants try to trick out a semantic argument to undermine the undisputed reality: as a matter of custom and practice, the medical personnel, when they fail to provide life sustaining medication, do nothing—no record checks, no notifications, no corrective action, no computer program application in place to notify of a medication failure—to remedy the lack of properly administered medication. Whether a failure of "policy"—of which the witnesses testified without contradiction, there was none—or a failure of training—given the testimony that there was no training on procedures to use to ensure proper administration of medications—or both, is really of no moment. The fact is that

the actual custom and practice, as shown by the facts of this case and defendants' testimony of their own conduct over time, is Constitutionally inadequate. Dr. Venters' Rule 26 report shows the fatuity of the County's argument:

> **Finding 1. San Diego County failed to provide Mr. Wilson with his heart failure medication**. Multiple failures are apparent in the case of Mr. Wilson's death that point to systemic and deeply entrenched deficiencies in prescribing and administration of medication to patients. Not only did Dr. Leon fail to correctly prescribe Mr. Wilson's Lasix, he failed to even mention the multiple other medications in his encounter and failed to ensure that these medications would actually be given to Mr. Wilson. A standard approach is to include the community medications into the initial provider encounter, then the provider can show they have been reviewed, continued or alternatively, provide a clinical rationale for any changes. In his deposition testimony, Dr. Leon was unsure about how he came to prescribe Lasix only once daily instead of twice daily, offering that he may have made an error or that he may have thought the twice daily dose was too much. Subsequent to this deeply flawed encounter with Dr. Leon, Mr. Wilson and his family made repeated attempts to get him seen and for him to receive his medications, largely without any result. . . .
>
> Mr. Wilson missed most of the medications he should have received. For example, Mr. Wilson only received two doses of Lasix and three of metoprolol, despite the order by Dr. Leon for one Lasix and two metoprolol pills each day. The sick call forms submitted by Mr. Wilson should have caused nursing staff to immediately determine whether he was receiving his medications and contact providers to address the errors. The medical personnel ignored the reports, which dramatically increased the likelihood that Mr. Wilson's heart failure would worsen without intervention. **The actual encounters with a nurse and a nurse practitioner should have included determining how many missed doses of medications there were for Mr. Wilson and triggered a review of how to fix those errors. These multiple failures in how Mr. Wilson was**

**prescribed and denied his life-saving medications reveal serious and systemic problems with the health system in the San Diego County Jail, which involve nursing, medical and pharmacy systems and staff.**

**Review of deposition testimony reveals that these failures reflect lack of policy, practice and training that meets minimum standards for correctional health care.** The specific missing policies in this area include;

• Failure to have policy, practice and training that ensures community medications are continued (absent clinical rationale). **The testimony of Dr. Leon reflects confusion about why he switched the Lasix dosage for Mr. Wilson, and makes clear that he was under no clear policy mandate to review each community medication and either continue it or document the clinical reason for changes or discontinuations. He makes clear that this was not an area on which he was trained by County staff or the Medical Director.** Jail standards from the NCCHC present multiple approaches for how continuity of medications can be achieved. "The facility has several options to ensure that inmates admitted on prescribed medication continue to receive the necessary drugs in a timely manner." But the case of Mr. Wilson reveals that San Diego County has failed to establish such a policy, practice or training for medical staff in this crucial area.

• Failure to have policy, practice and training to monitor/address missed medications. While crucial heart medications of Mr. Wilson were simply ignored, others were prescribed but never given to Mr. Wilson. This represents a failure of policy, practice and training because one of the most basic tasks of correctional health staff is to ensure that once prescribed, medications are received by the patient. NCCHC standards make clear: "Unless medications are taken as prescribed, maintaining a therapeutic dose of medications may not be possible, which may have grave consequences to patient health." In fact, the NCCHC standards and basic correctional practices call out missed medications as a special danger: "The

> medication services program includes provisions to address urgent incidents of missing medication."
>
> **Testimony from nursing staff, including Nurse Rognlien-Hood make clear that there was no clear policy or practice to identify missed medications and that the codes entered into the medication system were not clearly or consistently understood by their staff. Nurse Rognlien Hood made clear in her testimony that there was no training on how to identify or respond to missed medications in the San Diego County Jail at the time of Mr. Wilson's death. In order to adequately address this required element of correctional health care, there must be a mechanism in place for nursing staff to recognized missed medications, a policy in place that guides their response (such as notification of an MD or mid-level provider), and training on how these tasks are to be conducted and documented.**

(Venters Report, p. 9-12, emphasis added).

The facts, especially the defendants' testimony, as to their actual practice and training, reveal a fatal truth:

> I am very familiar with the medication system utilized by the County at this time (Sapphire) as well as paper medication administration systems and both are routinely utilized to detect and address missed medications in jail settings. **The lack of basic monitoring for missed medications in the case of Mr. Wilson, and the testimony of the health staff**, reflect a **serious problem with oversight, policies, practices and training by the head physician and the County.**

(Venters Report, p. 12, emphasis added).

The Court should reject the County's attempt to disqualify Dr. Venters. The arguments they urge, such as they are, may provide fodder for cross-examination, but are woefully inadequate to disqualify.

///

///

### D. CIRB Materials

Defendants raise the issue of the CIRB materials, appearing to suggest that Dr. Venters violated the protective order in *Greer v. County of San Diego*, case no. 19-cv-00378-JO-DEB. They are mistaken. Dr. Venters was retained as an expert in *Greer.* (*Id*. at ¶ 25). As part of his work on his expert report in Greer, Plaintiff's counsel provided Dr. Venters with the CIRB documents. (*Id*. at ¶ 26). Plaintiff's counsel informed Dr. Venters that the documents were subject to a protective order and instructed him to limit his use of the documents solely to his expert report in *Greer*. (*Id*.)

After Dr. Venters was retained to render an expert opinion in the instant case, Plaintiff's counsel provided Dr. Venters with a Court order publicly filed on March 1, 2023, in the *Greer* case. (*Id*. at ¶ 28). A copy of the order is attached hereto as Exhibit D. That order, by District Court Judge Jinsook Ohta, included an extensive reiteration of the underlying investigations conducted by CIRB. (*Id*.) Plaintiff's counsel instructed Dr. Venters to limit his opinion in this case to the materials set forth in Judge Ohta's written order in Greer, which was publicly available. Plaintiff's counsel further instructed Dr. Venters to restrict any quotation from, or reliance on, the materials in the CIRB records to information in that opinion. (*Id*.) Plaintiff's counsel did not provide Dr. Venters with CIRB reports in this case. (*Id*.) The protective order in *Greer* was not violated. The references in Dr. Venters Rule 26 report provided to defendants in discovery were based exclusively to the Court's order in the Greer case, which was public information and not subject to any protective order.

/ / /
/ / /
/ / /
/ / /
/ / /

## IV. CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests the Court deny the County's motion to disqualify Dr. Venters and/or exclude his opinions at trial.

Respectfully Submitted,

DATED August 2, 2023

**IREDALE AND YOO, APC**
s/ *Eugene Iredale*
EUGENE IREDALE
Attorneys for Plaintiff Estate of Michael Wilson