# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF MICHAEL WILSON, by and through its successor-in-interest PHYLLIS JACKSON, and PHYLLIS JACKSON,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No.: 3:20-cv-00457-RBM-DEB<br><br>**ORDER DENYING COUNTY DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S EXPERT DR. HOMER VENTERS AND/OR TO EXCLUDE HIS OPINIONS AT TRIAL**<br><br>**[Doc. 98]** |

On June 13, 2023, the County Defendants filed a motion to disqualify the Estate of Michael Wilson's ("Plaintiff") expert witness Dr. Homer Venters and/or to exclude his opinions at trial ("Motion"). (Doc. 98.) In their Motion, the County Defendants argue Dr. Venters is disqualified due to a conflict of interest and lacks foundation for his opinion that the County failing to have policies, procedure, or training concerning missed medications. (*Id.* at 4–10.)[1] Plaintiff filed a brief in opposition to Defendant's Motion on August 2, 2023 ("Opposition") (Doc. 112), and the County Defendants filed a reply on August 30, 2023

---

[1] The Court cites the page number displayed on the docketed document, not the CM/ECF pagination, unless otherwise noted.

1  ("Reply") (Doc. 127).

2  For the reasons discussed below, the County Defendants' Motion is **DENIED**.

## I.   RELEVANT BACKGROUND

### A. Dr. Venters' Experience and Report

Plaintiff designated Dr. Homer Venters as an expert in correctional medicine who will provide testimony concerning "the standard of medical care in correctional facilities; the level and appropriateness of care provided to decedent Michael Wilson within the San Diego County Central Jail; policies and procedures pertaining to medical care; medical charting and electronic health records; the administration of medication; and oversight of medical care providers." (Doc. 96-2 (Ex. Q) at 1.) Dr. Venters is a physician, internist, and epidemiologist with over a decade of experience in health care services for incarcerated persons. (Doc. 98-2 (Ex. B), Dr. Homer Venters' Expert Report ("Venters Report") at 1.) In preparing his expert report, Dr. Venters listed that he reviewed Critical Incident Review Board ("CIRB") documents and a California State Auditor's Report. (*Id.* at 3–4.) Dr. Venters confirmed that he reviewed CIRB documents in his deposition as well. (Doc. 98-2 (Ex. A), Deposition of Dr. Homer Venters ("Venters Dep.") 19:18–24.) Dr. Venters understood that the CIRB records were subject to a protective order but did not recall signing an agreement before receiving those records. (*Id.* at 61:18–62:6.) Dr. Venters did not recall the amount of CIRB records he reviewed, or which documents he reviewed. (*Id.* at 19:18-24, 65:1–6.) Dr. Venters was not sure whether he relied on the California State Auditor's Report in forming his opinions in this case. (*Id.* at 20:8-17.)

### B. COCHS Best Practices Review

Between December 2018 and April 2020, Dr. Venters served as a Senior Health Fellow and President of the Community Oriented Correctional Health Services ("COCHS"), a nonprofit promoting evidence-based improvements to correctional practices in the United States. (Venters Report at 2.) In his deposition, Dr. Venters stated that, while he was either a Senior Health Fellow or President of COCHS, COCHS conducted a best practices review for the County of San Diego. (Venters Dep. 53:10–22.) Dr. Venters did

2

1  not recall the best practices review beyond that it had to do with "big picture policies"
2  concerning how people come to be in jail and managing their care on the way through and
3  out of jail. (*Id.* at 53:23–54:5.) Dr. Venters was listed as an author of the best practices
4  review. (*Id.* at 54:6–8.) Dr. Venters did not recall looking at the profiling of medications,
5  medication records, or medication administration records ("MARs") for the best practices
6  review, but he believed COCHS may have talked to staff at a policy level about how they
7  get medications and if some medications are hard to acquire. (*Id.* at 54:10–55:8.)

8        When asked whether Dr. Venters was told COCHS' contract with the County of San
9  Diego contained certain confidentiality provisions, Dr. Venters stated "I don't recall
10 looking at the contract. But so yes, I just don't recall looking at that." (*Id.* at 57:14–18.)
11 When asked if the information Dr. Venters learned from the best practices review
12 influenced his opinions in this case, he stated "[a]bsolutely not" and characterized the
13 review as high-level policy review that does not bear on this case or similar cases where
14 he has been retained to look at specific medical records. (*Id.* at 58:11–19.) When asked
15 whether there was no policy in place regarding continuation of medication, Dr. Venters
16 stated that, based on what he saw in this case, if there was such a policy, it was not effective
17 or being followed. (*Id.* at 69:11–21.) Dr. Venters explained that he did not review any
18 written policy regarding continuation of medication for admitted inmates and was not sure
19 whether the deficiencies he observed were the result of policy, practice, or training, or some
20 combination of the three. (*Id.* at 69:22-70:13.) When Dr. Venters was asked if his opinion
21 was that no training was provided to nursing staff on how to pass out medication and
22 document it on the MAR, he explained that it was not but rather his opinion was that there
23 was some deficiency in policy, practice, or training leading the system to not function. (*Id.*
24 at 77:1-15.)

25       In a declaration, Dr. Venters recalled that, as part of the best practices review, the
26 County explicitly declined to provide medical records of any patients or any other patient-
27 specific information. (Doc. 112-5, Declaration of Dr. Homer Venters ("Venters Decl.")
28 ¶ 22.) Dr. Venters recalled talking to jail staff during a walkthrough where he was shown

a PowerPoint presentation concerning an overview of the jail and how it worked; he also recalled meeting leadership of the jail, touring different parts of the facility including the medical area and housing units, and not discussing specific patients or cases. (*Id.* at ¶ 23.)

The COCHS best practices review involved a two-day series of meetings and process reviews, including observing several areas of two current jail facilities in San Diego. (Doc. 112-3 (Ex. B), COCHS Best Practices Review at 2.) Dr. Venters emailed the best practices review to the Chief Operating Officer of the Officer of Public Safety for San Diego County on March 30, 2020, but it is not clear when the meetings, process reviews, or facility observations occurred. (*Id.* at 1–27.) The COCHS best practices review report has a section on medication management, but that section makes no mention of any policy or procedure of the San Diego County jail. (Venters Decl. ¶ 24; COCHS Best Practices Review at 14–16.) The COCHS best practices review report also notes that "[t]he scope of COCHS Engagement did not enable us to determine which model is actually operational in the jail nor to determine the extent to which the procedures and processes were conforming to policies that had been implicitly or explicitly selected by either the board or the San Diego County Sheriff." (COCHS Best Practices Review at 21.)

## II.   LEGAL STANDARD

A. Conflict of Interest

"Federal courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004). "However, disqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Id.* "[D]isqualification of an expert is warranted based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation." *Id.* at 1192–93. "[I]f only one of the two factors is present, disqualification likely is inappropriate." *Id.* at 1093. "In addition to these two factors, the Court also should consider whether disqualification

4

would be fair to the affected party and would promote the integrity of the legal process." *Id.* The party moving to disqualify bears the burden of proof on these issues. *Hayward Prop., LLC v. Commonwealth Land Title Ins. Co.*, Case No. 17-cv-06177 SBA, 2021 WL 4923379, at *2 (N.D. Cal. Aug. 31, 2021) (citing *Hewlett-Packard*, 330 F. Supp. 2d at 1096).

In evaluating whether a confidential relationship with an expert existed, courts consider: (1) whether the relationship was long standing and involved frequent contacts, (2) whether the expert is to be called as a witness in the underlying case, (3) whether alleged confidential communications were from the expert to the party or vice-versa, (4) whether the moving party funded or directed the formation of the opinion to be offered at trial, (5) whether the expert and party entered into a formal confidentiality agreement, (6) whether the expert was retained to assist in the litigation, (7) the number of meetings that took place, (8) whether work product or documents were discussed or provided to the expert, (9) whether the expert received a fee, (9) whether the expert was asked not to discuss the case with opposing parties and counsel, and (10) whether the expert derived any of his specific ideas from work done under the direction of the party. *Hewlett-Packard*, 330 F. Supp. 2d at 1093 (citing *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1083 (C.D. Cal. 2001); *Mayer v. Dell*, 139 F.R.D. 1, 2–3 (D.D.C. 1991); *Paul By & Through Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 280 (S.D. Ohio 1988)).

Confidential information is information "of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege." *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (quoting *Rawling Sporting Goods Co.*, 123 F.R.D. at 279). It may include "discussions of the party's litigation strategy, its view of the strengths and weaknesses of each side, the role of each party's experts and anticipated defenses" and at least one court has concluded that "[c]ommunication based upon technical information as opposed to legal advice is not considered privileged." *Hayward Prop., LLC*, 2021 WL 4923379, at *4 (citing *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (citations omitted)). "Because the burden is on the party

5

seeking to disqualify the expert, that party should point to specific and unambiguous disclosures that if revealed would prejudice the party." *Hewlett-Packard*, 330 F. Supp. 2d at 1094.

B. <u>Expert Qualification</u>

Federal Rule of Evidence ("Rule") 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

Before finding expert testimony admissible, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147–49 (1999)).

The Court must find "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 590. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and

experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). "[T]he court must assess [an expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano*, 598 F.3d at 564). "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id*. (citing *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007)).

The inquiry required by Rule 702 "is a flexible one." *Daubert*, 509 U.S. at 594; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969). "In evaluating proffered expert testimony, the trial court is 'a gatekeeper, not a fact finder.'" *City of Pomona*, 750 F.3d at 1043 (quoting *Primiano*, 598 F.3d at 565). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Id*. at 1044. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S. at 596).

### III.   DISCUSSION

A. <u>Disqualification for Conflict of Interest</u>

The County Defendants argue Dr. Venters had a "position of trust" with the Sheriff's Department where he received confidential information, at least from interviews with jail staff about medication management. (*See* Doc. 98-1 at 5–6.) The County Defendants assert Dr. Venters must be disqualified because he is now testifying as an expert adverse to the County on the same subject matter that he previously authored a confidential policy report for the County on and that covered the relevant period. (*See id.* at 6.) The County Defendants claim that best practices reviews *may* involve the County disclosing confidential information to organizations such as COCHS. (*See id.* at 1.) Plaintiff responds

7

that the County Defendants have failed to meet their burden in that they (1) do not submit a contract with Dr. Venters, (2) point to any confidentiality provision, or (3) submit proof of any confidential information provided. (*See* Doc. 112 at 5.) The County Defendants respond that Dr. Venters testified that he was told the contract contained confidentiality provisions and that Dr. Venters' access to the facility, staff, and leadership amounts to confidential disclosures. (*See* Doc. 127 at 1.) The County Defendants also respond that Dr. Venters' opinions in this case are related to the best practices review in that he cites National Commission on Correctional Health Care ("NCCHC") standards and how the County's actions fell below those standards. (*See id.* at 1–2.)

### i. Confidential Relationship

The County Defendants have failed to meet their burden of proving a confidential relationship between Dr. Venters and the County. *See Hewlett-Packard*, 330 F. Supp. 2d at 1093. The County Defendants have put forth insufficient evidence concerning the length and frequency of Dr. Venters' interaction with the County as part of the best practices review, whether work product or documents were discussed or provided to Dr. Venters, whether Dr. Venters received a fee for his services, whether he was told not to discuss the best practices review with opposing parties, and whether Dr. Venters derived specific ideas for his opinions in this case from that work. *See id.* Additionally, while it appears Dr. Venters emailed the best practices review to the County on March 30, 2020, it is unclear whether the two days of meetings, process reviews, and observation of some areas of two facilities occurred before, during, or after the incident in this case. (*See* COCHS Best Practices Review at 1–27.)

The Court is not persuaded by Dr. Venters' equivocal statement during his deposition, including not recalling reviewing a COCHS contract with the County, that such a contract contained confidentiality provisions. (*See* Venters Dep. 57:14-18.) The County Defendants have not presented evidence of such confidentiality provisions or their terms. It appears Dr. Venters was personally part of a single site visit at some unknown time where, during a walkthrough, he talked with jail staff and leadership. (*See* COCHS Best

Practices Review at 1; Venters Decl. ¶ 23–24.)  Such a limited interaction does not transform his association with the County into a confidential relationship.

### ii. Confidential Information

Even assuming Dr. Venters had a confidential relationship with the County, the County Defendants have failed to point to any confidential information provided to Dr. Venters that is relevant and would prejudice the County Defendants in this action.  *See Hewlett-Packard*, 330 F. Supp. 2d at 1094.  The County Defendants have not pointed to any attorney work product or information within the scope of the attorney-client privilege that Dr. Venters was provided.  *See id.*  Dr. Venters did not review any medical records or patient-specific information.  The best practices review itself makes no mention of the policies or procedures of the San Diego County jail, in fact, it specifically explains COCHS' engagement with the County did not allow COCHS to determine which procedures and processes the County uses.  (*See* COCHS Best Practices Review at 21.) And whether the best practices review cites NCCHC standards has nothing to do with whether Dr. Venters received confidential information from the County.  The County Defendants assert mere access to the facility and the ability to interview staff and leadership amounts to confidential disclosure.  That is incorrect.  The County Defendants have failed to point to "specific and unambiguous" disclosures to Dr. Venters that would prejudice the County Defendants in this action.  *See Hewlett-Packard*, 330 F. Supp. 2d at 1094.

B. Expert Qualification

The County Defendants argue Dr. Venters has no foundational basis for his opinions concerning the County's failing to have policies, practices or training sufficient to address missed medications when his report did not include review of any such policies, practices, or training. (*See* Doc. 98-1 at 6–7.) The County Defendants also contend that Dr. Venters review of CIRB documents violated the protective order in *Greer v. County of San Diego*, 19-cv-0378-JO-DEB and the California State Auditor's Report may underlie his opinions as to the County's procedures, policies, or training. (*See id.* at 7–10.) The County Defendants contend that because Dr. Venters has not reviewed any specific policies,

procedures or trainings, his opinion that the County had inadequate policies, procedures or trainings is speculative and lacks foundation. (*See id.* at 10.)

Plaintiff responds that Dr. Venters' specialized knowledge and experience provide adequate foundation for his opinions in this case. (*See* Doc. 112 at 8–10.) Plaintiff contends that Dr. Venters can opine, based on records and the testimony of County employees, on the failure of the County to have policies, procedures, or training to verify that inmates were receiving their medications and/or the *de facto* custom and practice of the County's medical staff in failing to ensure proper administration of medications. (*See id.* at 11–15.) Plaintiff also responds that the only CIRB materials Dr. Venters reviewed for this case were those publicly available in a summary judgment order in *Greer* and that there was no violation of the protective order in that case. (*See id.* at 16.) The County Defendants respond that Dr. Venters cannot opine as to mechanisms in place at the jail concerning missed medications because he failed to review any of the jail's policies, procedures, or training and so his opinions lack foundation. (*See* Doc. 127 at 3–6.)

The parties appear to agree that Dr. Venters has the requisite medical training and education to render opinions on correctional medicine. (*See* Doc. 112 at 8–11; Doc. 127 at 5.) However, the County Defendants contend that Dr. Venters lacks foundational knowledge regarding the County's policies, procedures, and trainings to reach the opinions he put forth in his expert report. (*See id.*)[2]

The Court has reviewed Dr. Venters expert report and the portions of Dr. Venters' deposition that the parties rely on in their *Daubert* briefing. The County Defendants are correct that Dr. Venters has not reviewed the County's official policies, procedures, or

---

[2] The County Defendants attempt to distinguish Plaintiff's use of the word "mechanism" in his Opposition from "procedure" in arguing that there were mechanisms in place to check for missed medications. (*See* Doc. 127 at 3–4.) However, Dr. Venters' deposition testimony is focused on an alleged lack of effective policy, procedure, or training evidenced by the County Defendants' depositions. Plaintiff's use of the word "mechanism" in his Opposition does not alter that fact.

training. However, Dr. Venters' opinions regarding deficiencies in policies, procedures, or training are based on his review of deposition testimony from County employees in this case and inferences drawn therefrom. Such opinions are helpful to the jury in evaluating Plaintiff's claims that the County had a custom and practice of failing to ensure the proper administration of medication to inmates, regardless of any formal policies, procedures, or training. The fact that Dr. Venters did not review the County's policies, procedures, or training is more properly addressed on cross-examination. *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). Similarly, the extent to which Dr. Venters' opinions are based on his review of publicly available information from the summary judgment order in *Greer* and the California State Auditor's Report is more properly addressed on cross-examination.

## IV.   CONCLUSION

For the reasons discussed above, the County Defendants' Motion (Doc. 98) is **DENIED**. However, the Court cautions Plaintiff that the Court's ruling does not mean that Dr. Venters can opine on formal policies, procedures, or training that he did not review in preparation of his expert report.

**IT IS SO ORDERED.**

DATE:  December 1, 2023

_____
HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE