# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF MICHAEL WILSON, by and through its successor-in-interest, PHYLLIS JACKSON, and PHYLLIS JACKSON,<br><br>                                   Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br>                                   Defendants. | Case No.:  3:20-cv-00457-RBM-DEB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART CCMG DEFENDANTS AND COUNTY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>**[Docs. 96, 100]** |

This case concerns the death of 32-year-old Michael Wilson, who was serving a two-week flash incarceration at the San Diego Central Jail for a probation violation.  Wilson had a history of suffering from hypertrophic cardiomyopathy ("HCM") and congestive heart failure ("CHF") and had an implanted heart pacer.  Prior to his incarceration, he took four cardiac medications to manage his heart condition.  Before his booking, the court warned medical staff at the jail in writing that Wilson had serious medical needs.

During the first six days of his incarceration, Wilson did not receive any of his cardiac medications.  He missed 36 doses of those medications.  Over the next three days, he received six doses of only some of his medications, but his prescriptions required 18 doses.  On the morning of the tenth day, Wilson passed away due to sudden cardiac death

1

arising from acute CHF and HCM.

Pending before the Court are Vincent Ronald Gatan, Peter Freedland, Mark O'Brien, and Coast Correctional Medical Group's (collectively, the "CCMG Defendants") motion for summary judgment ("CCMG's Motion") (Doc. 96) and the County of San Diego, William Gore, Barbara Lee, Louis Gilleran, Laucet Garcia, Rizalin Bautista, Macy Germono, Marylene Ibanez, and Anil Kumar's (collectively, the "County Defendants") motion for summary judgment ("County's Motion") (Doc. 100). CCMG Defendant Mark O'Brien and County Defendants Barbara Lee, Louis Gilleran, Laucet Garcia, and Rizalin Bautista have been dismissed from this lawsuit with prejudice. (*See* Docs. 95, 124.) Accordingly, the Court will not address any arguments concerning Defendants O'Brien, Lee, Gilleran, Garcia, and Bautista.

The Estate of Michael Wilson ("Plaintiff")[1] filed a brief in opposition to CCMG and the County Defendants' Motions ("Opposition"). (Doc. 113.) The CCMG and County Defendants filed reply briefs. (Docs. 130, 132.) Plaintiff filed a sur-reply. (Doc. 138.)[2]

The Court finds this matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons discussed below, CCMG's Motion and the County's Motion are **GRANTED IN PART** and **DENIED IN PART**.

## I.     BACKGROUND

At four to five months old, a pediatrician discovered Wilson had an enlarged heart and he was diagnosed with HCM and CHF. (Doc. 39-1 (Ex. 1), Declaration of Phyllis Jackson ¶ 4.) CHF occurs when there is fluid accumulation in the body, including the lungs. (Doc. 96-2 (Ex. S), Dr. Alon Steinberg's Expert Report ("Steinberg Report") at 9.)

---

[1] All claims asserted by Phyllis Jackson in her individual capacity were previously dismissed by the Court. (*See* Doc. 62 at 14–22.)

[2] Plaintiff filed an *ex parte* motion for leave to file a sur-reply to respond to the County Defendants' evidentiary objections raised in their reply brief. (Doc. 134.) The County Defendants filed an opposition. (Doc. 136.) The Court granted Plaintiff's *ex parte* motion. (Doc. 137.)

When fluid accumulates in the lungs, it causes shortness of breath, coughing, orthopnea (shortness of breath laying down), and paroxysmal nocturnal dyspnea (waking at night due to shortness of breath).  (*Id.*)  Failure to treat CHF can lead to respiratory failure and significant stress to the heart, which can lead to death.  (*Id.*)

HCM, a disease in which the heart muscle becomes thickened, can make it harder for the heart to pump blood.  Mayo Clinic, Hypertrophic cardiomyopathy, mayoclinic.org, *available      at*      https://www.mayoclinic.org/diseases-conditions/hypertrophic-cardiomyopathy/symptoms-causes/syc-20350198 (last visited November 2, 2023).  It can cause shortness of breath, chest pains, or changes in a heart's electrical system resulting in life-threatening heart rhythms or sudden death.  *Id.*

**A. Parole Revocation – February 5, 2019**

On February 5, 2019, Wilson was sentenced to a two-week "flash incarceration" for a probation violation.  (Doc. 131, Joint Statement of Undisputed Facts at 1.)[3]  During the probation revocation hearing, the Court ordered "medical staff to be aware that this defendant has some serious medical issues."  (*Id.*)

**B. Booking Procedure – February 5, 2019**

a.  Intake Medical Screening

Per County policy, procedure, and training, nurses conduct an intake medical screening to evaluate an inmate's physical, medical and psychological conditions based on their statements, responses to a lengthy questionnaire, appearance, behavior, presentation, and any hospital discharge paperwork.  (Doc. 100-2, Declaration of Serina Rognlien-Hood ("Rognlien-Hood Decl." ¶ 11.)  A 3:50 p.m. note on Wilson's medical chart included his intake   medical   screening   and   was   located   electronically   on   the   Jail   Information

---

[3] The Court cites to the page number on a docketed document, not the CM/ECF pagination, unless otherwise specified.

Management System ("JIMS").[4]  (*Id.* ¶ 13; Doc. 96-2 (Ex. B) CSD000001.)[5]  In the note, Wilson weighed 215 pounds.  (CSD000002.)  Wilson reported he had a history of CHF, HCM, and asthma.  (CSD000013.)  He was referred to a second stage assessment with Nurse Rizalina Bautista.  (Doc. 131 at 1.)

        b. Secondary Screening

Approximately one hour later, Wilson met with Bautista for an initial assessment of his reported CHF, HCM, and asthma.  (Doc. 131 at 1.)  Wilson told Bautista that he used an Albuterol inhaler for asthma, took 40 milligrams of Lasix daily for CHF, and took Invega for schizophrenia.  (*Id.* at 2.)  Bautista observed Wilson's respirations were even and unlabored and his lungs were clear to auscultation.  (*Id.*)  The note does not indicate how Bautista tested Wilson's lungs for auscultation.  (CSD000022.)[6]  Bautista did not take Wilson's weight.  (*Id.*)

Bautista initiated the Standard Nurse Protocol for asthma and gave Wilson an Albuterol inhaler.  (*Id.*)  Bautista obtained a release of information to acquire Wilson's medication list from Rite Aid Pharmacy.  (*Id.*)  Bautista scheduled Wilson for a medical doctor sick call, noting he was as a "Level 1"[7] who claimed a history of CHF, taking 40

---

[4] Hereinafter, "note" refers to an entry on Wilson's medical chart on JIMS.  In a patient's medical chart, a note will have a time stamp of when it was entered into the computer, which is not necessarily when the medical staff entering the note saw the patient.  (Doc. 96-2 (Ex. D), Deposition of Peter J. Freedland ("Freedland Dep.") 22:20–23:15; Doc. 96-2 (Ex. F), Deposition of Serina Rognlien-Hood ("Rognlien-Hood Dep.") 128:20–130:4.)

[5] Hereinafter, pages of Wilson's medical chart on JIMS will be cited by their page number (e.g., CSD000001).

[6] Plaintiff's expert Dr. Venters opined that fluid in a CHF patient's lungs is most apparent when they are lying flat or at a 45-degree angle.  (Doc. 96-2 (Ex. T) Deposition of Dr. Homer Venters ("Venters Dep.") 27:17–28:3.)  Dr. Venters explained that to properly check lungs, a patient must lay down for a while before the provider checks their jugular venous pressure and listens to their lungs because a doctor is not as likely to find something if the patient is sitting up or standing.  (*Id.* at 46:10–24.)

[7] Level 1 for medical doctor sick calls means the patient is a priority.  (Doc. 116-10 (Ex. 10), Deposition of Rizalin Bautista ("Bautista Dep.") 107:5–11.)

milligrams of Lasix daily, having HCM with "multiple meds," and asthma. (CSD000023.) Bautista mentioned the court's warning regarding Wilson's serious medical needs. (*Id.*)

### c. Chest x-ray

That evening, Wilson underwent a chest x-ray, which found no effusion (abnormal fluid), mild cardiomegaly (enlarged heart), no Tuberculosis, and reflected Wilson's "[l]eft-sided pacer" in his heart. (CSD000021.) This pacer provides electric shock to the heart in the event the heart switches into a dangerous or fatal rhythm. (Doc. 96-2 (Ex. R), Dr. Homer Venters' Expert Report ("Venters Report") at 4.)

Wilson did not receive any cardiac medications on February 5, 2019. (Doc. 116-2 (Ex. 2) at 1–3.)

**C. February 6, 2019**

On February 6, 2019, a 10:32 a.m. note stated Wilson weighed 195 pounds. (CSD000023.) At 10:55 a.m., the Sheriff's Department received Wilson's list of prescription medications from Rite Aid Pharmacy. (Doc. 131 at 2.) The medications included Spironolactone ("1/2 tablet by mouth once daily"), Lisinopril ("take 1 tablet by mouth at bedtime"), Furosemide ("take 1 tablet by mouth twice a day"), and Metoprolol ("take ½ tablet by mouth twice a day"). (*Id.* at 2–3.)

Furosemide, the generic of Lasix, is a diuretic that treats congestion and fluid retention; many patients with CHF require diuretics to prevent fluid retention and accumulation in the body. (Steinberg Report at 10; Doc. 96-2 (Ex. C) Deposition of Arturo Leon ("Leon Dep.") 46:15–17.) Spironolactone is also a diuretic. (Steinberg Report at 10.) Lisinopril is an ACE inhibitor that has been shown to reduce the work the heart does, helps the heart pump better, and prevents heart failure from worsening. (*Id.* at 10.) Spironolactone and Lisinopril have been shown to decrease morbidity and mortality in patients with weak hearts and CHF. (*Id.*) Metoprolol is a beta-blocker that is used to treat high blood pressure and patients with heart failure. Mayo Clinic, Metoprolol (Oral Route), mayoclinic.org, *available at* https://www.mayoclinic.org/drugs-supplements/metoprolol-oral-route/description/drg-20071141 (last visited November 11, 2023).

a.   <u>Dr. Leon Assessment</u>

At 11:08 a.m., Dr. Arturo Leon, a CCMG physician,[8] noted Wilson did not present in acute distress and had multiple medications for medical conditions including asthma and cardiac problems. (CSD000023.)  He stated Wilson's vitals were normal and he had 100 percent oxygen saturation, clear lungs, and no rales or wheezing. (*Id.*)  He noted Wilson's history of asthma and hypertension but not his CHF or HCM. (*Id.*)  He noted Wilson would be placed on "metroprolo 5omg BIB" and "Lasix 40mg qd." (*Id.*)  In his deposition, Dr. Leon explained his "5omg" entry should have been 50 milligrams and his "BIB" entry should have been "BID," the abbreviation for twice a day. (Doc. 96-2 (Ex. C) Leon Dep. 35:3–4; Doc. 116-11 (Ex. 11) Leon Dep. 44:13-17.)  He planned to restart the rest of Wilson's medications once they received his pharmacy records. (Doc. 131 at 3.)  A nurse noted Wilson's medications were reflected on Sapphire and they were awaiting his records. (CSD000023.)  Physicians can order medications through JIMS, and those orders end up on Sapphire. (Doc. 96-2 (Ex. C) Leon Dep. 18:1–23, 39:10–15; Doc. 131 at 3.)

b.   <u>Sapphire</u>

Sapphire shows a patient's list of medications and instructions for use. (Doc. 96-2 (Ex. H) Deposition of Vicente Ronald L. Gatan ("Gatan Dep.") 96:23–97:11.)  Sapphire was used in conjunction with JIMS to track the jail's medication administration records ("MARs"). (Rognlien-Hood Decl. ¶ 14.)  Sapphire and JIMS are intended to share and synchronize information regarding where patients are housed so that their prescribed medications can be added to their respective module's medication pass list. (*Id.* at ¶ 16.)  On Sapphire, nurses document whether prescribed medication was given, marking it as administered or stating reasons why the medication was not given. (Doc. 100-2 (Ex. K) Rognlien-Hood Dep. 72:10–22.)   Typically, nurses enter that a medication was

_____

[8] Between April 1, 2016 and September 30, 2020, CCMG provided physicians and, for part of that time, nurse practitioners to San Diego County jails to provide medical services. (Doc. 96-2 (Ex. I), Declaration of Dr. Mark O'Brien ("O'Brien Decl.") ¶ 2.)

6

administered as soon as the medication is given at a patient's cell and there is a laptop on the medical cart to do so.  (*Id.* at 72:23–73:6, 73:7–9.)  Sapphire does not automatically show providers a date range of when a patient refused to take medications; the provider must click on a patient's medication to see if they are taking it or not.  (Doc. 96-2 (Ex. F) Rognlien-Hood Dep. at 194:1–196:6.)

### c. Ordering Wilson's Medications

At 1:15 p.m., Dr. Leon noted that he reviewed Wilson's pharmacy records and reconciled his medications in Sapphire.  (CSD000026.)   Wilson's pharmacy records showed he was previously prescribed Furosemide (a Lasix generic) at 40 milligrams twice a day, but Dr. Leon only ordered Furosemide at 40 milligrams once a day.  (Doc. 131 at 4.)  Dr. Leon was not sure if that error was based on his clinical judgment or simply due to not seeing the pharmacy records indicated 40 milligrams twice a day.  (*Id.* at 4.)

A Sapphire printout of a patient's electronic medical administration record ("eMAR") indicates the status of each dose prescribed to the patient, with the system allowing a finite set of options.  (*Id.* at 8.)  A floor nurse will print the eMAR, which tells them which patients live on their floor and which medications those patients receive; nurses use the eMAR to ensure all medications for each patient on the floor is in the medical cart before going to pass medication.  (Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 74:13–75:4.) The eMAR reveals that, in addition to half of Wilson's daily Furosemide dose, Dr. Leon ordered his Spironolactone, Metoprolol (order changed on February 8, 2019), and Lisinopril.  (Doc. 96-2 (Ex. G) at 1–3.)

Wilson did not receive any cardiac medication on February 6, 2019.  (*Id.*)

**D. February 7 and 8, 2019**

### a. Sick Call Request – February 7, 2019

On February 7, 2019 at 3:30 p.m., Wilson submitted a sick call request to see a doctor, stating "med the health & mental clinitian [sic] I haven't received any." (CSD000045.)  A nurse will triage a sick call request within 24 hours.  (Doc. 117-5 (Ex. 16) at 1.)  The nurse who reviews the sick call request must review the patient's medical

records.  (Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 50:4–8, 53:5–10.)  The nurse must also ascertain a patient's full set of vital signs, including weight and height at the time of the appointment, and affix all recent lab results to their chart for review.  (Doc. 117-5 (Ex. 16) at 1–2.)  If a nurse cannot handle the type of request at issue, they will elevate the request to a medical doctor sick call.  (Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 83:5–21.)

> ### b. <u>Defendant Kumar Response – February 8, 2019</u>

The following day, on February 8, 2019, Defendant Anil Kumar, a nurse, responded to Wilson's sick call request.  (CSD000045.)  Defendant Kumar understood Wilson's request to mean Wilson had not received his medications.  (Doc. 117-4 (Ex. 15), Deposition of Anil Kumar ("Kumar Dep.") 74:23–75:2.)  Defendant Kumar responded to Wilson's request that he was scheduled for a nurse sick call for an assessment.  (CSD000045.)  Defendant Kumar did not recall whether Wilson was already scheduled for a sick call or if he scheduled Wilson for a sick call in one to three days.  (Doc. 117-4 (Ex. 15) Kumar Dep. 75:18–76:11.)

Defendant Kumar reviewed Wilson's medical records.  (*Id.* at 76:8–11.)  He knew about Wilson's CHF and HCM.  (*Id.* at 78:20–79:14.)  He knew Wilson took 40 milligrams of Lasix daily and had multiple medications for HCM.  (*Id.* at 81:17–23.)  He saw the court's warning to medical staff.  (*Id.* at 82:6–12.)  He saw Dr. Leon's entry and was aware Wilson's medications were on order but had not yet arrived.  (Doc. 100-2 (Ex. D) Kumar Dep. 112:24–113:9.)

Defendant Kumar reviewed Wilson's Sapphire eMAR.  (Doc. 117-4 (Ex. 15) Kumar Dep. 84:21–25, 92:24–93:3.)  He agreed Wilson received no Furosemide on February 5 or 6, 2019.  (*Id.* at 94:19–23.)  He did not know what the February 7, 2019 notation "M" for Wilson's Furosemide meant, but later thought it may mean the medication was not available or was missed.  (*Id.* at 94:24–95:3, 96:9–14.)  He did not know what the February 8, 2019 notation "A" for Wilson's Furosemide meant.  (*Id.* at 95:4–7.)  He agreed Wilson received no Metoprolol or Spironolactone from February 5 through 8, 2019.  (*Id.* at 97:21–25, 98:5–9.)

8

1   Defendant Kumar did not believe there was anything more he could do about
2   Wilson's medications while they were on order.  (Doc. 100-2 (Ex. P), Declaration of Anil
3   Kumar ("Kumar Decl.") ¶ 4.)  He did not inform a doctor that Wilson had not received his
4   prescribed medications for at least four days.  (Doc. 117-4 (Ex. 15) Kumar Dep. 98:16–
5   20.)  He never met with Wilson.  (*Id.* at 112:11–16.)

6              c.  Defendant Germono Note – February 8, 2019

7          At 9:42 p.m., Defendant Germono, a nurse, noted that Wilson was a "[L]evel 1" who
8   complained of shortness of breath and that Wilson stated, "I see the dr about my med, I
9   haven't received any" and "cough that won't go away."  (CSD000036.)  Germono noted
10  Wilson's mother called about his history of CHF and having trouble breathing and that he
11  was a "MUST SEE" patient.  (*Id.*)  Germono denied entering this note because she did not
12  answer Wilson's prior inmate request.  (Doc. 117-2 (Ex. 13), Deposition of Macy Lauren
13  Javier Germono ("Germono Dep.") 88:19–89:5.)  She believed her name was displayed
14  because she was the last one to enter that Wilson was a Level 1 patient.  (*Id.* at 89:11–13.)

15         Wilson did not receive any of his cardiac medications on February 7 or 8, 2019.
16  (Doc. 96-2 (Ex. G) at 1–3.)

17  **E. February 9 and 10, 2019**

18              a.  Sick Call Request – February 9, 2019

19         On February 9, 2019, Wilson submitted a request for medical services due to a
20  "cough that won't go away."  (CSD000044.)

21              b.  Defendant Ibanez Response – February 9, 2019

22         Defendant Marylene Ibanez, a nurse, responded to Wilson's request, noting that she
23  reviewed his medical chart and that he was "already scheduled to see the nurse."  (*Id.*)  She
24  denied refusing to provide Wilson medication or knowing that he had missed medications.
25  (Doc. 100-2 (Ex. O) Declaration of Marylene Ibanez ("Ibanez Decl.") ¶ 6.)  She knew that
26  the medications commonly used to treat CHF, a potentially fatal condition if not treated
27  properly, include diuretics, beta blockers, or medications that lower blood pressure.  (Doc.
28  117 (Ex. 19), Deposition of Marylene Ibanez ("Ibanez Dep.") 10:21–11:5, 11:14–17.)

9

Wilson did not receive any cardiac medication on February 9 or 10, 2019.  (Doc. 96-2 (Ex. G) at 1–3.)

**F. February 11, 2019**

a. <u>Phyllis Jackson's Call</u>

On February 11, 2019 at 9:32 a.m., Nurse Milissa Burns entered a note that she received a call from Wilson's mother, Phyllis Jackson.  (CSD000029.)  Jackson told Burns that she had just gotten off the phone with Wilson.  (*Id.*)  Jackson stated Wilson was in distress, has a history of CHF, is unable to breathe, and is not receiving medications.  (*Id.*)  Jackson explained that Wilson usually gets admitted to the hospital and she wanted to speak with Burns' watch commander.  (*Id.*)  Burns informed Jackson that she would send a nurse to evaluate Wilson.  (*Id.*)

b. <u>Macanlalay Assessment</u>

At 10:30 a.m., Nurse Samantha Macanlalay entered a note requesting a medical doctor sick call for an "[e]mergency" due to Wilson's pulse of 129-180 and oxygen saturation of 90 to 94 percent.  (CSD000030.)  A heart rate of 129-180 is high and signals that Wilson's heart was beating fast to try to maintain his cardiac output and is a sign that the heart is in distress.  (Steinberg Report at 11.)  Oxygen saturation of 90 to 94 percent is not normal, but rather shows there is fluid in Wilson's lungs preventing him from getting a normal blood oxygen saturation of 96 to 100 percent.  (*Id.*)  Macanlalay also noted Wilson complained of a "cough" and had "difficulty breathing when lying down."  (CSD000030.)

At 10:32 a.m., Macanlalay entered a note that Wilson stated, "I can't breathe when I lay down."  (CSD000029.)  Macanlalay did not weigh Wilson.  (*Id.*)  Burns recalled that Macanlalay told her that she was bringing Wilson down to Medical just in case.  (Doc. 117-9 (Ex. 20), Deposition of Milissa Burns ("Burns Dep.") 21:20–24.)  Nursing Director Serina Rognlien-Hood believed that nurses went down to see Wilson due to his mother's phone call and decided to bring him down to Medical, but she did not recall who brought Wilson down to Medical.  (Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 113:25–114:24.)

///

c.  Defendant Freedland Assessment

At 10:31 a.m., Defendant Dr. Peter Freedland, a physician with CCMG, entered a note after his encounter with Wilson.  (CSD000030.)  This encounter occurred in the hallway, not on an examination table.  (Doc. 96-2 (Ex. D) Freedland Dep. 30:5–9.) Defendant Freedland stated that Wilson complained of a mild cough but denied edema and chest pain.  (*Id.* at 47:8–21, 52:3–12; CSD000030.)  He stated Wilson had a history of CHF, but that Wilson stated he felt well and denied being in CHF.  (CSD000030.)  He noted "Lasix, [R]obitussin now" and Burns entered a note that those medications were given as ordered.  (*Id.*)

Defendant Freedland recalled staff discussing a mother calling for several days worried about her son.  (Doc. 96-2 (Ex. D) Freedland Dep. 29:18–21.)  He did not believe Wilson was on his list to be seen that morning, but he requested Wilson come down to see him based on what he had heard and recalled Wilson may have simultaneously come down to see him.  (*Id.* at 29:10–25, 72:9–13.)

Defendant Freedland recalled asking Wilson how he was doing, and Wilson said he was doing well.  (*Id.* at 30:4–5.)  He asked Wilson why his mother was worried, and Wilson responded that he just needed his medication.  (*Id.* at 30:10–13.)  Wilson told Defendant Freedland he had not received his Lasix.  (Doc. 131 at 6.)  Defendant Freedland told Wilson he would get him his medication.  (Doc. 96-2 (Ex. D) Freedland Dep. 30:19–20, 76:11–14.)  He told Wilson that his mother said he could not breathe and asked if that was the case; Wilson explained it was not the case and he was just there to get his medication.  (*Id.* at 30:20–25.)  He told Wilson his mother said he was short of breath and not doing well to which Wilson responded "[t]hat's because I need to get my medication."  (*Id.* at 31:1–4.)

Defendant Freedland knew Lasix, a diuretic, was an important medication to give people with CHF to help them avoid fluid accumulation in their body.  (Doc. 118-1 (Ex. 21) Freedland Dep. 84:4–13.)  Wilson told Defendant Freedland that he had a history of heart failure and heart problems when he was born.  (Doc. 96-2 (Ex. D) Freedland Dep. 32:6–7.)  When asked, Wilson confirmed he had been hospitalized for heart failure before.

11

(*Id.* at 32:11–13.)  When Defendant Freedland asked if Wilson felt like he needed to be hospitalized and if he felt like he did when he was in heart failure, Wilson responded "No." (*Id.* at 32:18–20.)  Defendant Freedland asked Wilson passive questions for heart failure, which Wilson answered in the negative.  (*Id.* at 33:6–16.)  He recalled Wilson saying he had a cough several days prior that had resolved.  (*Id.* at 33:16–18, 47:8–21.)  He did not recall Wilson presenting with or complaining of a present cough.  (*Id.* at 33:18–20.)  He asked Wilson active questions about whether he was short of breath after certain activities; Wilson responded in the negative.  (*Id.* at 33:21–34:4.)

Burns observed Defendant Freedland's interaction with Wilson and said Wilson denied needing to go to the hospital.  (Doc. 96-2 (Ex. E) Burns Dep. 76:25–77:18, 78:4–9, 79:6–15, 79:19–80:1.)  Burns recalled taking Wilson's vitals, pulse, and blood pressure, which were normal, and believed she showed Defendant Freedland those results after Wilson's vitals were taken by Macanlalay.  (*Id.* at 87:8–88:1, 88:10–13, 89:16–21.)

Defendant Freedland recalled asking Wilson if he had any swelling in his legs, and Wilson responded "No" and pulled up his pants.  (Doc. 96-2 (Ex. D) Freedland Dep. 34:5–6.)  Defendant Freedland could see Wilson's leg, which looked normal and without signs of edema.  (*Id.* at 52:13–53:4.)[9]  He asked if he could examine Wilson, but Wilson declined. (*Id.* at 34:7–24.)[10]  He did not check or ask anyone else to check Wilson's oxygen saturation.  (Doc. 118-1 (Ex. 21) Freedland Dep. 68:1–13.)  He knew weight gain of three or more pounds in a day or five pounds in a week could be a sign of worsening heart failure.

---

[9] Plaintiff's expert Dr. Venters opined that evaluating someone for edema by merely looking at their legs is not reliable unless they know the patient very well; the physician must palpitate the thumb on the lower extremities and abdomen to check for fluid accumulation.  (Doc. 120-6 (Ex. 40) Venters Dep. 47:3–11, 18–25.)  Dr. Venters added that the gold standard is to check a patient's daily weight because it gives physicians something objective to track.  (*Id.* at 47:13–17.)

[10] Plaintiff's expert Dr. Venters agreed that an incarcerated patient has a right to refuse medical treatment if they have decisional capacity.  (Doc. 96-2 (Ex. T) Venters Dep. 32:17–20.)

(*Id.* at 110:4–9.)  But he did not weigh Wilson or recall if he was weighed.  (*Id.* at 110:10–12.)  He did not recall checking to see Wilson's weight when initially admitted to the jail.  (*Id.* at 110:13–15.)  Defendant Freedland did not take Wilson's blood pressure or recall whether he reviewed his medical records for blood pressure readings.  (*Id.* at 111:5–14.)

Defendant Freedland called over Rognlien-Hood and explained what had occurred.  (Doc. 96-2 (Ex. D) Freedland Dep. 35:16–36:12.)  He recalled Rognlien-Hood asked Wilson if he was short of breath, sick, and if he wanted to go to the hospital, all of which he responded to in the negative.  (*Id.* at 36:19–25.)  Rognlien-Hood observed Defendant Freedland's interaction with Wilson in the hallway and largely confirmed his account.  (Doc. 96-2 (Ex. F) Rognlien-Hood Dep. 113:12–21, 120:9–121:1, 121:2–23, 122:7–16, 190:11–191:6; Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 118:12–119:14.)  Defendant Freedland recalled Wilson was happy when he received his medication.  (Doc. 96-2 (Ex. D) Freedland Dep. 37:13–15.)

Defendant Freedland was aware Wilson's medication had been ordered.  (*Id.*)  Defendant Freedland "highly suspect[ed]" that he looked at Wilson's records but could not guarantee what was available.  (Doc. 118-1 (Ex. 21) Freedland Dep. 40:22–41:4.)  He could not recall whether he knew at the time how many days Wilson had missed his medication, but he knew Wilson came to see him due to missed doses.  (*Id.* at 49:7–15.)  He did not recall whether he asked Wilson why he did not receive his missed doses and described such information as probably not "pertinent" because he was focused on getting Wilson his medication.  (*Id.* at 49:16–50:2, 50:10–16.)  In a February 14, 2019 interview, Defendant Freedland stated that he did not have Wilson's chart when he saw him.  (Doc. 118-2 (Ex. 22), San Diego Sheriff's Department's Follow-Up Investigation Report ("Follow-Up Investigation Report") at 2.)

Defendant Freedland did not recall reviewing Wilson's Sapphire records but stated it was his typical practice to review all information available to him, including physician, nurse, and pharmacy notes.  (Doc. 118-1 (Ex. 21) Freedland Dep. 56:13–25.)  He believed he would have reviewed Wilson's Sapphire records.  (*Id.* at 57:1–8, 89:10–16.)  When

doing so, he notes a patient's important medications.  (*Id.* at 97:7–12.)  However, he did not recall inquiring as to whether Wilson had missed doses of Metoprolol or whether he should give Wilson a dose of Metoprolol.  (*Id.* at 97:2–6, 97:13–98:2.)  He did not recall knowing whether Wilson was prescribed Spironolactone or whether he had received doses of Spironolactone.  (*Id.* at 98:21–24, 99:8–12.)  He stated he did not know why Wilson's medications were ordered but not received.  (*Id.* at 99:16–18.)  He did not recall whether he contacted the pharmacist to ask him if there was a problem with Wilson's medications.  (*Id.* at 99:19–24.)  He was aware Wilson had a standing order for Lasix, and because Wilson received Lasix from him, he assumed that medication would continue.  (*Id.* at 77:16–25.)  Defendant Freedland did not recall seeing Macanlalay's emergency chart note.  (*Id.* at 64:16–65:10.)

        d.  <u>Yujane Lampkin's Call</u>

At 8:55 p.m., a nurse entered a note that she received a call from Wilson's sister, Yujane Lampkin.  (CSD000032.)  Lampkin stated that Wilson was in distress and short of breath.  (*Id.*)  Lampkin stated Wilson was given Lasix earlier, which helped a little bit, but he was again short of breath.  (*Id.*)  Lampkin explained that Wilson has a history of left ventricle heart failure.  (*Id.*)  Lampkin recalled telling the nurse Wilson needs his medication and questioned why he was not receiving his medication.  (Doc. 118-3 (Ex. 23), Deposition of Yujane Lamkpin ("Lampkin Dep.") 47:12–20.)  Lampkin recalled the nurse saying he was going to send a doctor to see Wilson.  (*Id.* at 47:20–23.)  The nurse instructed the housing deputy to bring Wilson down to the clinic for an evaluation.  (CSD000032.)  Deputy Andrew Radovich went to Wilson's cell, and noted he was coughing, and Wilson stated he was short of breath.  (Doc. 100-2 (Ex. U), Declaration of Andrew Radovich ("Radovich Decl.") ¶¶ 3–4.)  Deputy Radovich escorted Wilson to Medical to be evaluated.  (*Id.* at ¶ 4.)

        e.  <u>Defendant Germono Assessment</u>

At 10:50 p.m., Defendant Germono noted that Wilson complained of shortness of breath and had a history of CHF.  (CSD000035.)  She noted Wilson was in moderate

distress and had lung sounds, upper respiratory and inspiratory wheezing.  (*Id.*)  She noted Wilson was not using accessory muscles to breathe but that he had a cough and would "catch his breath whenever he talks."  (*Id.*)  She did not recall Wilson complaining of chest pains or being sick the past couple of days.  (Doc. 100-2 (Ex. F) Germono Dep. 106:24–107:9.)  She assessed that Wilson had ineffective airway clearance and initiated the Standard Nurse Protocol for asthma, including nebulizer treatment.  (CSD000034–35.)[11] Wilson reported relief afterwards and was provided with an inhaler.  (CSD000035.)

Defendant Germono received a verbal order from Defendant Vincent Ronald Gatan, a CCMG nurse practitioner, to give Wilson 10 milliliters of Robitussin three times a day and she administered the first dose.  (*Id.*)  Defendant Germono did not recall what she told Defendant Gatan prior to receiving this verbal order, but noted such discussions typically concern the patient's history and current condition.  (Doc. 100-2 (Ex. F) Germono Dep. 110:24–111:4.)  She recalled Defendant Gatan was not by her side when she performed Wilson's sick call.  (*Id.* at 111:16–18.)  She did not recall Defendant Gatan reviewing Wilson's medical records even though they were readily available.  (*Id.* at 111:9–15; Doc. 117-2 (Ex. 13) Germono Dep. 114:21–115:2.)  Wilson left the clinic in stable condition. (CSD000035.)  Defendant Germono scheduled a follow-up medical doctor sick call.  (*Id.*)

Defendant Germono understood that people can die from CHF if left untreated and undiagnosed.  (Doc. 117-2 (Ex. 13) Germono Dep. 35:10–12.)  She knew that weight gain of three or more pounds in a day is a symptom of CHF or worsening heart failure but did not weigh Wilson.  (*Id.* at 45:20–46:3, 107:25–108:1.)  She knew signs of CHF included jugular vein distention, edema, and difficulty breathing.  (Doc. 100-2 (Ex. F) Germono Dep. 30:5–13.)  She did not recall whether she reviewed Wilson's Sapphire records but

---

[11] Plaintiff's expert Dr. Venters did not believe Defendant Germono measured Wilson's peak flow to assess his pulmonary function as is instructed in the Standard Nursing Protocol for asthma.  (Venters Report at 8; Doc. 118-4 (Ex. 24), Standard Nursing Procedure, Asthma at 1; Gatan Dep. 77:23–25.)

noted that Wilson did not complain that his medications were not delivered. (Doc. 117-2 (Ex. 13) Germono Dep. 135:13–22.) She accesses Sapphire every day that she works, typically more than once, but she does not necessarily review every medication for a patient. (*Id.* at 44:18–45:6.) Defendant Germono denied knowing Wilson missed any medications. (Doc. 100-2 (Ex. M) Declaration of Macy Germono ("Germono Decl.") ¶ 7.)

Wilson did not receive Spironolactone or Metoprolol on February 11, 2019, but he did receive one dose of Lisinopril for the first time and one 40 milligram tablet of Furosemide. (Doc. 131 at 6.)

**G. February 12, 2019**

a. Defendant Gatan Assessment

On February 12, 2019 at 6:22 p.m., Defendant Gatan entered a note after a follow-up examination of Wilson. (CSD000037.) Wilson claimed he had mild constipation but denied shortness of breath. (*Id.*) Defendant Gatan noted that Wilson had no pedal edema and a steady gait. (*Id.*) He noted Wilson was alert and oriented, not in acute distress, had clear auscultation of both lungs, and that he could hear his heart sounds at S1 and S2. (*Id.*; Doc. 96-2 (Ex. H) Gatan Dep. 95:8–22.) He assessed Wilson as having a history of CHF and being stable with a claim of mild constipation. (CSD000037.) He administered Colace (stool softener), advised lifestyle modifications, and noted Wilson can return to the clinic as needed. (*Id.*) His note incorporated Defendant Germono's note that she claims she did not draft. (*Id.*) His note did not include Wilson's vital signs. (*Id.*)

Defendant Gatan explained that he examined Wilson outside of the clinic room on the medical floor close in time to the entry of his note on JIMS. (Doc. 119-1 (Ex. 25) Gatan Dep. 90:14–24, 133:13–134:3.) Before meeting with Wilson, he knew Wilson had a history of CHF, was a "Must See" patient, had a cough that would not go away, and had complained of not receiving any medication. (*Id.* at 122:20–123:10.) He described Wilson's not receiving medication as one of the "big reasons why actually he went to see us in the clinic." (*Id.* at 123:7–10.) He did not check Wilson's peak flow. (*Id.* at 148:18–24.) He knew checking someone's weight is a way to see if fluid is building up in their

lungs for CHF but did not check Wilson's weight.  (*Id.* at 149:16–150:8, 150:10–11.)

Defendant Gatan did not recall seeing Dr. Leon, Defendant Freedland, Macanlalay, and Defendant Germono's notes nor Wilson's sister's call informing the desk nurse that he was in distress.  (*Id.* at 49:2–21, 68:23–69:17, 74:11–13, 75:1–12, 87:9–12.)  He did not recall any policy saying it is mandatory to review all nursing notes.  (*Id.* 34:21–24.)  His understanding was that it was in his discretion to review certain documents, and he reviewed medical provider and nurse practitioner notes, but only once in a while reviewed nursing notes.  (*Id.* at 34:9–13, 35:2–6.)  He stated he reviews what is significant for the patient and providers, and if the condition warrants it, he will check nurse notes.  (Doc. 96-2 (Ex. H) Gatan Dep. 36:20–24.)

Defendant Gatan performed a Sapphire medication check on Wilson.  (CSD000037.)  He saw there was a prescription for Lasix.  (Doc. 100-2 (Ex. S) Gatan Dep. 108:7–19.)  When he learned that Wilson had not received his medications, he notified the desk nurse that Lasix was an important medication, and that Wilson needs to have his Lasix.  (Doc. 96-2 (Ex. H) Gatan Dep. 105:6–10, 147:5–21.)  He believed the desk nurse was Defendant Germono and that he informed her that Wilson needed Lasix and Colace but no other medications.  (Doc. 119-1 (Ex. 25) Gatan Dep. 123:13–124:20.)  While he could access Sapphire to see Wilson's medications, doses, and administration instructions, Defendant Gatan stated he could not access the Sapphire eMAR and was not sure if doctors and nurse practitioners have access to it.  (*Id.* at 113:2–114:13.)  He did not know the dates on which a patient missed medications.  (*Id.* at 121:6–8.)  Nothing would have prevented him from ordering the eMAR records from a nurse, but he had never done that in the over two-year period he had worked at the jail.  (*Id.* at 126:15–127:17.)

### b. Deputy Radovich and Inmate Observations

While Deputy Radovich was conducting a medication distribution on the sixth floor, he observed a nurse passing medication to Wilson and asked Wilson how he was feeling.

(Radovich Decl. ¶ 6.)[12]  Radovich recalled Wilson saying he felt much better, and he observed Wilson was no longer coughing and sounded less congested.  (*Id.*)  Conversely, inmate Demarco Gregory, who was in Wilson's cell module, recalled that Wilson was "breathing real hard" and wheezing a couple days before his death.  (Doc. 119-3 (Ex. 27) 8:4–11.)  Inmate Drew Crane explained that Wilson was "coughing the whole time" two days before his death and could "barely even speak."  (Doc. 119-7 (Ex. 31) 6:21–7:8, 10:2–3.)  Crane recalled Wilson saying he could barely sleep or eat and described Wilson as "sick."  (*Id.* at 7:12–16.)  Inmate David Lucero explained that for the three days prior to his death, Wilson had been coughing and complaining about his asthma and having trouble breathing.  (Doc. 119-5 (Ex. 29) 5:8–19.)

c. Germono Chart Review

At 8:09 p.m., Germono entered a note that stated "noted, med on sapphire." (CSD000036.)  Germono explained this note meant she reviewed Wilson's charting.  (Doc. 117-2 (Ex. 13) Germono Dep. 93:24–94:1.)  In the evening, Wilson received 50 milligrams of Metoprolol and 100/5 milliliters of Guaifenesin (Robitussin to relieve chest congestion). (Doc. 131 at 7; Doc. 100-2 (Ex. B).)  Wilson did not receive Spironolactone, Lisinopril, or Furosemide (Lasix) on February 12, 2019.  (Doc. 131 at 7.)

**H. February 13, 2019**

a. Inmate Observations

The night before Wilson's death, Lucero recalled Wilson complaining about his asthma and not being able to breathe.  (Doc. 119-5 (Ex. 29) 3:5–13.)  Crane spoke to Wilson, who said he was coughing from fluid in his lungs.  (Doc. 119-7 (Ex. 31) 2:8–22.) Inmate Kenneth Hayes recalled Wilson complaining about his breathing and his implanted defibrillator that Wilson could feel moving around, which scared him.  (Doc. 119-9 (Ex.

---

[12] While Radovich's declaration references the date February 10, it appears this was in error as his observation occurred the day after Germono gave Wilson his nebulizer treatment. (*Id.* at ¶¶ 5–6.)

18

33) 3:6–11, 18–21, 8:3–13.)  At about 9:00 p.m., Inmate Daniel Pennison recalled Wilson was not feeling well and said he could not breathe right and could not sleep.  (Doc. 120-1 (Ex. 35) 7:20–23.)  Pennison recalled that every time Wilson spoke to him, "he was gasping for air."  (*Id.* at 7:24–25.)  Pennison recalled that Wilson said he could not breathe right or sleep at night at some point prior.  (*Id.* at 6:12–13, 19–21.)

### b. Medication Administration

On February 13, 2019, Wilson received two doses of Metoprolol and Guaifenesin and one dose of Furosemide in the morning.  (Doc. 100-2 (Ex. B).)  He did not receive any Spironolactone or Lisinopril.  (*Id.*)

## I.  February 14, 2019

On February 14, 2019 at about 8:16 a.m., Wilson fell from the top bunk of his cell to the floor.  (Doc. 120 (Ex. 36).)  At about 8:19 a.m., medical personnel received a "mandown" call.  (CSD000040.)  Resuscitation attempts were unsuccessful, and Wilson was pronounced dead at the hospital.  (Doc. 100-2 (Ex. X), Toxicology Report.)  The autopsy report concluded he died of sudden cardiac death due to acute CHF and HCM.  (CSD000278.)  At 11:02 a.m., Defendant Freedland entered a note, recalling Wilson "had a severe congenital heart defect and severe cardiomyopathy for many years."  (CSD000038.)

## J.  February 15, 2019

On February 15, 2019 at 12:02 p.m., Rognlien-Hood sent an email to Nursing Director Nancy Booth.  (Doc. 96 (Ex. V).)  An attachment to the email explained that Wilson was prescribed 5 milligrams of Lisinopril and was to take half a tablet orally once a day.  (*Id.*)  Rognlien-Hood noted Dr. Leon ordered Lisinopril on February 6, 2019, but that it never arrived at the facility because it was patient-specific, and they only had 10 milligram tablets in stock.  (*Id.*)  Rognlien-Hood noted that, according to the eMAR, on February 11, 2019, a nurse administered a dose to Wilson.  (*Id.*)  When asked by Rognlien-Hood, the nurse believed he administered half of a 10-milligram tablet because he did not see the instruction that would have required only a 2.5 milligram dose.  (*Id.*)

Rognlien-Hood stated that Dr. Leon ordered 40 milligram Furosemide tablets to be administered to Wilson once a day.  (*Id.*)  She explained the medication never arrived at the facility because it was patient-specific.  (*Id.*)   She explained Wilson was not administered this medication because the jail only had 20 milligram Furosemide tablets in stock and a pharmacist told Rognlien-Hood that pharmacy regulations require nurses to dispense medicine as ordered.  (*Id.*)  However, Rognlien-Hood noted that, according to the eMAR, Wilson received one dose each on February 11 and 13, 2019.  (*Id.*)  She stated both doses Wilson received were in the form of two 20 milligram tablets, not a 40-milligram tablet, which was not in the jail's stock.  (*Id.*)

Rognlien-Hood explained that Dr. Leon ordered 50 milligram doses of Metoprolol on February 7, 2019 that arrived on February 8, 2019 at 1:41 p.m.  (*Id.*)  The medication should have been given to Wilson starting the evening of February 8, 2019 but was not administered until February 13, 2019.  (*Id.*)  Rognlien-Hood believed that could be because Wilson was in the X-Module in Sapphire, or the nurses were unaware that the medication arrived at the facility.  (*Id.*)

**K. Policies, Procedures, and Training**

a. <u>Administering Correct Dosage of Medication</u>

Burns estimated that the issue of the jail not having a particular dosage of medication in supply arises 40 percent of the time.  (Doc. 117-9 (Ex. 20) Burns Dep. 38:13–18.)  Burns encountered this issue daily.  (*Id.* at 42:7–13.)  Burns raised this issue to jail administration, the pharmacy, pharmacy techs, Rognlien-Hood, and other supervisors.  (*Id.* at 40:6–21, 43:8–25, 44:18–24.)   Burns stated ultimately the sheriff and medical department were involved.  (*Id.* at 43:12–14.)  Burns explained there was no formal training telling nurses whether to add pills together to achieve the prescribed dosage of a medication.  (*Id.* at 46:17–47:1.)  Burns explained that if medication was not available in the jail's storehouse, nurses were supposed to make it known to the pharmacy, pharmacy tech, or the charge nurse.  (*Id.* at 49:4–14.)  Burns recalled the usual response was for someone to inquire into the issue and see if the medication can be ordered or was awaiting delivery.  (*Id.* at 49:25–

50:6.)  In Burns' experience, the longest time a patient was unable to obtain prescription medication was three to four days.  (*Id.* at 50:12–15.)  Defendant Gatan did not believe there was a specific policy prohibiting giving a patient two tablets to meet the correct dosage amount and that, if he were confronted with that situation, he would have the nurse give two 20 milligram tablets to meet the 40-milligram prescribed dosage.  (Doc. 119-1 (Ex. 25) Gatan Dep. 127:18–128:8, 129:9–24.)

Dr. Louis Gilleran, the Interim Medical Director of the San Diego County Jail Medical System, explained that, if medication were available from a pharmacy in an amount less than the dosage needed, the standard operating procedure would be for the nurse to go back to notify the prescriber.  (Doc. 96-2 (Ex. J), Deposition of Louis George Gilleran ("Gilleran Dep.") 56:15–21, 60:19–61:1.)  However, he was not aware of a written policy regulating this situation.  (*Id.* at 61:5–9.)  The prescriber, their supervisor, or the pharmacist would determine if using multiple tablets to achieve the correct dosage was acceptable, not the nurse.  (*Id.* at 62:6–63:5.)  Gilleran was not aware of any written rules about notifying the pharmacy when the medication prescribed did not conform to the dosage the pharmacy had available, but he believed that was standard procedure.  (*Id.* at 61:4–9.)  Rognlien-Hood explained that nurses were only allowed to administer medication as ordered and could not administer two 20 milligram doses to meet a 40-milligram dose.  (Doc. 117 (Ex. 12) Rognlien-Hood Dep. 184:21–185:1; Doc. 96 (Ex. V).)

b.  <u>Medication Administration Record and Missed Medications</u>

According to the San Diego County Sheriff's Department's Medical Service Division's Pharmaceutical Services Policy and Procedure Manual, all medications, except for those administered at a sick call or secondary to an emergency, must be delivered to patients at their designated housing units by nursing staff and administered according to a providers' orders.  (Doc. 117 (Ex. 14) at 5.)  The nurse who administers the medication is responsible for recording any administration in the MAR on Sapphire at the time it is given as well as noting if any medication is missed or refused.  (*Id.*)

Rognlien-Hood agreed there was no procedure requiring a nurse who made a MAR

21

entry to review whether the patient had missed previous doses of prescribed medication. (Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 76:20–25.)  She agreed there was no technique by Sapphire to alert medical personal or a pharmacist if a patient had missed multiple days of prescribed medication.  (*Id.* at 77:1–6.)  She agreed there was no training given to nurses reviewing the MAR to determine if there had been some failure for a patient to receive prescribed medication.  (*Id.* at 77:7–12.)  Burns did not recall any training for nurses regarding whether to review Sapphire records to see how many days a patient went without medication when it was discovered that a patient missed a dose of medication.  (Doc. 117-9 (Ex. 20) Burns Dep. 52:16–22.)  Burns did not recall training regarding whether to notify a doctor if a patient missed three, four, or five days of medication.  (*Id.* at 56:22–57:5.)

c.  Sapphire eMAR Symbol Keys

For medication administration records, Rognlien-Hood explained that, on the eMAR, "A" stands for "Absent," which means the patient is not in their cell or designated location.  (Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 161:5–18.)  Defendant Germono was not sure whether "A" meant the patient was absent or the medication was absent.  (Doc. 117-2 (Ex. 13) Germono Dep. 129:15–23.)  She was trained to read Sapphire charts and explained that each nurse used their discretion in determining how to use the symbol keys on Sapphire.  (*Id.* at 129:2–11, 16–20.)

Rognlien-Hood explained that "M" stands for "Missed" and is automatically entered if a nurse does not address an issue during a medical pass.  (Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 162:6–16.)  Burns believed that "M" meant that the medication was missing. (Doc. 117-9 (Ex. 20) Burns Dep. 54:2–11.)  Ibanez believed that "M" meant the medication was not given or administered.  (Doc. 117-8 (Ex. 19) Ibanez Dep. 33:2–5.)  Defendant Kumar did not initially recall what "M" meant, but later stated it may be the medication was not available or missed.  (Doc. 117-4 (Ex. 15) Kumar Dep. 94:24–95:17, 96:3–14.) Defendant Germono believed "M" meant the person was missing or the medication was missing.  (Doc. 117-2 (Ex. 13) Germono Dep. 134:21–135:11.)  When asked whether "M" or "A" should be used when a medication is not available, Defendant Germono responded

22

that it is up to the nurse passing the medication on how to use the symbol key.  (*Id.* at 135:2–11.)

Rognlien-Hood explained that "H" stands for "Held" and means the nurse did not give the patient medication.  (Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 162:2–5.) Defendant Germono believed "H" could mean anything depending on who entered it onto the system and could mean the nurse held the medication for the patient who did not want to use it, a certain parameter was in place, or the medication was "as needed" only.  (Doc. 117-2 (Ex. 13) Germono Dep. 128:22–129:1, 131:18–132:7.)

### d.  NCCHC Technical Assistance Report

In January 2017, the National Commission on Correctional Health Care ("NCCHC") completed a technical assistance report concerning the San Diego Central Jail.  (Doc. 120-5 (Ex. 39) at 1.)  The San Diego Sheriff's Department contracted with NCCHC Resources, Inc. ("NRI") in 2016 for technical assistance concerning their compliance with the NCCHC's 2014 Standards for Health Services in Jail.  (*Id.* at 3.)  As relevant here, NCCHC criticized the jail as follows.  There did not seem to be any accountability for when medications were received in the medication rooms.  (*Id.* at 15.)  Patients entering the facility were continued on their current medications, but it could take a few days to receive the orders and medications.  (*Id.*)  The jail's policy described pharmacy services but failed to set time frames between ordering and delivery.  (*Id.*)  Nurses' licensure does not allow them to take from a stock bottle and place medication in an envelope to administer unless it is an emergency or under the direction of a provider.  (*Id.* at 16.)  Nurses routinely did this, which is a serious violation of the Nurse Practice Act.  (*Id.*)  Nurses failed to take the MAR with them when seeing inmate-patients.  (*Id.*)  Nurses failed to conduct a safety check for names, allergies, and which medications are to be administered at that time to an inmate-patient.  (*Id.*)  The NCCHC concluded that the "lack of accountability is evident as there is no inventory control practice for medications (order and delivery) that are ordered, which medications are delivered, and when a medication container is empty."  (*Id.*)

///

**L. Plaintiff's Expert Dr. Homer Venters**

Plaintiff's expert Dr. Homer Venters submitted a report in this case.  (Venters Report at 1.)  Dr. Venters is a physician, internist, and epidemiologist with over a decade of experience in health services for incarcerated persons, including as Medical Director, Deputy Medical Director, Assistant Commissioner, and Chief Medical Officer of the New York City Jail Correctional Health Service.  (*Id.* at 1.)

a.  Failure to Provide Cardiac Medication

Dr. Venters criticized the jail for failing to provide Wilson with his heart failure medication.  (Venters Report at 9.)  Specifically, he criticized Dr. Leon for failing to prescribe Wilson the correct dosage of Lasix and failing to ensure Wilson received his cardiac medications.  (*Id.*) He criticized the nursing staff that responded to Wilson's February 7 and 9, 2019 sick calls for not immediately determining whether Wilson was receiving his medication and contacting providers to address any errors.  (*Id.* at 10.)  He opined that their ignoring Wilson's reports "dramatically increased the likelihood that Mr. Wilson's heart failure would worsen without intervention."  (*Id.*)  He criticized the nurse and nurse practitioner who met with Wilson for failing to determine how many doses of medication Wilson missed and not initiating a review to determine how to fix any medication errors.  (*Id.*)

b.  Failure to Monitor Missed Medications

Dr. Venters criticized the jail for failing to have policy, practice, or training to monitor and address missed medications.  (*Id.* at 11.)  Specifically, he pointed to Rognlien-Hood's deposition testimony as making clear there was "no clear policy or practice to identify missed medications and that the codes entered into the medication system were not clearly or consistently understood by their staff."  (*Id.* at 12.)  He opined that Rognlien-Hood's deposition testimony showed there was no training for medical staff on how to identify or respond to missed medications.  (*Id.*)  He stated that the jail must have a mechanism to recognize missed medications, a policy to guide a response (including escalation), and training on how to conduct these tasks and document them.  (*Id.*)  Dr.

24

Venters explained that, under the NCCHC jail standard J-D-02, the responsible physician must establish policies regarding the administration and delivery of prescribed medication and must monitor medication services to identify and resolve delay and discontinuity. (*Id.*)

### c. Failure to Adequately Assess Wilson's Heart Failure

Dr. Venters criticized medical staff for failing to adequately assess Wilson's heart failure. (*Id.* at 13.) He criticized Dr. Leon for failing to "elicit even the most basic information from Mr. Wilson about the history of his heart failure, its classification or severity, and the triggers and factors that improved his symptoms." (*Id.*) He criticized Dr. Leon for ignoring or disregarding the court's admonition in Wilson's medical chart, failing to appreciate the chest x-ray revealing Wilson's implanted defibrillator, and failing to appreciate that Wilson's medication list revealed medication management for heart failure, of which a standard regimen for treatment is administration of both Lasix and Spironolactone. (*Id.* at 13–14.) He criticized Dr. Leon for failing to identify any cardiac problems for further assessment or treatment, which set the stage for other providers to misunderstand Wilson's symptoms of worsening heart failure. (*Id.* at 14.)

Dr. Venters criticized Defendant Kumar's decision to simply schedule Wilson for a sick call the next day considering his missed medications and CHF history, which should have prompted an immediate assessment by a higher-level provider. (*Id.* at 15.) He criticized Defendant Ibanez for the same deficiency considering Wilson's sick call request indicating a "cough that won't go away." (*Id.*) He criticized Defendant Germono for failing to obtain a peak flow measurement for asthma and failing to review Wilson's eMAR despite Wilson's reports of not receiving his medications. (*Id.*) He criticized Defendant Freedland for failing to conduct a confidential encounter or physical examination of Wilson, failing to determine how many doses of medication Wilson missed and how to rectify the issue, and failing to address Wilson's abnormal vital signs. (*Id.* at 15–16.) He opined that Wilson's condition required Defendant Freedland to transfer Wilson to an emergency room or, at a minimum, medical monitoring in a medical monitoring bed. (*Id.* at 16.) He criticized Defendant Gatan for failing to identify how many doses of medication

Wilson had missed and how his medications could be restarted.  (*Id.*)  He also criticized Defendant Gatan for failing to weigh Wilson and not assessing his lower extremities for edema, despite knowing Wilson's history of CHF and missed medications.  (*Id.*)

> d. <u>Failure of the Jail's Medical Leadership to Ensure Patients with Serious Illnesses Received Needed Assessments and Care</u>

Dr. Venters criticized Rognlien-Hood's February 15, 2019 email to Booth for the County's failing to have a routine backup pharmacy supply for patients on life-saving medications.  (*Id.* at 20–21.)  He criticized medical staff's failure to administer Lasix to Wilson due to only having 20 milligram tablets, which the pharmacy staff should have resolved with the physician instead of denying Wilson his life-saving medication.  (*Id.* at 21.)  Dr. Venters was not aware of any reason why a patient could not take two 20 milligram tablets instead of a 40-milligram tablet of their medication.  (Doc. 120-6 (Ex. 40) Venters Dep. 111:3–23.)  He opined that Wilson's recent heart tests revealed he was in class C heart failure, meaning he had not reached the stage where medications do not provide life-saving benefits.  (*Id.* at 22.)

**M. Plaintiff's Expert Dr. Alon Steinberg**

Plaintiff's expert Dr. Alon Steinberg submitted a report in this case.  (Steinberg Report at 1.)  Dr. Steinberg is a board-certified cardiologist practicing full time in cardiovascular diseases and has been practicing cardiology for nearly 25 years.  (*Id.*)  Dr. Steinberg treats patients with dilated cardiomyopathy and CHF daily.  (*Id.*)

Dr. Steinberg explained that it is very important to administer medications to patients like Wilson with a history of dilated cardiomyopathy and CHF to both prevent and improve CHF.  (*Id.* at 9.)  He assessed that Wilson's cough and shortness of breath were symptoms of CHF and that he failed to receive the cardiac medications that would have prevented him from going into CHF.  (*Id.*)

Dr. Steinberg criticized medical staff for failing to perform daily weights of Wilson because weight gain of two to five pounds in a week is an early sign of CHF.  (*Id.* at 10.)  He characterized Wilson's receiving two doses of Furosemide when he should have

26

received close to 18 doses as "egregious." (*Id.* at 10–11.)  He criticized Dr. Leon for failing to enter Wilson's correct dosage of Lasix and not even noting that he had CHF.  (*Id.* at 11.) He criticized medical staff for failing to ensure Wilson was taking his critically important medication for CHF.  (*Id.*)  In a reference to Defendants Gatan and Freedland, he criticized medical staff for failing to examine Wilson appropriately in an examination room.  (*Id.*)

Dr. Steinberg criticized Defendant Freedland for failing to address Wilson's elevated heart rate, a warning sign that Wilson's heart was in distress, and his lowered oxygen saturation, which was not normal and revealed a degree of fluid was in his lungs preventing him from receiving a normal amount of oxygen.  (*Id.*)  He criticized Defendant Freedland for not ordering an EKG, taking Wilson's weight, or ordering a chest x-ray, and failing to assess if Wilson was short of breath when lying flat.  (*Id.*)

Dr. Steinberg opined that it should have been obvious to a medical professional that Wilson was very dependent on taking his medication to prevent heart failure and death. (*Id.*)  He opined that not giving Wilson his medication also led to congestion and fluid in his lungs.  (*Id.* at 11–12.)  He concluded that poor medical care and failure to give Wilson his vital cardiac medication for CHF directly led to his death.  (*Id.*)

**N. CCMG Defendants' Expert Dr. Paul Adler**

CCMG Defendants' expert Dr. Paul Adler submitted a report in this case.  (Doc. 96-2 (Ex. W), Dr. Paul Adler's Expert Report ("Adler Report") at 1.)  Dr. Adler is the CEO and Chief Medical Officer of Correctional Health Management, which specializes in health care in police lock ups and smaller city/county jails.  (*Id.*)  Dr. Adler has overseen care of inmates who suffer from CHF and cardiomyopathy.  (*Id.* at 2.)

Dr. Adler opined that the reason Wilson did not receive his medications could be that he was not in his room, not on the jail floor, chose not to go to medication pass, was in transit to different parts of the jail, or that not all the medicine had arrived from the pharmacy company.  (*Id.* at 3.)  He opined that Dr. Leon met the standard of care because his examination of Wilson was essentially normal, he ordered his medication, and the nurses never informed him that Wilson did not receive his medications.  (*Id.* at 4–5.)  He

opined that Defendant Freedland met the standard of care because Wilson denied being in CHF and refused a physical examination after Defendant Freedland's repeated questioning of Wilson. (*Id.* at 4–5.) Dr. Adler opined that no nurse told Defendant Freedland that Wilson had missed six days of medication. (*Id.* at 4.) He did not believe Defendant Freedland was aware of Wilson's abnormal vitals recorded by Macanlalay but was aware of his normal vitals that Burns stated she recorded. (*Id.* at 5.)

Dr. Adler opined that Defendant Gatan did not fail to meet the standard of care by not sending Wilson out to the emergency department because, by all appearances, he was not in distress. (*Id.* at 6.) He opined that Wilson did not have an abnormal chest exam, no "lung evidence" for CHF, no visible jugular venous distention, no swollen legs, and no continuously abnormal vital signs because his CHF may have resulted from a congenital problem rather than the typical coronary heart disease. (*Id.*) He opined that CCMG did not have to write policies and procedures to cover all common and uncommon conditions because they hired well-trained, advanced-level providers. (*Id.*)

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fortune Dynamic*, 618 F.3d at 1031 (internal quotation marks and citations omitted). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex*, 477 U.S. at 323. To carry its burden,

28

"the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Jones v. Williams*, 791 F.3d 1023, 1030–31 (9th Cir. 2015) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv.*, 809 F.2d at 630 (citations omitted). The nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted).

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. In ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.   DISCUSSION

Plaintiff's remaining claims include: (1) deliberate indifference to serious medical needs against Defendants Kumar, Ibanez, Freedland, Germono, and Gatan (First Cause of Action); (2) failure to train against Defendant Gore (Second Cause of Action); (3) failure to supervise and discipline against Defendant Gore (Third Cause of Action); (4) *Monell* liability for policy omissions and failure to train against the County and CCMG (Fourth Cause of Action); (5) a survival action against all Defendants (Fifth Cause of Action); and (6) a negligence action against Defendants County of San Diego, Kumar, Ibanez, Germono and the CCMG Defendants (Sixth Cause of Action).

29

The Court previously dismissed the wrongful death cause of action by the estate and Phyllis Jackson for lack of standing.  (*See* Doc. 17 at 10–11, 15; Doc. 62 at 14–22.) Plaintiff did not amend its First Amended Complaint ("FAC") with a new theory concerning Jackson's standing to bring the wrongful death claim.  Thus, CCMG's Motion is **<u>DENIED AS MOOT</u>** for the wrongful death claim.

Before addressing Plaintiff's remaining claims, the Court will consider the County Defendants' evidentiary objections to Plaintiff's evidence in support of its Opposition, but only as necessary to resolve CCMG and the County's Motions.

**A. Evidentiary Objections**

    1. <u>Inmate Interview Videos and Transcripts</u>

The County Defendants object to audio and transcripts of interviews with inmates who observed and spoke to Wilson in the days leading up to his death on the grounds of relevance, hearsay, improper opinion, and failure to disclose.  (*See* Doc. 132-1 at 4–7.)

With respect to failure to disclose, Plaintiff responds that the Sheriff's Department conducted these interviews on February 14, 2019 and provided them to Plaintiff in discovery nearly three years ago.  (*See* Doc. 138 at 2, 4–5.)  Federal Rule of Civil Procedure 26(e) requires supplementing or correcting disclosure only where "the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  The County was aware of the interviews it conducted and disclosed to Plaintiff during discovery.

With respect to relevance, hearsay, and improper opinion, Plaintiff points to *Sandoval v. County of San Diego*, 985 F.3d 657, 666–67 (9th Cir. 2021), where the Ninth Circuit criticized the County for making one-word objections that were meritless.  (*See* Doc. 138 at 2–4.)  Here, the County Defendants fail to explain their relevance and improper opinion objections.  *See Sandoval*, 985 F.3d at 666–67.  With respect to hearsay, as the Ninth Circuit explained in *Sandoval*, "[i]f the contents of a document can be presented in a form that would be admissible at trial […] the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment."

*Id.* at 666 (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003)).  The inmates can testify "about the[ir] personal observations" reflected in their interviews.  *See id.*  And under Federal Rule of Evidence 803(3), they can testify about statements Wilson made reflecting his then-existing emotional, sensory, or physical condition.

Thus, the objection is overruled.

### 2.  NCCHC Technical Assistance Report

The County Defendants object to the NCCHC technical assistance report on the grounds of relevance, foundation, personal knowledge, hearsay, and failure to disclose.  (*See* Doc. 132-1 at 7.)  The County Defendants fail to explain their relevance, foundation, personal knowledge, and hearsay objections.  *See Sandoval*, 985 F.3d at 666–67.  And the County was aware of the NCCHC technical assistance report that it had commissioned.

Thus, the objection is overruled.

### 3.  Court Opinions and Discovery from Other Court Cases

The County Defendants object to a response to a Request for Admission by Defendant Gore in the *Frankie Greer v. County of San Diego et al.*, Case No. 19-cv-00378-JO-DEB case on the grounds of relevance and failure to disclose.  (*See* 132-1 at 8.)  They also object to summary judgment orders and a deposition transcript from other deliberate indifference cases concerning CCMG employees on the grounds of relevance, hearsay, and failure to disclose.  (*See id.* at 9–11.)

The County was a defendant in each of those cases and thus had notice of the judicial orders and underlying discovery in those cases.  Defendant Gore's admission in *Greer* is relevant to whether he had notice of the deficiencies in the NCCHC technical assistance report.  The cases themselves are relevant to determining CCMG's notice of alleged constitutional violations.

As to hearsay, the "court may properly take judicial notice of pleadings and/or orders from other court proceedings 'if those proceedings have a direct relation to the matters at issue.'"  *Foster v. Kaweah Delta Med. Ctr.*, Case No. 1:21-cv-01044-JLT-HBK (PC), 2023 WL 3254349, at *5 (E.D. Cal. May 4, 2023) (quoting *United States ex. rel. Robinson*

31

*Rancheria Citizens Counsel v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992)). "However, a court may not take judicial notice of findings of facts from another case." *Id.* (citing *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006)).

The Court will take judicial notice of the existence of these other lawsuits but not the contents of any court opinion or deposition for the truth of the matter asserted. *See Mitchell v. Cnty. of Contra Costa*, 600 F. Supp. 3d 1018, 1026 (N.D. Cal. 2022) ("The court takes judicial notice of the existence of the lawsuits and the allegations of police misconduct therein because they relate to Plaintiff's *Monell* allegations; it does not take judicial notice of the facts within the complaints.").

Thus, the objection is overruled.

**B. Deliberate Indifference to Serious Medical Needs (First Cause of Action)**

"§ 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (citation omitted). "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (citing *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)).

"Individuals in state custody have a constitutional right to adequate medical treatment." *Sandoval*, 985 F.3d at 667. Prison officials act "under color of state law" when providing medical care to prisoners. *West v. Atkins*, 487 U.S. 42, 49–50 (1988) ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.").

The Eighth Amendment protects prisoners against deliberate indifference to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[13] "[D]eliberate

_____

[13] The Court previously determined that, because Wilson's flash incarceration for a probation violation was tied to his underlying conviction, the Eight Amendment applicable

indifference to a prisoner's serious illness or injury states a cause of action under [Section] 1983." *Id.* at 105. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106.

"In the Ninth Circuit, the test for deliberate indifference consists of two parts." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997) (en banc)). The plaintiff must show that (1) the inmate had "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain" and (2) the "defendant's response to the need was deliberately indifferent." *Id.* (internal quotation marks and citation omitted). The second prong is satisfied if the plaintiff can show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* (citations omitted).

The Parties do not dispute that Wilson's CHF and HCM constituted serious medical needs. Rather, they dispute whether each Defendant was deliberately indifferent to Wilson's serious medical needs.

### 1. Deliberate Indifference

"A prison official is deliberately indifferent under the subjective element of the test only if the official knows of and disregards an excessive risk to inmate health and safety." *Egberto v. Nevada Dep't of Corr.*, 678 F. App'x 500, 503 (9th Cir. 2017) (citing *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (internal quotation marks omitted). Acting with "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The official "must both be aware of facts from which the inference could be drawn

_____

to prisoners, rather than the Fourteenth Amendment applicable to pretrial detainees, governs his deliberate indifference claim. (*See* Doc. 62 at 24–28.)

that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (internal citations omitted). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. However, deliberate indifference does not "preclude a scheme that conclusively presumed awareness from a risk's obviousness." *Id.* at 840.

Deliberate indifference may occur where officials are aware of a significant risk to an inmate's health or safety yet fail to act. *See McGuckin*, 974 F.2d at 1060 ("[T]he fact that an individual sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering."). It may also occur where "prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* at 1059 (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).

"[T]he more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established 'deliberate indifference' on the part of the defendant." *Id.* at 1061. However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. And "[m]ere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *McGuckin*, 974 F.2d at 1059 (internal quotation marks and citations omitted).

### i. Defendant Kumar

Prior to responding to Wilson's sick call request, Defendant Kumar reviewed Wilson's medical records. (*See* Doc. 117-4 (Ex. 15) Kumar Dep. 76:8–11.) He knew Wilson had HCM and CHF, that he took 40 milligrams of Lasix daily, and had multiple medications for HCM. (*See id.* at 78:20–79:14, 81:17–23.) He also understood Wilson's sick call to mean he was saying he did not receive his medications. (*Id.* at 74:23–75:2.) Defendant Kumar reviewed Wilson's Sapphire eMAR and was aware he had missed days of his medications, including at least four days of Metoprolol and Spironolactone and possibly Furosemide (Lasix). (*See id.* at 84:21–25, 92:24–93:3, 94:19–95:3, 96:9–14, 97:21–25, 98:5–9, 98:16–20.) The jury could conclude Defendant Kumar was aware of Wilson's history of CHF and HCM, that he took medications for those conditions, and that the court had warned medical staff concerning his serious medical needs. The jury could also determine he was aware of Wilson's four cardiac medications and that he had missed many doses of those medications. Defendant Kumar's argument that he was unaware Wilson had missed medications is not persuasive on summary judgment considering his review of Wilson's medical records and Sapphire eMAR. *See Jett*, 439 F.3d at 1096 (finding that, despite doctor's denial of being aware of plaintiff's injury, viewing the facts in plaintiff's favor, it must be presumed the doctor received a letter notifying him of the injury). Thus, there is a genuine dispute of material fact as to whether Defendant Kumar was aware of a substantial risk to Wilson's health and safety.

Defendant Kumar knew Dr. Leon ordered Wilson's medications but believed they had not yet arrived and there was nothing he could do. (*See* Kumar Decl. ¶ 4.) However, Defendant Kumar, contrary to policy, did not examine Wilson nor ascertained his full set of vitals. (*See* Doc. 117-5 (Ex. 16) at 1–2.) It does not appear he engaged in any effort to determine the status of Wilson's medication order or attempted to provide Wilson any available medications from the jail's stock. It does not appear that he escalated Wilson for missed medications or informed a doctor that he had possibly missed several days of his essential cardiac medications. In fact, Defendant Kumar conceded he did not inform a

35

doctor that Wilson had missed at least four days of his medications.  (*See* Doc. 117-4 (Ex. 15) Kumar Dep. 98:16–20.)  Instead, he responded to Wilson's sick call with a note that he had an upcoming registered nurse sick call.  (*See* CSD000045.)  But he did not recall whether Wilson was already scheduled for a sick call or if he scheduled him for a sick call in one to three days.  (Doc. 117-4 (Ex. 15) Kumar Dep. 75:18–76:11.)  Defendant Kumar did not make an entry on Wilson's chart reflecting the scheduling of a registered nurse sick call while other similar entries are on his chart.  (*See* Doc. 96-2 (Ex. B).)  Plaintiff's expert Dr. Venters criticized Defendant Kumar for not immediately determining whether Wilson was receiving his medications and contacting providers to address any errors.  (Venters Report at 10.)  Dr. Venters criticized Defendant Kumar for scheduling Wilson for a sick call despite his history of CHF and missed medications, which should have prompted him to immediately escalate Wilson to a higher-level provider.  (*Id.* at 15.)

Viewing the evidence and drawing all reasonable inferences in the light most favor to Plaintiff, there is a genuine dispute of material fact as to whether Defendant Kumar's inaction was in disregard of a substantial risk to Wilson's health and safety.

### ii.  Defendant Ibanez

Prior to responding to Wilson's sick call request for a "cough that won't go away," Defendant Ibanez reviewed Wilson's medical records.  (*See* CSD000044.)  The jury could conclude Defendant Ibanez was aware of Wilson's history of CHF and HCM, that he took medications for those conditions, and that the court had warned medical staff concerning his serious medical needs.  The jury could also conclude Defendant Ibanez saw Wilson's sick call concerning not receiving his medications and that Defendant Kumar did not examine Wilson or give him any of those medications.  Defendant Ibanez's argument that she was unaware Wilson had missed medications is not persuasive on summary judgment considering her review of his medical records.  *See Jett*, 439 F.3d at 1096.  Thus, there is a genuine dispute of material fact as to whether Defendant Ibanez was aware of a substantial risk to Wilson's health and safety.

Contrary to policy, it does not appear Defendant Ibanez examined Wilson or

36

ascertained his full set of vitals.  (*See* Doc. 117-5 (Ex. 16) at 1–2.)  It does not appear she engaged in any effort to determine the status of his medication order or attempted to provide him any available medications from the jail's stock.  Nor does it appear she escalated Wilson for missed medications or informed a doctor that he had possibly missed several days of his essential cardiac medications.  Instead, she responded to Wilson's sick call with a note that he had an upcoming registered nurse sick call.[14]  (*See* CSD000044.) Defendant Ibanez did not make an entry on Wilson's chart reflecting the scheduling of a registered nurse sick call while other similar entries are on his chart.  (*See* Doc. 96-2 (Ex. B).)  Plaintiff's expert Dr. Venters criticized her for not immediately determining whether Wilson was receiving his medications and contacting providers to address any errors. (Venters Report at 10.)  Dr. Venters criticized her for scheduling Wilson for a sick call despite his history of CHF and missed medications, which should have prompted her to immediately escalate him to a higher-level provider.  (*Id.* at 15.)

Viewing the evidence and drawing all reasonable inferences in the light most favor to Plaintiff, there is a genuine dispute of material fact as to whether Defendant Ibanez's inaction was in disregard of a substantial risk to Wilson's health and safety.

### iii.  Defendant Freedland

There is a dispute as to whether Defendant Freedland called down Wilson due to conversations he heard from medical staff or if Macanlalay brought Wilson down to him after finding Wilson's vitals were abnormal.  (*See* Doc. 96-2 (Ex. D) Freedland Dep. 29:18–21; Doc. 117-9 (Ex. 20) Burns Dep. 21:20–24.)  While Defendant Freedland did not

---

[14] To the extent the County Defendants argue that Defendant Ibanez's role as charge nurse should affect the result, the Court rejects that argument at this stage.  Whether her role, which included in part covering for other nurses and apparently reviewing sick calls and medical records, renders her actions not deliberately indifferent is a question for the jury. *C.f. Peralta v. Dillard*, 744 F.3d 1076, 1086–87 (9th Cir. 2014) (finding chief dental officer and chief medical officer not deliberately indifferent for performing their administrative roles and not reviewing medical records after the plaintiff was already evaluated by two qualified dentists).

recall seeing Macanlalay's note reflecting those abnormal vitals, (*see* Doc. 118-1 (Ex. 21) Freedland Dep. 64:16–65:10), the jury could determine that he saw the note or was informed as much by Macanlalay, (*see* Doc. 117-9 (Ex. 20) Burns Dep. 21:20–24.).  The jury could also determine Defendant Freedland was not aware of Burns' finding normal vitals for Wilson or that those readings never took place because there is no record of them.

During Defendant Freedland's questioning of Wilson in the hallway, he learned Wilson needed his medication, specifically Lasix, which he knew was important to give someone with CHF to avoid fluid accumulation in their body.  (*See* Doc. 96-2 (Ex. D) Freedland Dep. 30:10–13; Doc. 118-1 (Ex. 21) Freedland Dep. 84:4–13; Doc. 131 at 6.) He learned Wilson had a history of CHF and heart problems and had been hospitalized for heart failure.  (*See* Doc. 96-2 (Ex. D) Freedland Dep. 32:6–7, 32:11–13.)  He learned Wilson had a cough a few days ago that had resolved.  (*Id.* at 33:16–18, 47:8–21.)  There is a dispute as to whether Wilson presented with a cough and shortness of breath as neither Freedland, Burns, nor Rognlien-Hood recall that, (*see id.* at 33:18–20; Doc. 96-2 (Ex. E) Burns Dep. 78:4–9); Doc. 96-2 (Ex. F) Rognlien-Hood Dep. 190:11–191:8), but at least one inmate reported Wilson coughing and having trouble breathing for the three days before his death, (*see* Doc. 119-5 (Ex. 29) 5:8–19).  Defendant Freedland highly suspected he reviewed Wilson's medical chart and knew Wilson came to see him due to missed medication doses.  (Doc. 118-1 (Ex. 21) Freedland Dep. 40:22–41:4, 49:7–15.)  He believed he reviewed Wilson's Sapphire records and saw his medications were on order. (*Id.* at 57:1–8, 89:10–16, 99:19–24.)  This is sufficient to reasonably infer that Defendant Freedland was subjectively aware of a substantial risk to Wilson's health and safety.

Defendant Freedland confirmed Wilson did not feel like he did when he was previously in heart failure or needed to go to the hospital.  (*See* Doc. 118-1 (Ex. 21) Freedland Dep. 32:18–20.)  He asked Wilson passive and active questions for CHF, and Wilson denied all indicators.  (*See* Doc. 96-2 (Ex. D) Freedland Dep. 33:6–15, 33:21–34:4.)  He checked Wilson's leg for edema.  (*Id.* at 52:13–53:4.)  He asked to examine Wilson, but Wilson declined.  (*Id.* at 34:7–24.)  Burns and Rognlien-Hood largely

38

corroborated his account.  (*See* Doc. 96-2 (Ex. F) Rognlien-Hood Dep. 113:12–21, 120:9–121:1, 121:2–23, 122:7–16, 190:11–191:6; Doc. 96-2 (Ex. E) Burns Dep. 76:25–77:18, 78:4–9, 79:6–15, 79:19–80:1; Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 118:12–119:14.)  He called over Rognlien-Hood to explain what had happened and she briefly questioned Wilson.  (*See* Doc. 96-2 (Ex. D) Freedland Dep. 35:16–36:12, 36:19–25.)  Defendant Freedland gave Wilson a dose of Lasix and Robitussin.  (*See* CSD000030.)  He knew Wilson had a standing order for Lasix, which he assumed meant the medication would continue.  (Doc. 118-1 (Ex. 21) Freedland Dep. 77:16–25.)

However, Defendant Freedland knew Wilson came to see him in part due to missed doses of medications.  While he gave Wilson a dose of Lasix, he failed to administer Metoprolol, Spironolactone, and Lisinopril to Wilson or contact the pharmacy to see if there was any problem with his ordered medication.  (*See id.* at 99:19–24.)  Defendant Freedland highly suspected he reviewed Wilson's medical chart and believed he reviewed Wilson's Sapphire records.  (*See id.* at 40:22–41:4, 49:7–15, 57:1–8, 89:10–16, 99:19–24.)  Yet it does not appear that Defendant Freedland undertook any effort to determine which medications Wilson missed and how many doses or days of those medications he missed.  Dr. Venters criticized Defendant Freedland for failing to determine how many doses of medication Wilson missed and to address his abnormal vital signs.  (*See* Venters Report at 15–16.)  Dr. Venters opined that Wilson's condition required Defendant Freedland to transfer him to the emergency room or, at a minimum, a medical monitoring bed.  (*See id.* at 16.)  If the jury determines that Defendant Freedland was aware of Wilson's abnormal vital signs and that he had missed doses of medication, it could conclude that Defendant Freedland disregarded a perceived substantial risk to Wilson's health or safety by not determining how many doses of medications Wilson missed and escalating his care.  *See Farmer*, 511 U.S. at 836 ("[D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

Thus, viewing the evidence and drawing all reasonable inferences in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether Defendant

Freedland disregarded a substantial risk to Wilson's health and safety.

### iv. Defendant Germono

There is some dispute as to whether Defendant Germono entered a note on February 8, 2019 indicating her awareness of a call from Jackson about Wilson's shortness of breath, not receiving his medications, and having a "cough that won't go away." (*See* Doc. 117-2 (Ex. 13) Germono Dep. 88:19–89:5.)  It appears that note concerns events from February 9 and 11, 2019, but it is unclear if or when Defendant Germono saw that information and if it was before her February 11, 2019 examination of Wilson.  During that examination, she knew Wilson complained of shortness of breath and had a history of CHF.  (*See* CSD000035.)  She knew Wilson was in moderate distress, had lung sounds and upper respiratory and inspiratory wheezing. (*See id.*)  She knew he was not using his accessory muscles to breathe but had a cough and would catch his breath whenever he talks.  (*See id.*)  The next day, she noted his medications on Sapphire and indicated during her deposition that she meant she reviewed his medical chart.  (*See* Doc. 117-2 (Ex. 13) Germono Dep. 93:24–94:1.)   While she denied knowing Wilson missed doses of medication, (*see* Germono Decl. ¶ 7), there is a genuine dispute of material fact as to whether she was subjectively aware of a substantial risk to Wilson's health and safety at both the time of her examination and upon her chart review the next day.

As the Court previously explained, Plaintiff may not proceed with a deliberate indifference claim against Defendant Germono on the ground that she entered Wilson into a Standard Nurse Protocol for asthma as opposed to a cardiac-related protocol. (*See* Doc. 62 at 31 n.18.)  However, that does not mean she could not be deliberately indifferent to Wilson's serious medical needs on another ground.  Choosing the incorrect medically acceptable form of treatment does not alleviate a defendant from failing to respond to another perceived significant risk to the inmate's health and safety.

The jury could conclude, at the time of her examination, Defendant Germono, despite knowing of Wilson's history of CHF and reports of not receiving his medications, engaged in no effort to provide him those medications or determine their order status.  Nor

does it appear she escalated Wilson's care or informed a doctor concerning his missing doses of medication.   Plaintiff's expert Dr. Venters criticized Defendant Germono for failing to determine how many doses Wilson had missed and initiating a review to determine how to fix any errors in his medication order.   (*See* Venters Report at 10.)   The jury could determine that whenever Defendant Germono reviewed Wilson's chart, her need for action should have been that much more salient.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether Defendant Germono's inaction was in disregard of a substantial risk to Wilson's health and safety.

### v.  Defendant Gatan

The jury could determine that on February 11, 2019, Defendant Germono informed Defendant Gatan of Wilson's history of CHF, shortness of breath, and wheezing.   (*See* Doc. 100-2 (Ex. F) Germono Dep. 110:24–111:4.)   The next day, before examining Wilson, Defendant Gatan was aware that Wilson had complained of a cough that would not go away and not receiving his medications.   (*See* Doc. 119-1 (Ex. 25) Gatan Dep. 122:20–123:10.)   He conducted a Sapphire medication check and saw Wilson had a prescription for Lasix.   (Doc. 100-2 (Ex. S) Gatan Dep. 108:7–19.)   He did not mention Wilson's other cardiac medications that appear on Sapphire.   (*See id.*)   He claimed he could not access the eMAR and so did not know the dates on which a patient missed medication.   (*See* Doc. 119-1 (Ex. 25) Gatan Dep. 113:2–114:13.)   In any event, the jury could determine that Defendant Gatan was aware of a substantial risk to Wilson's health and safety.

Upon examination in the hallway, Defendant Gatan learned Wilson had mild constipation but he denied shortness of breath.   (CSD000037.)   He assessed that Wilson did not have pedal edema, had a steady gait, was not in acute distress, had clear auscultation of both lungs, and that he could hear Wilson's heart sounds at S1 and S2.   (*Id.*)   Conversely, inmates reported Wilson was wheezing, coughing, and could barely speak in the two days before his death.   (*See* Doc. 119-3 (Ex. 27) 8:4–11; Doc. 119-7 (Ex. 31) 6:21–7:16, 10:2–3.)   Any dispute concerning Wilson's condition during Defendant Gatan's examination is

a dispute of fact for the jury.  Defendant Gatan claimed he informed the desk nurse, who he believed was Defendant Germono, that Lasix is an important medication that Wilson needed.  (*See* Doc. 96-2 (Ex. H) Gatan Dep. 105:6–10, 147:5–21.)  There is no record of this conversation.[15]  Plaintiff's expert Dr. Venters criticized Defendant Gatan for failing to determine how many doses Wilson had missed and initiating a review to determine how to fix any errors in his medication order.  (*See* Venters Report at 10.)

Defendant Gatan did not provide Wilson with any of his cardiac medications. Whether he informed Defendant Germono that Wilson's Lasix was an important medication that he needed is a question of fact.  It does not appear that he undertook any effort to determine the status of Wilson's medications and their administration.  Nor does it appear that he escalated Wilson or informed a doctor about his missed medications.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether Defendant Gatan's inaction was in disregard of a substantial risk to Wilson's health and safety.

### 2. Causation

To prevail on a § 1983 claim, "the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).  To do so, "the plaintiff must establish both causation-in-fact and proximate causation."  *Id.*  "'If reasonable persons could differ' on the question of causation then 'summary judgment is inappropriate and the question should be left to a jury.'"  *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1080 (9th Cir. 2013) (quoting *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990)).

When assessing whether causation is satisfied in § 1983 actions, federal courts look to "traditional tort law."  *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citation omitted).  Causation-in-fact exists if the defendant's conduct was "a substantial

---

[15] Nothing in the record before the Court evinces that Defendant Germono acknowledged that this call occurred.

factor in bringing about the [plaintiff's] injury." *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1049 (1994). Proximate cause "exists if the actor's conduct is a 'substantial factor' in bringing about the harm and there is no rule of law relieving the actor from liability." *Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 665–66 (2001) (citing *Rosh v. Cave Imaging Sys., Inc.*, 26 Cal. App. 4th 1225, 1235 (1994)).

"The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, he will nevertheless be absolved because [of] the manner in which the injury occurred." *Id.* (quoting *Hardison v. Bushnell*, 18 Cal. App. 4th 22, 26 (1993)). "Thus, where there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the 'legal' or proximate cause." *Id.* (quoting *Hardison*, 18 Cal. App. 4th at 26). However, an independent intervening act relieves liability only if the act is "highly unusual or extraordinary and hence not reasonably foreseeable." *Id.* at 699. "Proximate cause is generally held to be a question of fact for the trier of fact to determine based upon the evidence." *Garton v. Title Ins. & Tr. Co.*, 106 Cal. App. 3d 365, 380 (1980).

The CCMG Defendants argue Plaintiff relies solely on Dr. Steinberg to provide a causation opinion, but that he is unqualified to make that opinion because he is not an expert on the correctional standard of care and is subject to a *Daubert* motion. (*See* Doc. 96-1 at 22; Doc. 97.) The County Defendants assert that Wilson's death was the "inevitable result of serious congenital and behavioral health problems from which Mr. Wilson suffered long before his entry into Central Jail." (Doc. 100-1 at 1–2.) As explained in this Court's order concerning the CCMG Defendants' *Daubert* motion, (*see* Doc. 141), Dr. Steinberg is qualified to offer an opinion concerning causation in this case. Dr. Steinberg opined that Wilson's poor medical care undertaken by the Defendants and their failure to give Wilson his vital cardiac medications for CHF directly led to his death. (Steinberg Report at 12.)

While the County Defendants do not directly argue that a "technical glitch" was the actual and proximate cause of Wilson's death, they imply that it led to his missed

medications.  (*See* Doc. 100-1 at 1, 6, 18.)  On February 5, 2019, Wilson was placed in "fac 1 area 2."  (Doc. 100-2 (Ex. C) at 2.)  The same day, he was moved to "fac 1 area x." (*Id.*)  Rognlien-Hood explained Wilson was placed in area 2 on the second floor after booking, and then temporarily labeled as "X Module" in JIMS, which is a temporary label for inmates who are about to be released or are awaiting further assignment after booking from a housing deputy.  (Rognlien-Hood Decl. ¶ 16.)  On the same day, Wilson was moved from the X Module to "fac 1 area 6 hu B cell 10 bed B," which means cell 10 in module B on the sixth floor.  (*Id.* at ¶ 17; 100-1 (Ex. C) at 2.)  Rognlien-Hood explained that, "[d]ue to a technical glitch" between JIMS and Sapphire, the information in JIMS regarding Wilson's current housing unit on the sixth floor did not update in Sapphire.  (Rognlien-Hood Decl. ¶ 17.)  Consequently, he was not on the medical pass printout from Sapphire, and, per County policy, procedure, and training, nurses are not authorized to administer medication beyond what is prescribed on the printout.  (*Id.*)

Despite any technical glitch, it appears Wilson received certain cardiac medications during medication passes on February 12 and 13, 2019.  (*See* Doc. 116-2 (Ex. 2) at 1–3.) His Sapphire records also reflect "clinic housing unit change[s]" on February 8, 9, and 10, 2019.  (Doc. 100-1 (Ex. B); Doc. 116-2 (Ex. 2) CSD000052.)  Wilson informed the jail he had not received his medications on February 7, 2019.  (*See* CSD000045.)  His family informed the jail as much on February 11, 2019.  (*See* CSD000029; CSD000032.)  Whether the actual and proximate cause of Wilson's death was a technical glitch that led to Wilson not receiving his medications or Defendants' failures to provide Wilson with his medications are questions of fact to be resolved by the jury.  *See Lemire*, 726 F.3d at 1080.[16]

Thus, the Court **DENIES** CCMG and the County's Motions on the deliberate indifference to serious medical needs claim for Defendants Kumar, Ibanez, Germono,

---

[16] The Court incorporates this causation analysis as to each of the CCMG and the County's Defendants challenges concerning causation for the other causes of action against the individual nurse and provider Defendants.

Gatan, and Freedland.

## C. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Qualified immunity shields an officer from liability even if his or her action resulted from "'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A right is "clearly established" when, "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"[C]learly established law should not be defined at a high level of generality." *Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).   Rather, it "must be 'particularized' to the facts of the case." *Id.* (internal citation omitted).   The Supreme Court has repeatedly stressed that courts must not define clearly established law "at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *D.C. v. Wesby*, 583 U.S. 48, 63–64 (2018).

There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 at 741.   The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust

consensus of cases of persuasive authority." *Wesby*, 583 at 63 (internal quotation marks and citations omitted).  The Supreme Court has also made clear "that officials can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question" even if the specific action in question has not previously been held unlawful.  *See Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) (quoting *Hope*, 536 U.S. at 741).

The County Defendants argue that Wilson's right was not clearly established because Plaintiff cannot point to a case where a nurse violated the Constitution in similar circumstances by unknowingly missing a plaintiff's medications due to a technical computer glitch.  (*See* Doc. 100-1 at 21.)  Plaintiff responds by citing cases from other circuits to assert that Wilson had a "clearly established right to receive his life-saving heart medications of which the Jail was undisputedly aware." (Doc. 113 at 1–2.)  The County Defendants respond that Plaintiff failed to address qualified immunity entirely and has thus waived the issue of qualified immunity.  (*See* Doc. 132 at 1–2.)

Plaintiff did not waive the issue of qualified immunity.  And as explained *supra* at II.B, there is a genuine dispute of material fact as to whether Defendants Kumar, Ibanez, Germono, Gatan and Freedland were deliberately indifferent to Wilson's serious medical needs.[17]  Accordingly, the Court rejects the County Defendants' framing of the question. The question before this Court is whether Wilson had a right to not be denied or delayed in receiving all of his prescribed cardiac medications by jail medical staff who knew of his severe cardiac issues and that he had missed doses of his essential cardiac medications.

In the Ninth Circuit, it has long been clearly established that prison officials may not "deny, delay, or intentionally interfere with medical treatment[.]" *McGuckin*, 974 F.2d at

---

[17] As discussed *infra* at II.E, Defendant Gore is not subject to supervisory liability for failure to train and failure to supervise and discipline.  Thus, the Court declines to address qualified immunity as to Defendant Gore.

1059; *see also Sandoval*, 985 F.3d at 680 ("[A] prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition."); *Jett*, 439 F.3d at 1097–98 (denying summary judgment on deliberate indifference claim concerning delay of treatment of fractured thumb); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (denying summary judgment where jury could conclude nurse knew plaintiff was in manic state and took psychotropic medication but declined to act upon that knowledge); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418–21 (9th Cir. 2003) (denying summary judgment on deliberate indifference claim where there were genuine disputes of material fact as to whether officers knew the plaintiff was diabetic and needed food, but did not provide him food); *Clement v. Gomez*, 298 F.3d 898, 904–06 (9th Cir. 2002) (denying qualified immunity where there were genuine disputes of material fact as to whether officers deliberately denied prisoners showers and medical attention for four hours after they were pepper sprayed) (citing *Estelle*, 429 U.S. at 104–05).

This clearly established right includes the denial or delay of medication to address a serious medical need, which results in a substantial risk of serious harm to the inmate-patient. *See Reed v. Barcklay*, 634 F. App'x 184, 186 (9th Cir. 2015) (denying summary judgment on qualified immunity where there were genuine disputes of material fact as to whether a doctor failed to provide effective medication long prescribed to the plaintiff to address his serious migraines); *Butler v. Anakalea*, 472 F. App'x 506, 507 (9th Cir. 2012) (denying summary judgment where staff was aware plaintiff complained of kidney stone and requested pain medication, but failed to provide any); *Johnson v. Schwarzenegger*, 366 F. App'x 767, 770 (9th Cir. 2010) ("Failure to provide medication to prevent a life-threatening condition may amount to deliberate indifference to a serious medical need.").

Additionally, a robust consensus of cases of persuasive authority from other circuits supports this clearly established right. *See e.g.*, *Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018) (denying summary judgment where doctor was aware of plaintiff's serious need for

47

psychiatric medication but failed to take reasonable steps to ensure plaintiff received her medication); *Carter v. Broward Cnty. Sheriff Off.*, 710 F. App'x 387, 391–92 (11th Cir. 2017) (denying motion to dismiss where plaintiff adequately pled that "prison officials acted with deliberate indifference to his medical needs by regularly failing to provide his blood-pressure medication as prescribed."); *Dadd v. Anoka Cnty.*, 827 F.3d 749, 756 (8th Cir. 2016) (denying motion to dismiss concerning allegations that prison staff failed to distribute plaintiff's prescription pain medication and that a nurse delayed his receiving that medication from a doctor despite his complaints of pain); *Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (denying motion to dismiss concerning allegations that prisoner told prison officials he needed his heart medications immediately multiple times, which prison officials did not respond to); *Parsons v. Caruso*, 491 F. App'x 597, 604–06 (6th Cir. 2012) (denying summary judgment where medical staff knew the plaintiff had a seizure disorder and did not have his seizure medication and he continued to not receive that medication from medical staff for at least two days); *Gaines v. United States*, 498 F. App'x 415, 416 (5th Cir. 2012) ("We have held that a prison employee's refusal to provide prescribed medication when an inmate with known heart problems complained of chest pain rose to the level of deliberate indifference.") (citing *Easter v. Powell*, 467 F.3d 459, 463–65 & n.25 (5th Cir. 2006)); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154–55 (6th Cir. 1991) (denying summary judgment concerning refusal to provide plaintiff pain medication resulting in physical pain and mental anguish); *Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990) (denying summary judgment where doctor discontinued schizophrenic inmate-patient's anti-depression medication despite his substantial suicide risk).

Even if there were not a multitude of cases that clearly established this right, the general constitutional rule preventing the denial or delay of medical treatment, including prescribed medication, applies with obvious clarity to the conduct in question. *See Taylor*, 141 S. Ct. at 54; *see also Sandoval*, 985 F.3d at 680 (finding that, if delay of treatment for non-life-threatening conditions was deemed a constitutional violation, the same is true for failing to provide meaningful treatment to an inmate who is sweating and appeared so tired

that a deputy urged that he be re-evaluated); *Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999) (holding that prior to release, prisons must provide a "prisoner who is receiving and continues to require medication with a supply sufficient to ensure that he has that medication available during the period of time reasonably necessary to permit him to consult a doctor and obtain a new supply."). Repeated failure to provide all prescribed cardiac medications to an inmate-patient that medical staff knows has a history of CHF and HCM and had missed doses of those medications could very well be a matter of life and death. It should have been obvious that doing nothing to ensure Wilson received those medications could constitute deliberate indifference resulting in a constitutional violation. The Court concludes that every reasonable medical staff member would understand that denying or delaying providing all prescribed cardiac medications to an inmate-patient with a history of CHF and HCM who had missed several days of those medications was a constitutional violation.

Thus, the County's Motion for qualified immunity is **DENIED**.

### D. *Monell* claim (Fourth Cause of Action)

A municipal entity is liable under § 1983 only if the plaintiff alleges his constitutional injury was caused by employees acting pursuant to a municipal policy or custom. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691 (1978). A municipality may not be held vicariously liable under § 1983 simply based on allegedly unconstitutional acts of its employees. *Jackson v. Barnes*, 749 F.3d 755, 762 (9th Cir. 2014). Instead, the municipality may be held liable when its policy or custom "caused a constitutional tort." *Monell*, 436 U.S. at 691. Accordingly, to succeed on a *Monell* claim, a plaintiff must show "(1) he possessed a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy is the 'moving force behind the constitutional violation.'" *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006). "Normally, the question of whether a policy or custom exists would be a jury question. However, when there are no genuine issues of material fact and the plaintiff has failed to

49

establish a prima facie case, disposition by summary judgment is appropriate." *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996).

The Court will first address the *Monell* claims against the County for (1) a policy omission concerning the need to check for missed medications for inmate-patients with serious medical needs; (2) a policy omission concerning delivering all patient-specific medication, combining medications, and prompt administration once ordered medication is received by the facility; and (3) a failure to adequately train medical staff regarding Sapphire symbol keys. The Court will then address the *Monell* claim against CCMG for a policy omission and failure to train concerning requiring CCMG employees to review an inmate-patient's medical records prior to rendering a medical decision.

### 1. County

The County argues Plaintiff has failed to prove the underlying constitutional violation necessary to assert a municipal liability claim. (*See* Doc. 100-1 at 21–22.) For the reasons discussed *supra* at II.B, the Court rejects that argument.

Next, the County contends Plaintiff has not identified a specific municipal policy, nor a municipal custom because Plaintiff cannot establish a pattern of prior, similar constitutional violations. (*See id.* at 22–23.) Plaintiff responds the County failed to implement policies controlling the order and delivery of medications that led to Wilson's death. (*See* Doc. 113 at 42–43.) Specifically, Plaintiff argues the County failed to implement policies (1) "requiring medical personnel to check Sapphire to ensure that an inmate-patient was receiving his ordered medications, particularly when the inmate-patient specifically complained that he had not received medications"; (2) concerning "ordering patient specific dosages of medication and ensuring delivery of that medication to the patient" or "combining medications in stock;" and (3) concerning "what nurses should do in the event they encountered a situation where the prescribed dosage was not in the current inventory." (*Id.* at 43–46.) Plaintiff argues the County was deliberately indifferent because the NCCHC notified the Sheriff's Department of deficiencies in policies regarding order, delivery, and audits of medications in January 2017. (*Id.* at 46.) Plaintiff also contends

50

the County failed to train medical personnel regarding the "proper use of the Sapphire system," which "is evident in their wildly varying understanding of the system." (*Id.* at 46–47.)  The County responds Plaintiff has provided no evidence "of any prior instance involving any missed medication of any other inmate to suggest any pattern or custom that the County was aware of and ignored." (Doc. 132 at 8.)  The County responds Plaintiff failed to prove the NCCHC technical assistance report is relevant as its accreditation standards are not the legal or constitutional standard. (*Id.* at 8–9.)  The County responds that it did submit evidence of policies and procedures concerning requiring nurses to audit eMAR records and ensuring patients receive prescriptions. (*Id.* at 9.)

### i.  Failure to Implement Policies

A failure to implement a policy, or a policy omission, can be subject to *Monell* liability.  *See Oviatt v. Pearce*, 954 F.2d 1470, 1477–78 (9th Cir. 1992) (holding sheriff's awareness that some inmates were not arraigned on time as required by Oregon law and decision to do nothing was a conscious choice of deliberate indifference subject to *Monell* liability); *see also Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (finding *Monell* liability where a sheriff, who was aware it was common for individuals to be arrested on the wrong warrant, failed to implement any procedures to alleviate the problem).

The plaintiff must prove the municipality's deliberate indifference led to the failure to implement the policy and that it caused the employee to commit the constitutional violation. *Gibson*, 290 F.3d at 1186.  "To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.*  Negligence will not suffice; the inaction must be a conscious or deliberate choice among various alternatives.  *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004).  The plaintiff can prove the municipality was on notice in one of two ways: (1) "the policy may be so facially deficient that any reasonable policymaker would recognize the need to take action" to prevent the likely violation of the plaintiff's constitutional rights, or (2) "a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice."

51

*Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141–42 (9th Cir. 2020).  To prove causation, the plaintiff must prove the injury would have been avoided if the municipality instituted the affirmative procedure.  *See Oviatt*, 954 F.2d at 1478.

With respect to actual or constructive notice of the County, Plaintiff's Opposition does not present evidence of a pattern of prior, similar constitutional violations.  (*See* Doc. 113 at 42–48.)  Therefore, the Court must evaluate whether Plaintiff presented sufficient evidence of a facially deficient omission in policy, which any reasonable policymaker would recognize required action to prevent likely violations of constitutional rights.

Relevant to that inquiry is the County's knowledge of certain medication control issues.  Plaintiff points to the NCCHC technical assistance report as placing the County on notice concerning issues with order, delivery, and audits of medications.  (*See* Doc. 113 at 46.)  The jury could conclude the County was aware of the NCCHC technical assistance report because it commissioned that report.  (*See* Doc. 120-5 (Ex. 39) at 3.)  As relevant here, that report criticized the jail for (1) having a lack of accountability for when medications were received in medication rooms, (2) failing to set time frames between ordering and delivery of medications, (3) nurses failing to conduct safety checks for names, allergies, and which medications are to be administered to an inmate-patient when seeing them, and (4) a lack of accountability evidenced by no inventory control practice for order and delivery of medications.  (*See id.* at 15–16.)  However, the report makes no mention of a failure to have policies concerning checking for missed medications.  Nor does it address a lack of policies for ordering and delivery of all *patient-specific* medications or combining medication dosages in the jail's inventory to reach a prescribed dosage.  The report is relevant to the *Monell* claim, as discussed *infra* at II.D.1.i.2, to the extent it concerns whether the County was aware of medication inventory control issues and a lack of accountability for when medications were received in the medication rooms.[18]

_____

[18] The County argues the NCCHC standards are irrelevant because they are not the legal or constitutional standard.  (*See* Doc. 132 at 8–9.)  Even if the NCCHC standards are not

*1. Failure to Check for Missed Medications*

County policy, procedure, and training required medical staff to evaluate an inmate-patient's condition upon intake, including through a lengthy questionnaire assessing their medical needs.  (*See* Rognlien-Hood Decl. ¶ 11.)  The jury could conclude the County's intake process indicated an awareness that some prisoners would arrive at the jail with serious medical needs.  The jury could also reasonably infer that some of those inmate-patients would require essential medications to manage or treat their conditions and the County's intake process sought to understand those needs.  *See Gibson*, 290 F.3d at 1190 (finding county policy requiring detainees to be checked for medical conditions requiring immediate attention indicated the county's awareness that inevitably some prisoners would arrive at the jail with urgent health problems requiring hospitalization).

The County employed use of a system, Sapphire, that allows medical personnel to see an inmate-patient's MAR, including the ability to see their history of medication administration or lack thereof.  (*See* Doc. 96-2 (Ex. F) Rognlien-Hood Dep. at 194:1–196:6.)   That history is also contained in the eMAR that nurses print before conducting a medical pass on a jail floor.  (*See* Doc. 131 at 8.)  County policy required nurses who administer medication to record any administration on the MAR at the time it was given as well as if any medications were missed or refused.  (*See* Doc. 117 (Ex. 14) at 5.)  There would be little purpose in the County employing use of Sapphire to record the administration of medication and requiring nurses to do so unless it was at least in part to keep track of whether inmate-patients were receiving their medications.  The jury could conclude the County sought to track the administration of medications to inmate-patients in part because it knew they may not receive their medications in some instances and sought to prevent those instances.

Rognlien-Hood conceded there was no procedure requiring a nurse who made a

_____

the legal or constitutional standards, the Court finds the NCCHC technical assistance report relevant to determining the County's awareness of the issues identified.

53

MAR entry to check if a patient missed previous doses of prescribed medication.  (*See* Doc. 117-1 (Ex. 12) Rognlien-Hood Dep. 76:20–25.)  She conceded there was no training given to nurses to review the MAR to determine if there had been a failure for a patient to receive prescribed medication.  (*See id.* at 77:7–12.)  Burns did not recall any such training, even where it was discovered that a patient missed a dose of medication.  (*See* Doc. 117-9 (Ex. 20) Burns Dep. 52:16–22.)  Nor did Burns recall training concerning when a nurse should notify a doctor that a patient missed several days of medication.  (*See id.* at 56:22–57:5.)  In addressing these deficiencies, Plaintiff's expert Dr. Venters explained jails must have a mechanism to recognize missed medications, guide a response (e.g., escalation), and training on how to conduct and document these tasks.  (*See* Venters Report at 12.)

Despite knowing that some inmate-patients may suffer from serious medical needs and that some may not receive their essential medications in some instances, the County apparently established no procedure requiring medical personnel to check if an inmate-patient with serious medical needs missed previous doses of prescribed medication.  That was true even if the inmate-patient or their family notified medical personnel that they had not received their medications.  The jury could conclude that it should have been obvious to the County that such an omission could likely result in constitutional violations.  *See Gibson*, 290 F.3d at 1195 (holding it should have been obvious to the County that failure to require nurses to act upon any information derived from an incoming detainee's prescribed medication would likely result in constitutional violations).  Thus, there is a genuine dispute of material fact as to whether the County's failure to establish a policy to check whether inmate-patients with serious medical needs missed any of their prescribed medications, particularly where medical personnel were put on notice of that possibility, constituted deliberate indifference to their constitutional rights.  *See Long*, 442 F.3d at 1190 (denying summary judgment regarding County's failure to implement policies for responding to the fall of a medically unstable patient, prompt assessment if a special medical unit patient refuses treatment, and to transfer medically unstable patients).

Moreover, there is a genuine dispute of material fact as to whether Wilson's death

would have been avoided had the County implemented a policy to check whether an inmate-patient with serious medical needs missed doses of prescribed medications when put on notice of that possibility. *See Gibson*, 290 F.3d at 1196 (finding County's absence of a policy instructing medical staff to use information obtained from a prisoner's medication to screen incoming detainees could have led to the recommended transportation or treatment necessary to avoid inmate-patient's death). The jury could conclude that, had the County implemented such a policy, medical personnel would have learned how many doses of essential cardiac medication Wilson missed and notified a doctor or otherwise escalated his care, which could have averted his death.

### 2. *Patient-Specific Medication, Combining Doses, and Receipt of and Prompt Administration of Ordered Medication[19]*

The day after Wilson died, Rognlien-Hood emailed Booth that Wilson's Lisinopril and Furosemide prescriptions were ordered, but never arrived because they were patient-specific. (*See* Doc. 96 (Ex. V).) Rognlien-Hood's email leaves questions concerning why those medication orders did not go through due to their being patient-specific, including whether the facility cannot order certain patient-specific medications. Viewed in the light most favorable to Plaintiff, the jury could conclude the County did not have a policy to ensure the delivery of at least some patient-specific medications.

Wilson received four 20 milligram tablets of Furosemide from the jail's stock, meaning nurses added two 20 milligram tablets of Furosemide together for each administration. (*See id.*) Burns explained there was no formal training for nurses on whether to add pills together to reach a prescribed dosage when it was not otherwise available. (*See* Doc. 117-9 (Ex. 20) Burns Dep. 46:17–47:1.) Gilleran was not aware of a written policy for this situation. (*See* Doc. 96-2 (Ex. J) Gilleran Dep. 61:5–9.) However, Gilleran explained that if medication were available in an amount less than the prescribed

---

[19] The Court discusses Plaintiff's arguments concerning these alleged omissions collectively due to their interrelated nature.

dosage, the standard operating procedure would be for the nurse to notify the prescribing physician, who would determine if combining tablets to achieve the correct dosage was acceptable.   (*See id.* at 56:15–21, 60:19–61:1.)[20]  At the same time, Rognlien-Hood explained that, under a pharmacy regulation, nurses were only allowed to administer medication as ordered.  (*See* Doc. 117 (Ex. 12) Rognlien-Hood Dep. 184:21–185:1; Doc. 96 (Ex. V).)   Viewed in the light most favorable to Plaintiff, the jury could conclude Wilson's receipt of Furosemide through combined tablets was prohibited by County policy.

Burns explained that if medications were not available in the jail's storehouse, nurses were supposed to make it known to the pharmacy, pharmacy tech, or the charge nurse.  (Doc. 117-9 (Ex. 20) Burns Dep. 49:4–14.)  She explained someone would investigate the issue to see if the medication was ordered or if they were awaiting delivery.  (*Id.* at 49:25–50:6.)  Despite these procedures, Burns encountered the issue of not having the correct dosage of medication in inventory daily and estimated it occurred about 40 percent of the time.  (*See id.* at 38:13–18, 42:7–13.)  She raised this issue to jail administration, pharmacy, pharmacy techs, Rognlien-Hood, other supervisors, and the sheriff and medical department were involved.  (*Id.* at 40:6–21, 43:8–25, 44:18–24.)  The NCCHC report also criticized the County for having medication inventory control issues.  (*See* Doc. 120-5 (Ex. 39) at 16.)  The jury could conclude that, despite the County's policy concerning alerting the pharmacy, pharmacy tech, or charge nurse when medications were out of stock, the County was aware of the daily issue of medical staff not having a particular dosage of medication for an inmate-patient in inventory.

Combined with this awareness, and with the possibility that some patient-specific medications could not be delivered, (*see* Doc. 96 (Ex. V).), medical staff would be left to

---

[20] Dr. Venters was not aware of any reason why a patient could not take two 20 milligram tablets instead of a 40-milligram tablet of their medication or why such an issue could not be resolved by medical staff with a physician instead of denying Wilson life-saving medication.  (*See* Venters Report at 21; Doc. 120-6 (Ex. 40) Venters Dep. 111:3–23.)

look to the jail's inventory for a different dosage of such medications.  But even if a different dosage of medication was available in inventory, viewed in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether there was an omission in policy concerning allowing nurses to combine medications to meet a prescribed dosage or to escalate that issue.  Burns did not recall such training, Gilleran was not aware of a formal policy, and Rognlien-Hood stated nurses could only administer medication as ordered.  (*See* Doc. 117-9 (Ex. 20) Burns Dep. 46:17–47:1; Doc. 96-2 (Ex. J) Gilleran Dep. 61:5–9; Doc. 117 (Ex. 12) Rognlien-Hood Dep. 184:21–185:1; Doc. 96 (Ex. V).)  The County cannot orchestrate a double bind wherein patients do not receive all patient-specific medications, and nothing is done to ensure they receive a comparable dosage from available inventory or that the issue is escalated and resolved.  Viewed in the light most favorable to Plaintiff, the jury could determine that it should have been obvious to the County such an omission may result in constitutional violations—specifically, that inmate-patients would be denied or would simply not receive patient-specific doses of their prescribed medications.[21]  *See Long*, 442 F.3d at 1190; *Gibson*, 290 F.3d at 1190.

Moreover, in the light most favorable to Plaintiff, the jury could determine the County had an omission in policy concerning accounting for the receipt of prescribed medication and promptly administering it to inmate-patients.  Rognlien-Hood explained the Metoprolol ordered for Wilson arrived at the facility on February 8, 2019 but it was not administered to him until at least February 12, 2019.  (*See* Doc. 96 (Ex. V); Doc. 131 at 7.)  The NCCHC technical assistance report criticized the County regarding the lack of accountability for when medications were received in the medication room.  (*See* Doc. 120-

---

[21] While the County raises that the jail was found to be compliant with Title 15 in 2018 and 2020, both before and after Wilson's death, the County has pointed to only one specific requirement under Title 15 that the pharmacy maintains a "quality assurance program to document and assess pharmacy-related medication errors."  (*See* Doc. 100-1 at 17–18.) *See* Cal. Code Regs. Tit. 15 § 3999.380(d).  Based on the record in this case, it is unclear to the Court whether such a quality assurance program covers the omissions in question.

5 (Ex. 39) at 15.)   The jury could determine the NCCHC technical assistance report informed the County about such a potential omission in policy.   However, it is not such notice, without a pattern of prior, similar constitutional violations, that raises the question of deliberate indifference.   *See Hyun Ju Park*, 952 F.3d at 1141–42.   Rather, the jury could determine it should have been obvious to the County that failing to promptly administer an inmate-patient's prescribed medications once received by the facility could result in constitutional violations.   *See Long*, 442 F.3d at 1190; *Gibson*, 290 F.3d at 1190.   Thus, viewing the evidence and drawing all reasonable inferences in the light most favor to Plaintiff, there is a genuine dispute of material fact as to whether the County had an omission in policy amounting to deliberate indifference regarding ensuring ordered and received prescribed medications were promptly administered to an inmate-patient.

Finally, there is a genuine dispute of material fact as to whether Wilson's death could have been avoided had the County implemented policies to ensure the delivery of patient-specific medication, concerning how medical staff must respond when they have an inmate-patient's correct medication in the incorrect dosage, and concerning the prompt administration of ordered medication to an inmate-patient once received by the facility. *See Gibson*, 290 F.3d at 1196.   The jury could conclude that, had the County implemented such policies, Wilson would have received his cardiac medications and his death could have been averted.

### ii.  Failure to Train[22]

A failure to train or inadequacy of training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons" with whom the municipal employees come into contact.   *City of Canton v. Harris*, 489 U.S.

---

[22] The Court notes that Plaintiff states in its factual recitation that the County was on notice Defendant Germono needed to be further trained and closely monitored due to the case of *Greer v. Cnty. of San Diego*, Case No. 19cv378-JO-DEB, 2023 WL 2145528 (S.D. Cal. Feb. 21, 2023).  (*See* Doc. 113 at 32.)

58

378, 388 (1989).  The question is "whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent [municipal] policy."  *Id.* at 390.  There may be situations where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need."  *Id.*  In such situations, "the failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable if it actually causes injury."  *Id.*  Put another way, a failure to train can be shown where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  *Long*, 442 F.3d at 1186 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

In non-obvious cases, there must be proof the program inadequacies "resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate."  *Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985).  "If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.  Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability."  *Brown*, 520 U.S. at 407.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citing *Brown*, 520 U.S. at 409).  There must also be an "affirmative link between the policy and the particular constitutional violation alleged."  *Tuttle*, 471 U.S. at 823.  In other words, the deficiency in the program "must be closely related to the ultimate injury."  *Harris*, 489 U.S. at 391.  The plaintiff must show the constitutional injury would have been avoided if the municipal entity properly trained its

employees.  *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).

Plaintiff has not presented evidence of a conscious choice by the County not to train despite a pattern of prior, similar constitutional violations by untrained employees.  *See Connick*, 563 U.S. at 62 (2011).  Thus, the question is whether "the need for more or different training for medical staff was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the County can reasonably be said to have been deliberately indifferent to the need."  *Harris*, 489 U.S. at 388.

While Germono made clear that a Sapphire training program existed, (*see* Doc. 117-2 (Ex. 13) Germono Dep. 129:2–11, 16–20), she stated that nurses were using their discretion to determine how to use Sapphire symbol keys, (*see id.* at 129:2–11, 15–23).  That is consistent with nurses' varying understandings of Sapphire symbol keys in this case.  *See supra* at I.K.c.

The County knew that medical staff must look to an inmate-patient's MAR to see their history of medication administration or lack thereof.  *See supra* II.D.i.1.  County policy required nurses who administer medication to record any administration on the MAR at the time it was given as well as if any medications were missed or refused.  (*See* Doc. 117 (Ex. 14) at 5.)  Accordingly, the jury could conclude that the County needed to adequately train medical staff to establish a common understanding and usage of Sapphire symbol keys on the MAR.  Without such a common language, medical staff are unable to adequately assess the status of an inmate-patient's medication administration.  For example, if medical staff do not know whether "A" for "Absent" means the inmate-patient is absent or the medication is absent, (*see* Doc. 117-2 (Ex. 13) Germono Dep. 129:15–23), medical staff are unable to properly identify a medication administration issue and resolve it.  Inmate-patients may be denied administration of essential medications as a result.  It should be obvious to the County that, if medical staff lack adequate training to establish a common language to understand what medication administration issues an inmate-patient is facing, there is a likelihood of constitutional violations.

The jury could determine that the need for more or different training concerning

Sapphire symbol keys was so obvious, and the inadequacy so likely to result in constitutional violations, that the County was deliberately indifferent. The jury could also determine that a lack of common understanding of Sapphire symbols contributed to medical staff's failure to provide Wilson with his essential cardiac medications. Finally, the jury could determine that, had such a common understanding existed, medical staff could have identified that Wilson missed several days of his medications, escalated the issue, and his death could have been avoided. *See Lee*, 250 F.3d at 681.

Thus, the Court **DENIES** the County's Motion concerning omissions in policy for (1) missed medication checks for inmate-patients with serious medical needs and (2) delivery of all patient-specific medications, combining medications, and prompt administration once ordered medication is received by the facility. The Court also **DENIES** the County's Motion concerning failure to adequately train medical staff concerning Sapphire symbol keys.

### 2. CCMG

CCMG, relying on Dr. Adler's expert report, argues it does not have to establish policies and protocols to cover all common and uncommon conditions because it hires healthcare providers certified by the State of California for their scope of practice. (*See* Doc. 96-1 at 27.) Regarding a failure to train, CCMG argues it provided training to its providers and supervised them by consistently reviewing their medical charting and providing feedback, if necessary. (*See id.* at 28.) And that neither CCMG nor the County found any relevant deficiencies. (*Id.*) Plaintiff responds that CCMG was aware of at least three cases concerning its practitioners that put it on notice that employees were failing to review patients' medical records before making medical decisions. (*See* Doc. 113 at 49.) Plaintiff argues that, due to CCMG's awareness, it should be denied summary judgment for failing to make remedial policy and training changes. (*Id.*) CCMG responds that even accepting Plaintiff's argument, there is no causation because both Defendants Freedland and Gatan were aware Wilson had CHF, which is the same information that would have been contained in the medical records. (*See* Doc. 130 at 7.) CCMG also responds that

Plaintiff is vague as to whether "medical records" refers to the MAR, and because Defendants Freedland and Gatan instructed nurses to administer medication, failure to review the MAR did not cause Wilson's death.  (*Id.*)

*Monell* can apply to suits against private entities under § 1983.  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).  To make out such a claim, a plaintiff must show the private entity (1) "acted under color of state law, and (2) if a constitutional violation occurred, the violation was caused by an official policy or custom of" the private entity.  *Id.*  CCMG does not contest it was acting under the color of state law.  In any event, private physicians that contract with a public prison system to provide treatment to inmate-patients at a state facility perform a public function under the color of law for purposes of § 1983.  *See West*, 487 U.S. at 57 n.15 (noting the reasons why a private physician carrying out duties at a state prison within a prison hospital renders them a state actor).

Under the second prong, the Court asks whether CCMG had a custom or policy that was the actionable cause of Wilson's constitutional violation.  *See Tsao*, 698 F.3d at 1143.  Plaintiff argues CCMG either failed to implement policy or failed to train its medical staff despite its awareness that its practitioners were not reviewing inmate-patient medical charts and records prior to making medical decisions.  To prove *Monell* liability for inaction, Plaintiff must establish CCMG's notice (1) through a facially deficient policy that any reasonably policymaker would recognize the need to act on to prevent the likely violation of the plaintiff's constitutional rights, or (2) a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice.  *See Hyun Ju Park*, 952 F.3d at 1141–42.  To prove *Monell* liability for failure to train, Plaintiff must show "a pattern of similar constitutional violations by untrained employees."  *Connick*, 563 U.S. at 62 (citing *Brown*, 520 U.S. at 409).  "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'"  *Id.* (citing *Brown*, 520 U.S. at 407.)  Alternatively, Plaintiff must show the violation of federal rights

was a highly predictable consequence of failing to equip CCMG staff with specific tools to handle recurring situations. *See Long*, 442 F.3d at 1186 (citing *Brown*, 520 U.S. at 409).

There is insufficient evidence in the record to determine whether CCMG had obvious inadequacies in policies and training regarding its employees' review of inmate-patients' medical charts prior to rendering a medical decision. CCMG hired providers with the necessary degrees for their requisite level of medical care and had proper licensure from relevant California accreditation boards. (O'Brien Decl. ¶ 3.) CCMG providers underwent a background check and orientation performed by the Sheriff's Department to familiarize CCMG providers with the jail's electronic medical records and protocols. (*Id.* at ¶ 5.) Plaintiff failed to point to any deficiencies in the County's training that CCMG employees underwent and CCMG's awareness of any such deficiencies. Thus, it cannot be said CCMG's policies were so obviously likely to result in constitutional violations or that the violation of federal rights was a highly predictable consequence of its training program.

Alternatively, Plaintiff could establish a pattern of prior, similar constitutional violations demonstrating CCMG's policy or custom of deliberate indifference. "Proof of random acts or isolated events is insufficient to establish custom." *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (quoting *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995)). Rather, "[l]iability for improper custom … must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)). "A custom is 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law.'" *J.M. by & Through Rodriguez v. Cnty. of Stanislaus*, No. 1:18-cv-01034-LJO-SAB, 2018 WL 5879725, at *3 (E.D. Cal. Nov. 7, 2018) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) and *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 890 (9th Cir. 1990)). The Ninth Circuit has explained that "[w]hile one or two incidents are insufficient to establish a custom or policy, we have not established what number of similar incidents would be sufficient to constitute

1  a custom or policy." *Oyenik*, 696 F. App'x at 794 (citations omitted).  Some district courts

2  have concluded that "more [than two] incidents may permit the inference of a policy, taking

3  into account their similarity, their timing, and subsequent actions by the municipality."  *Est.*

4  *of Mendez v. City of Ceres*, 390 F. Supp. 3d 1189, 1209 (E.D. Cal. 2019) (quoting *Cnty. of*

5  *Stanislaus*, 2018 WL 5879725, at *5)).  "Normally, the question of whether a policy or

6  custom exists would be a jury question.  However, when there are no genuine issues of

7  material fact and the plaintiff has failed to establish a prima facie case, disposition by

8  summary judgment is appropriate."  *Trevino*, 99 F.3d at 918.

9      Plaintiff points to three cases as placing CCMG on notice that it had inadequate

10  policies or training for CCMG providers in failing to review medical charts prior to making

11  medical decisions.  *See Estate of Paul Silva et al. v. City of San Diego et al.*, Case No. 3:18-

12  cv-02282-L-MSB; *Colleen Garot v. County of San Diego et al.*, Case No. 3:19-cv-01650-

13  L-BLM; *Frankie Greer v. County of San Diego et al.*, Case No. 19-cv-00378-JO-DEB.

14  The cases involve allegations that CCMG employees were not reviewing inmate-patient

15  medical records prior to rendering medical decisions, including one instance where a

16  physician allegedly failed to realize an inmate-patient was deprived of his anti-seizure

17  medication as a result.  There is some similarity between these cases and the allegations

18  against Defendants Freedland and Gatan.  While Defendant Freedland highly suspected he

19  reviewed Wilson's medical records, the day of Wilson's death, he stated he did not have

20  Wilson's chart when he saw him.  (*See* Doc. 118-1 (Ex. 21) Freedland Dep. 40:22–41:4;

21  Doc. 118-2 (Ex. 22) Follow-Up Investigation Report at 2.)  Defendant Freedland believed

22  he reviewed Wilson's Sapphire records but could not recall seeing whether he missed doses

23  of Metoprolol or Spironolactone.  (*See* Doc. 118-1 (Ex. 21) Freedland Dep. 56:13–25,

24  97:2–6, 97:13–98:2, 98:21–24, 99:8–12.)  Defendant Gatan appears to have only reviewed

25  some of Wilson's medical chart as he did not recall seeing Dr. Leon, Defendant Freedland,

26  Macanlalay, or Defendant Germono's notes or the call from Wilson's sister informing the

27  desk nurse that Wilson was in distress.  (*See* Doc. 119-1 (Ex. 25) Gatan Dep. 49:2–21,

28  68:23–69:17, 74:11–13, 75:1–12, 87:9–12.)  Defendant Gatan believed there was no policy

mandating review of nursing notes and that he had discretion to review certain notes that were significant for the patient, such as doctor or nurse practitioner notes, while only occasionally reviewing nursing notes. (*See id.* at 34:9–13, 34:21–24, 35:2–6; Doc. 96-2 (Ex. H) Gatan Dep. 36:20–24.)  Defendant Gatan also performed a Sapphire medication check on Wilson, but claimed he could not access the Sapphire eMAR, which would show when an inmate-patient missed medication; Defendant Gatan had also never ordered the Sapphire eMAR from a nurse in his over two-years working at the jail.  (*See* CSD000037; Doc. 119-1 (Ex. 25) Gatan Dep. 113:2–114:13, 121:6–8, 126:15–127:17.)  The jury could conclude that, similar to these prior cases involving CCMG employees, Defendants Freedland and Gatan did not sufficiently review all of Wilson's medical records, including his medication administration history, prior to or during their examinations of him.

Additionally, each of these prior alleged incidents occurred in 2018 within a period of three months of each other, months before the incident in this case.  Only one of these cases was filed before the incident in this case, and none identified the CCMG employees in question as named defendants until after the incident in this case.  Neither Party has identified any subsequent actions taken by CCMG to address these concerns.  Thus, the jury could conclude that (1) CCMG had constructive notice that its employees were not fully reviewing an inmate-patient's medical records, including their medication administration records, prior to rendering medical decisions, and (2) CCMG failed to enact policy or adequate training to address this issue.

Finally, Plaintiff has established the requisite causal connection, i.e., that the injury would have been avoided if the municipality instituted the affirmative procedure to ensure CCMG employees review an inmate-patient's medical records before making medical decisions.  *See Oviatt*, 954 F.2d at 1478.  While Defendants Freedland and Gatan were aware of Wilson's history of CHF and that he complained of missed medications during their examinations of him, (*see* Doc. 96-2 (Ex. D) Freedland Dep. 32:6–7, 32:11–13; Doc. 118-1 (Ex. 21) Freedland Dep. 49:7–15; Doc. 119-1 (Ex. 25) Gatan Dep. 122:20–123:10), the jury could determine that, had they reviewed all of Wilson's medical records, including

65

1  his medication administration records, his care for missed medications could have been
2  escalated and his death avoided.

3       Thus, the Court **DENIES** CCMG's Motion concerning a policy omission and failure
4  to train.

5  **E. Failure to Train and Failure to Properly Supervise and Discipline (Second and**
6  **Third Causes of Action)**

7       "A defendant may be held liable as a supervisor under § 1983 'if there exists either
8  (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient
9  causal connection between the supervisor's wrongful conduct and the constitutional
10 violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*,
11 885 F.2d 642, 646 (9th Cir. 1989)).  This causal connection can be established "by setting
12 in motion a series of acts by others which the actor knows or reasonably should know
13 would cause others to inflict the constitutional injury."  *Hydrick v. Hunter*, 500 F.3d 978,
14 988 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).  It
15 can also be established by "knowingly refus[ing] to terminate a series of acts by others,
16 which [the supervisor] knew or reasonably should have known would cause others to inflict
17 a constitutional injury."  *Starr*, 652 F.3d at 1207–08 (quoting *Dubner v. City & Cnty. of*
18 *San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)).  "A supervisor can be liable in his
19 individual capacity for his own culpable action or inaction in the training, supervision, or
20 control of his subordinates; for his acquiescence in the constitutional deprivation; or for
21 conduct that showed a reckless or callous indifference to the rights of others."  *Id.* at 1208
22 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998)).  A supervisor
23 may be liable under § 1983 for failing to train subordinates when the failure amounts to
24 deliberate indifference.  *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998) (citing
25 *Harris*, 489 U.S. at 388).  A supervisor can also be liable for "implement[ing] a policy so
26 deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving
27 force of the constitutional violation.'"  *Hansen*, 885 F.2d at 646 (citation omitted).

28      Plaintiff does not assert that Defendant Gore was personally involved in Wilson's

66

constitutional deprivation.   Thus, the question is whether there is a sufficient causal connection between Defendant Gore's alleged wrongful conduct and Wilson's constitutional violation.

The County Defendants argue Plaintiff's failure to train claim must fail because Defendant Gore had no "direct involvement in training any of the individuals that came into contact with Mr. Wilson." (*See* Doc. 100-1 at 17.)  They also assert that nurses had sufficient time to review patient information at booking or there was sufficient JIMS training because Wilson's conditions and medications were documented.  (*See id.*) Plaintiff contends Defendant Gore was responsible for establishing policies and procedures for the management of the jail pharmacy, including ensuring "that prescribed medications have or have not been administered, by whom, and if not, for what reason." (Doc. 113 at 48) (citing Cal. Code Regs. tit. 15, § 1216).)  Plaintiff asserts Defendant Gore admitted in the *Greer* case that he reviewed the NCCHC technical assistance report.  (*See* Doc. 113 (Ex. 41).)  Plaintiff points to *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019) to argue the elements of supervisory and municipal liability are the same when based upon a sheriff's maintenance or lack thereof of a policy or custom causing the underlying constitutional violation, particularly where the sheriff was on notice of a jail's deficiencies from NCCHC audit reports.  (*See* Doc. 113 at 48.)  The County Defendants respond that *Burke* involved a different factual landscape where the sheriff's awareness of the jail's deficiencies was indicated by his preparing false medical records for audits to cover up wrongdoing and receiving four reports identifying issues with the jail's medical care. (*See* Doc. 132 at 7–8.)  The County Defendants also respond that Plaintiff cites no evidence relating to Defendant Gore's actions in this case or that he made a conscious decision not to train staff in a manner constituting deliberate indifference.  (*See id.*)

Moreover, the County Defendants argue there is no evidence Defendant Gore failed to supervise any staff, or of repeated constitutional violations for which there was no reprimand, or that he failed to investigate jail staff accused of misconduct.  (*See* Doc. 100-1 at 18.)  They argue Defendant Gore cannot be held liable for decisions made by medical

67

1  staff because he cannot be liable for their diagnostic decisions when he lacks medical
2  expertise.  (*See id.* at 19.)

3        Plaintiff does not directly address its failure to train or failure to supervise and
4  discipline claims against Defendant Gore.  (*See* Doc. 113 at 48.)  Specifically, nowhere
5  does Plaintiff present evidence that Defendant Gore failed to train employees or maintained
6  an inadequate training program constituting deliberate indifference.  (*See id.*)  Nor does
7  Plaintiff present evidence Defendant Gore failed to supervise and discipline employees.
8  (*See id.*)[23]  Accordingly, this claim fails because Plaintiff has failed to establish any failure
9  to train or failure to supervise and discipline by Defendant Gore that "set[ ] in motion a
10  series of acts by others which the actor knows or reasonably should know would cause
11  others to inflict the constitutional injury."  *Hydrick*, 500 F.3d at 988 (citation omitted).

12        Thus, the Court **GRANTS** the County's Motion for the supervisory claims for
13  failure to train and failure to supervise and discipline.

14  **F. Survival Action and Economic Damages (Fifth Cause of Action)**

15        As stated in CCMG's Motion, "[f]or coverage purposes, this request for summary
16  judgment as to the issues in this subheading is withdrawn automatically should the Court
17  deny summary judgment as to any of the Section 1983 claims against any of these moving
18  defendants."  (Doc. 96-1 at 30.)  That subheading included CCMG's arguments concerning
19  the survival action.  (*See id.* at 30–32.)  Thus, because the Court denied summary judgment
20  to Defendants Freedland and Gatan on the § 1983 deliberate indifference claim, the Court
21  **DENIES AS MOOT** CCMG's Motion concerning the survival action.  While the CCMG
22  Defendants' argument concerning economic damages appears intertwined with the
23  survival claim, (*see id.* at 32), the CCMG Defendants argue Plaintiffs failed to present

24

25  _____

26  [23] To the extent Plaintiff argues Defendant Gore had notice of the deficiencies in the
27  NCCHC technical assistance report and failed to address them, (*see id.*), Plaintiff fails to
    link such an inference to evidence of a failure to train, an inadequate training program, or
28  a failure to supervise and discipline that constituted deliberate indifference.

evidence of economic damages separately from that claim, (*see id.* at 28.)   Accordingly, the Court will address the CCMG Defendants' arguments concerning economic damages.

The CCMG Defendants explain Plaintiff indicated that it seeks economic damages including medical bills, lost earnings, and property damage, the amount of which is subject to expert opinion. (*See* Doc. 96-1 at 28–29.)  However, they argue Plaintiff never disclosed a computation of damages or designated an expert to provide an opinion on economic damages. (*See id.*)  Plaintiff responds that, on June 21, 2022, it sent the CCMG Defendants an email containing a link which contained evidence of Wilson's lost wages and Plaintiff explained it would be happy to provide those documents to the Court. (*See* Doc. 113 at 50; Doc. 113-1, Declaration of Grace Jun ("Jun Decl.") ¶ 46.)  The CCMG Defendants respond that, despite producing 44 exhibits, Plaintiff failed to provide the documents it referenced to the Court and failed to provide a justification for failing to do so. (*See* Doc. 130 at 8.) The CCMG Defendants respond Plaintiff is seeking to surprise counsel at trial by failing to disclose their evidence of economic damages until years later and without a designated expert on damages. (*See id.*)  The CCMG Defendants note they reserve their right to file a motion to reopen discovery and augment their expert designation accordingly. (*See id.*)

To the extent Plaintiff disclosed evidence of lost wages to the CCMG Defendants during discovery, as CCMG acknowledges, (*see* Doc. 130 at 8), any failure to disclose such information in initial or subsequent disclosures is harmless.[24]  *See Maharaj v. California Bank & Tr.*, 288 F.R.D. 458, 463 (E.D. Cal. 2013) ("Plaintiff has shown that her failure to disclose that analysis is harmless since the information on which these damages are calculated is already in Defendant's possession.") (citing *Creswell v. HCAL Corp.*, No. 04cv388 BTM (RBB), 2007 WL 628036, at *2 (S.D. Cal. Feb. 12, 2007)).  The Court will reserve on other evidence of economic damages, including computation through expert

---

[24] As explained *supra* at II.A, a party need not supplement its initial or subsequent disclosures under Rule 26(e) if the information was otherwise made known to the other party during discovery.

testimony, for failure to disclose.

Thus, the Court **DENIES** CCMG's motion concerning economic damages.

## G. Negligence Action (Sixth Cause of Action)

As stated in CCMG's Motion, "[f]or coverage purposes, this request for summary judgment as to the issues in this subheading is withdrawn automatically should the Court deny summary judgment as to any of the Section 1983 claims against any of these moving defendants." (Doc. 96-1 at 30.) That subheading included CCMG's arguments concerning the negligence claim. (*See id.* at 30–32.) Thus, because the Court denied summary judgment to Defendants Freedland and Gatan on the § 1983 deliberate indifference claim, the Court **DENIES AS MOOT** CCMG's Motion concerning the negligence claim. Accordingly, the Court will only address the County's arguments for the negligence claim.

### 1. California Government Claims Act

The County argues Plaintiff cannot bring a negligence action against the County as a public entity due to the California Government Claims Act, which "provides that public entities cannot be held liable for injuries unless a statute provides for liability." (*See* Doc. 100-1 at 24.) As the Court previously explained, Plaintiff cannot assert a negligence claim against the County on a direct theory of liability without a statutory basis but can assert a claim against the County on a theory of *respondeat superior* liability for the alleged torts of its agents and employees. (*See* Doc. 62 at 48–49, 49 n.24.) Thus, Plaintiff's negligence claim against the County for *respondeat superior* liability may proceed.

### 2. Causation and Standard of Care

To the extent the County challenges the negligence claims against the individual nurse Defendants for a lack of individualized analysis of causation and the standard of care, (*See* Doc. 100-1 at 25), the Court rejects those arguments. As explained *supra* at II.B.2, Dr. Steinberg is qualified to render his opinion concerning causation of Wilson's death. This Court also rejected the County Defendants' *Daubert* motion challenging the expert opinion of Dr. Venters. (*See* Doc. 140.) The County does not specifically challenge Dr. Venter's opinions concerning the standard of medical care in correctional facilities and

deficiencies in the care Wilson received from the individual nurse Defendants.

Thus, the Court **DENIES** the County's Motion for the negligence claim against all County Defendants.

**H. Punitive Damages**

As stated in CCMG's Motion, "[f]or coverage purposes, this request for summary judgment as to the issues in this subheading is withdrawn automatically should the Court deny summary judgment as to any of the Section 1983 claims against any of these moving defendants." (Doc. 96-1 at 30.)  That subheading included CCMG's arguments concerning punitive damages.  (*See id.* at 30–32.)  Thus, because the Court denied summary judgment to Defendants Freedland and Gatan on the § 1983 deliberate indifference claim, the Court **DENIES AS MOOT** CCMG's Motion concerning punitive damages.  Accordingly, the Court will only address the County's arguments concerning punitive damages.

The County argues Plaintiff has not produced evidence of punitive damages against the County Defendants for either the federal law or state law claims.  (*See* Doc. 100-1 at 25.)  Plaintiff does not respond to these arguments.  Accordingly, the County argues Plaintiff has abandoned his claim for punitive damages.  (*See* Doc. 132 at 9–10.)

Under federal law, "[p]unitive damages may be awarded in 42 U.S.C. § 1983 cases if a defendant's conduct is driven by an evil motive or intent, or when it involves a reckless or callous indifference to the constitutional rights of others." *Booke v. Cnty. of Fresno*, 98 F. Supp. 3d 1103, 1131 (E.D. Cal. 2015).  "A plaintiff must show such conduct by a preponderance of the evidence." *Id.* (citations omitted).  "Under California law, a plaintiff may recover punitive damages if they can prove by clear and convincing evidence that the defendant acted with 'oppression, fraud, or malice.'" *AV Builder Corp. v. Houston Cas. Co.*, Case No. 20-CV-1679 W (KSC), 2021 WL 9474017, at *2 (S.D. Cal. Apr. 28, 2021) (quoting Cal. Civ. Code § 3294).

The Court may consider Plaintiff's failure to oppose the County's arguments against punitive damages as constituting waiver.  *See Samica Enters. LLC v. Mail Boxes Etc., Inc.*, 460 F. App'x 664, 666 (9th Cir. 2011) ("Arguments not raised in opposition to summary

judgment or in the opening brief before this court are waived."); *see also Montgomery v. Wal-Mart Stores, Inc.*, Case No. 12cv3057 AJB (DHB), 2015 WL 11234134, at *1 (S.D. Cal. Oct. 20, 2015) ("Partial summary judgment may be entered 'on all or any part of a claim,' which includes damages claims.") (quoting *Pinnacle Fitness & Recreation Mgmt., LLC v. Jerry & Vickie Moyes Family Trust*, 844 F. Supp. 2d 1078, 1093 (S.D. Cal. 2012)). The Court determines Plaintiff waived its punitive damages claim against the County Defendants.

Thus, the Court **GRANTS** the County's Motion concerning punitive damages.

## III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** CCMG's Motion and County's Motion as detailed herein.  Specifically, the Court:

1. **DENIES** CCMG and the County's Motions for deliberate indifference to serious medical needs (First Cause of Action);

2. **DENIES** the County' Motion for qualified immunity;

3. **DENIES** the County's Motion for the *Monell* claim regarding an omission in policy to check for missed medications for inmate-patients with serious medical needs (Fourth Cause of Action);

4. **DENIES** the County's Motion for the *Monell* claim regarding an omission in policy concerning receipt of all patient-specific medication, combining medication doses, and promptly administering delivered medication (Fourth Cause of Action);

5. **DENIES** the County's Motion for the *Monell* claim regarding a failure to adequately train concerning Sapphire symbol keys (Fourth Cause of Action);

6. **DENIES** CCMG's Motion for the *Monell* claim concerning an omission in policy and failure to train concerning reviewing medical records, including medication administration records, prior to making medical decisions (Fourth Cause of Action);

7. **GRANTS** the County's Motion for the supervisory claims for failure to train and failure to supervise and discipline against Defendant Gore (Second and Third Causes of Action);

8. **DENIES AS MOOT** CCMG's Motion for the wrongful death claim (Fifth

72

Cause of Action);

9.    **DENIES AS MOOT** CCMG's Motion for the survival claim (Fifth Cause of Action);

10.   **DENIES** CCMG's Motion concerning economic damages;

11.   **DENIES AS MOOT** CCMG's Motion for the negligence claim (Sixth Cause of Action);

12.   **DENIES** the County's Motion for the negligence claim (Sixth Cause of Action);

13.   **DENIES AS MOOT** CCMG's Motion for the punitive damages claim; and

14.   **GRANTS** the County's Motion for the punitive damages claim.

**IT IS SO ORDERED.**

DATE:  December 1, 2023

_____
HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE